**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| ADAM GRAD, on Behalf of Himself and All Others Similarly Situated,<br><br>           Plaintiff,<br><br>       v.<br><br>IRONNET, INC., KEITH B. ALEXANDER, JAMES C. GERBER, and WILLIAM E. WELCH,<br><br>           Defendants. | Civil Action No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Adam Grad ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Plaintiff's counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by IronNet, Inc. ("IronNet" or the "Company") and press releases and other public statements issued by, or about, the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of IronNet securities (the "Class") between September 15, 2021 and December 15, 2021, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

3.      Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d).  IronNet maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

5.     Plaintiff Adam Grad, as set forth in the accompanying certification incorporated by reference herein, purchased IronNet securities during the Class Period and has been damaged thereby.

6.     Defendant IronNet engages in the provision of cyber security services through its collective defense platform.  IronNet was founded in 2014 and is headquartered in McLean, Virginia.  The Company's common stock trades on the NYSE under the ticker symbol "IRNT."

7.     Defendant Keith B. Alexander ("Alexander") is a founder of IronNet and is its Co-Chief Executive Officer ("CEO") and Chairman of its Board of Directors (the "Board").

8.     Defendant William E. Welch ("Welch") is Co-CEO of IronNet and is a Board member.

9.     Defendant James C. Gerber ("Gerber") is IronNet's Chief Financial Officer ("CFO").

10.     Defendants Alexander, Welch, and Gerber are collectively referred to herein as the "Individual Defendants." Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about IronNet's business, operations, and present and future business prospects via internal corporate documents, conversations and

connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

11.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  Defendants' false and misleading statements and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

14.     Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IronNet securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding IronNet's business, operations, and present and future business prospects, and caused Plaintiff and the Class to purchase IronNet securities at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

15.     IronNet designs and develops solutions for cyber-attacks. It offers IronDefense, a network traffic analysis platform that delivers scalable behavioral analysis and integrated packet-level cyber hunt to detect advanced threats; and IronDome, a collective defense solution that delivers machine-speed visibility of potential threat campaigns targeting participant industry peers. The Company also provides a suite of technologies that provide real-time threat assessment and updates, behavioral modeling, big data analytics, and proactive responses; and consulting and training programs to protect against current and emerging threats. Its security solutions include collective defense, network traffic analysis, and cyber assessment tools. The Company serves energy and utilities, financial services, healthcare and life sciences, defense, and public sector industries.

- 4 -

16.     On August 27, 2021, IronNet became a publicly traded company via a merger (the "Merger") with LGL Systems Acquisition Corp. ("LGL"), a blank check company otherwise known as a special purpose acquisition vehicle ("SPAC").  Like other SPACs, LGL did not initially have any operations or business of its own.  Rather, it raised money from investors in an initial public offering and then later used the proceeds from the offering to acquire IronNet, which had been a private company.

17.     The proposed merger that would result in IronNet becoming a publicly traded company required approval of LGL shareholders.  In determining how to vote, LGL shareholders were provided with, among other things, IronNet's financial projections.

18.     On August 10, 2021, in anticipation of the Merger vote, IronNet updated its financial forecasts "[d]ue to shifts in the anticipated closing of several new customer contracts." It forecasted fiscal year 2022 ("FY 2022") (ended January 31, 2022) revenues of $43 million to $45 million and annual recurring revenue ("ARR") of $75 million, among other things, stating in relevant part:

**Update of Certain Forecasted Revenue Information**

IronNet remains on track to achieve $110.8 million in revenue in fiscal 2023, consistent with the internally prepared forecast included in proxy statement/prospectus relating to IronNet's proposed business combination with LGL Systems Acquisitions Corp.

Due to shifts in the anticipated closing of several large new customer contracts and the resulting impact to current year revenue recognition, IronNet now estimates that its fiscal year 2022 revenue will be between $43 and $45 million as compared to forecasted revenue of $54.2 million.  Investors are cautioned not to rely on the forecast in making a decision regarding the business combination, as the forecast may be materially different than actual results.

Although IronNet has not finalized its full financial results for its second fiscal quarter ended July 31, 2021, IronNet expects to report that its revenue for the six

- 5 -

months ended July 31, 2021 was approximately $13 million.  This estimated revenue is preliminary and unaudited, represents a management estimate and is subject to completion of IronNet's quarter end financial closing procedures.

Finally, IronNet has several pending large contracts that it expects to close in the third quarter of fiscal 2022.  Due to the increase in these larger contract opportunities, IronNet now expects its annual recurring revenue (ARR) to increase to $75 million by the end of fiscal 2022 and to continue its expansion to $129 million by the end of fiscal 2023.

19.     Based, in part, on these projections, on August 26, 2021, LGL shareholders voted to approve the Merger at a special shareholder meeting and the merged Company's stock began trading on the NYSE the next day.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

20.     On September 14, 2021, after market close, defendants issued a press release entitled "IronNet Announces Fiscal Second Quarter 2022 Financial Results," which announced disappointing revenue of $6.1 million for Q2 2022 (ended July 31, 2021) compared to $7.9 million for Q2 2021, which missed expectations by $1.3 million.  It further announced Q2 2022 ARR of $24.1 million compared to $19.5 million in Q2 2021 and a net loss of $17.2 million compared to $14.3 million for Q2 2021.

21.     Attempting to counteract the otherwise disappointing results, the press release reassured investors that the Company would still meet its financial guidance, as previously provided in connection with the Merger vote.  The press release stated:

William Welch, co-CEO of IronNet, commented, "***We are on target with our first half guidance*** and are encouraged to begin our journey as a public company this month following the recent completion of our business combination with LGL. ***New customer momentum so far in the second half of our fiscal year is strong*** and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group."

*     *     *

Outlook

"In the first half of fiscal 2022, IronNet was invited into larger deployments that shifted the anticipated closing of several large new customer contracts into the third quarter, including some that involve contracts for entire supply chain communities at once," said James Gerber, CFO of IronNet.  "Our cloud-based subscription revenue -- which grew to 60% of product revenue in the first half of the year, a 65% year-over-year growth rate -- is a strong proof point for the business and underscores the fully recurring aspect of our financial model.  ***Our cloud focus coupled with the large deal formation that we are seeing reflects IronNet's ease of deployment and increasing market recognition, which keeps us on pace to double ARR in the third quarter and meet our growth objectives for the full year.***"

***For the fiscal year 2022 and consistent with its most recent guidance for the year, IronNet currently still expects:***

- ***Revenue of $43-45 million***

- ***ARR of $75 million as of end of the fiscal year***

(Emphasis added).

22.     IronNet's reassurances had their intended effect.  The Company's stock price immediately skyrocketed 38%, or $8.81 per share, from a close of $23.32 per share on September 14, 2021 to a close of $32.13 per share on September 15, 2021.  By September 16, 2021, IronNet's stock price had doubled, reaching an intra-day high of $47.50 per share.

23.     Defendants' statements in paragraph 21, however, were materially false and misleading when made because they misrepresented and failed to disclose adverse facts about IronNet's business, operations and prospects which were known to defendants or recklessly disregarded by them as follows: (i) the Company had materially overstated its business and financial prospects; (ii) the Company was unable to predict the timing of significant customer opportunities which constituted a substantial portion of its publicly-issued FY 2022 financial

guidance; (iii) the Company had not established effective disclosure controls and procedures to reasonably ensure its public disclosures were timely, accurate, complete, and not otherwise misleading; and (iv) as a result, the Company's public statements were materially false, misleading, and/or lacked any reasonable basis in fact at all relevant times.

### THE TRUTH IS REVEALED

24.     On December 15, 2021, after market close, defendants issued a press release entitled "IronNet Reports Third Quarter Fiscal 2022 Financial Results," in which they slashed IronNet's FY 2022 guidance, which had been repeated shortly before the Merger vote and which was reaffirmed just months earlier.  The press release stated in relevant part:

> "Our prior outlook for both the quarter and fiscal year was supported by what we assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector.  *We had previously expected to finalize these opportunities in the second half of the fiscal year, however they remain pending primarily due to government delays in getting funding through to federal budgets.  These continue to be viable opportunities in our pipeline.  Given the difficulty in predicting when they will close, we have removed them from our ARR guidance.*  We will disclose any strategic contracts that are accretive to our revised fiscal year ARR outlook," said GEN (Ret.) Keith Alexander, Chairman and co-CEO of IronNet.
>
> *       *       *
>
> **Third Quarter Fiscal 2022 Financial & Operating Highlights**
>
> - **Revenue:** *$6.9 million compared to $7.0 million in the same quarter last year*
>   - Cloud subscription revenue grew to $3.8 million from $2.2 million in the same quarter last year
>   - Recurring product revenue, which is defined as revenue that is subscription-based, grew to $6.1 million, up from $4.4 million in the same quarter last year

- **Gross Margin:** 65.7% compared to 70.5% in the same quarter last year, with one-time cost of sales accounting charges accounting for 2.4% of the year over year decline

- **Operating loss:**

  - **GAAP:** $185.6 million, which includes $160.1 million in non-cash stock-based compensation expense and $1.6 million of transaction expenses, in both cases one-time, accounting-driven expenses triggered by the closing of the transaction this quarter, compared to $12.6 million in the same quarter last year

- **Net loss:**

  - **GAAP:** $193.1 million, which includes the one-time, accounting-driven expenses of $160.1 million and $1.6 million noted above as well as the additional one-time non-cash accounting-driven expense of $11.3 million related to the change in fair market value of the private warrants between the date of the closing and their exercise in late September and early October, compared to $12.5 million in the same quarter last year

  - **Non-GAAP Adjusted:** $20.2 million after excluding the one-time expenses described above

- **Annual Recurring Revenue (ARR):** _$27.5 million compared to $21.2 million at the end of the same quarter last year and $24.1 million at the end of the prior quarter_

*     *     *

**Outlook**

_For the fiscal year 2022, IronNet now expects:_

- _Revenue of approximately $26 million_

- _ARR of approximately $30 million to exit the fiscal year_

(Underline and italic emphasis added).

25.     On the analyst and investor call later that same day to discuss these surprising results, defendant Welch announced that the Company had fired its Chief Revenue Officer:

> Thank you, General.  We are very disappointed in our results.  We did not meet our targets and we know that is our responsibility.  We recognize the importance of becoming a more predictable business.
>
> First, I'd like to highlight a few changes to the team.  ***As disclosed in our Form 8-K filed today with our earnings release, we and Sean Foster, our Chief Revenue Officer, have mutually agreed that he will depart our company at the end of December to pursue other opportunities.***  I will provide increased oversight of the sales organization for as long as is needed.  Sean and I are working closely together between now and his departure to appropriately transition our sales efforts.  We greatly appreciate his commitments to our customers, we thank him and wish him well in his future endeavors.

(Emphasis added).

26.     On the call, defendants also admitted that, despite having first publicly issued IronNet's FY 2022 guidance in March 2021, they did not have any confidence as to when substantial revenues underlying the guidance would actually come in.  For example, defendants made the following statements during the call:

> [Alexander:] Our confidence remains high in the strategic opportunities.  ***We've revised our guidance for the year, and it reflects the fact that we aren't confident on what quarter they will actually come in***, but we see these as viable opportunities for the future.  We recognize that you want us to have a predictable business, and we can accomplish that with our transactional side, and we're going to do that, and these strategic deals will add momentum into our revenue as we move forward.
>
> *                *                *
>
> [Gerber:] I think you were just asking about our guidance for this year of the $26 million for revenue.  ***As we've noted, what we've significantly done here is to <u>completely remove</u> all of these larger strategic transactions that are still out there, but difficult to predict.  So, we've reset the guidance at this point to not include them.  Our guidance from August had included them.***  And so, we're setting ourselves up here, so that we can be sure that, as they come in and add materially to our number, that we get that information out.  We'll update our guidance accordingly. …

- 10 -

*       *       *

[Alexander:] Joe, let me just add in one final thing to hit in two sentences. T he transactional model that we're talking about, we believe, will put us right in line with what a high growth SaaS company should be.  And we're modeling our company on that, something that you can use to predict and forecast where we'll go.  We see the strategic deals as accelerants that will add to that model.  We're not taking them off the table.  ***It's just hard to say which quarter they will come in.*** Does that make sense, Joe?

(Emphasis added).

27.     On this news, IronNet's stock price plummeted from $6.80 per share on December 15, 2021 to a close of $4.66 per share the following day, a 31% decline, on abnormally high trading volume.

28.     The market for IronNet securities was open, well-developed and efficient at all relevant times.  As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, IronNet securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased IronNet securities relying upon the integrity of the market price of these securities and market information relating to IronNet, and have been damaged thereby.

29.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of IronNet securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

30.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about IronNet's business, operations, and prospects.  These material misstatements and omissions had the cause and effect of creating in the marketplace an unrealistically positive assessment of IronNet, its business, profitability, growth trends, and financial prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing IronNet securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

31.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding IronNet's management, competitive landscape, their control over, and/or receipt and/or modification of IronNet's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning IronNet, participated in the fraudulent scheme alleged herein.

32.     The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  Given their executive-level positions with IronNet, the Individual Defendants controlled the contents of IronNet's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

33.     Plaintiff also alleges that scienter of the Individual Defendants (who, as executive officers and control persons of the Company, knew or recklessly ignored facts related to the core operations of IronNet) can be imputed to IronNet.

34.     Given defendants' knowledge of and their misleading statements about IronNet's business and prospects made contemporaneously with that knowledge, defendants' materially false and/or misleading statements alleged herein were made willfully and caused IronNet's securities to trade at artificially inflated prices during the Class Period.

## LOSS CAUSATION

35.     As detailed herein, during the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of IronNet securities. This scheme operated as a fraud or deceit on Class Period purchasers of IronNet securities by

failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of IronNet securities declined significantly as the prior artificial inflation came out of the price of IronNet securities.

36.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of IronNet's business, prospects and operations.  Defendants' false and misleading statements had the intended effect and caused IronNet securities to trade at artificially inflated levels throughout the Class Period.  As a result of their purchases of IronNet securities at artificially inflated prices during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

37.     When the truth about the Company was revealed to the market, the price of IronNet securities fell significantly.  The decline began to remove the inflation from the price of IronNet securities, causing real economic loss to investors who had purchased these securities during the Class Period.  The declines in the price of IronNet securities when the corrective disclosure came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in IronNet securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

38.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of IronNet

securities and the subsequent significant decline in the value of these securities when defendants'

prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

39.     At all relevant times, the market for IronNet securities was an efficient market for

the following reasons, among others:

(a)     IronNet securities met the requirements for listing, and was listed and

actively traded on NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, IronNet filed periodic public reports with the SEC and

the NYSE;

(c)     IronNet regularly communicated with public investors via established

market communication mechanisms, including the regular dissemination of press releases

on national circuits of major newswire services, and other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

(d)     IronNet was followed by securities analysts employed by major brokerage

firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered

the public marketplace.

40.     As a result of the foregoing, the market for IronNet securities promptly digested

current information regarding the Company from all publicly available sources and reflected such

information in the price of IronNet securities.  Under these circumstances, all purchasers of IronNet

securities during the Class Period suffered similar injury through their purchase of these securities

at artificially inflated prices and a presumption of reliance applies.

- 15 -

41.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on defendants' material misstatements and/or

omissions.   Because this action involves defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects, information

that defendants were obligated to disclose, positive proof of reliance is not a prerequisite to

recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in making investment decisions.   Given the

importance of the Class Period material misstatements and omissions set forth above, that

requirement is satisfied here.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under the Private

Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements

pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-

existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false

may be characterized as forward looking, they were not adequately identified as "forward-looking

statements" when made and there were no meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the purportedly forward-

looking statements.  Furthermore, to the extent that the statutory safe harbor is determined to apply

to any forward-looking statements pleaded herein, defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of IronNet who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of IronNet during the Class Period.  Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IronNet securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IronNet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations, and management of IronNet; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, the defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 18 -

51.     These defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of IronNet securities during the Class Period.

52.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IronNet securities.  Plaintiff and the Class would not have purchased IronNet securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

53.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of IronNet securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

54.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of IronNet within the meaning of § 20(a) of the Exchange Act.

56.     By virtue of their positions as officers and/or directors of IronNet, and/or their beneficial ownership of IronNet common stock, the Individual Defendants had the power and authority to, and did, cause IronNet to engage in the wrongful conduct alleged.

57.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of IronNet securities during the Class Period.

58.     By reason of such conduct, the defendants named herein are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Designating Plaintiff as lead plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as lead counsel;

B.     Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.     Awarding Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  April 22, 2022                    **THE OFFICE OF CRAIG C. REILLY, ESQ.**


                                          */s/ Craig C. Reilly*
                                          ────────────────────────────────
                                          CRAIG C. REILLY
                                          VSB # 20942
                                          209 Madison Street
                                          Suite 501
                                          Alexandria, VA 22314
                                          Telephone: (703) 549-5354
                                          Facsimile: (703) 549-5355
                                          craig.reilly@ccreillylaw.com

                                          **JOHNSON FISTEL, LLP**
                                          MICHAEL I. FISTEL
                                          40 Powder Springs Street
                                          Marietta, GA  30064
                                          Telephone: 470.632.6000
                                          Facsimile: 770.200.3101
                                          michaelf@johnsonfistel.com

                                          *Attorneys for Plaintiff*

- 21 -