UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| ADAM GRAD, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>IRONNET, INC., et al., )<br><br>Defendants. ) | Civil Action No. 1:22-cv-00449-RDA-JFA<br><br>CLASS ACTION |

**SHIRLEY GUTHRIE, YONG KIM, AND ROGER CAROWAY'S REPLY BRIEF IN
SUPPORT OF MOTION FOR APPOINTMENT
AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL**

- 1 -

4890-7405-5976.v1

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................1

STATEMENT OF MATERIAL PROCEEDINGS FOR APPOINTMENT AS
        LEAD PLAINTIFF .............................................................................................1

REPLY ARGUMENT .....................................................................................................3

I.      THE IRONNET INVESTOR GROUP QUALIFIES A "GROUP OF PERSONS"
        WHO MAY BE SELECTED AS LEAD PLAINTIFF........................................3

II.     INADVERTENT AND IMMATERIAL ERRORS IN A MOVANT'S
        CERTIFICATION ARE NOT DISQUALIFYING ..............................................7

III.    MR. SHUNK DOES NOT MEET THE TYPICALITY AND ADEQUACY
        REQUIREMENTS.................................................................................................8

        A.      Determining Rule 23 Typicality for Lead Plaintiff..................................9

        B.      Mr. Shunk is Incapable of Adequately Representing the Class and is
                Subject to Unique Defenses ...................................................................12

IV.     CONCLUSION....................................................................................................13

4890-7405-5976.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Andrada v. Atherogenics, Inc.*,
2005 WL 912359 (S.D.N.Y. Apr. 19, 2005)............................................................................12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................................................10

*Chamblee v. Terraform Power, Inc.*,
2016 WL 4039178 (D. Md. July 28, 2016).................................................................................7

*Chill v. Green Tree Fin. Corp.*,
181 F.R.D. 398 (D. Minn. 1998).................................................................................................8

*City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology Holdings, Inc.*,
2010 WL 2000040 (D. Idaho May 19, 2010) .............................................................................7

*Ferrari v. Gisch*,
225 F.R.D. 599 (C.D. Cal. 2004) ...............................................................................................8

*Hansen v. Ferrellgas Partners, L.P.*,
2017 WL 281742 (S.D.N.Y. Jan. 19, 2017) ...............................................................................8

*Hirtenstein v. Cempra, Inc.*,
2017 WL 2874588 (M.D.N.C. July 5, 2017)..............................................................................6

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001).......................................................................................................3

*In re Elan Corp. Sec. Litig.*,
2009 WL 1321167 (S.D.N.Y. May 11, 2009) ..........................................................................12

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004)
*vacated on other grounds* 471 F.3d 24 (2d Cir. 2006)..............................................................8

*In re MicroStrategy Inc. Sec. Litig.*,
110 F. Supp. 2d 427 (E.D. Va. 2000) ............................................................................ *passim*

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................................10

*In re Mills Corp.*,
2006 WL 2035391 (E.D. Va. May 30, 2006) .............................................................................7

*In re Red Hat, Inc. Sec. Litig.*,
261 F.R.D. 83 (E.D.N.C. 2009) .................................................................................................8

4890-7405-5976.v1

**Page**

*In re SLM Corp. Sec. Litig.*,
    2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) .............................................................................8

*Klugmann v. Am. Cap. Ltd.*,
    2009 WL 2499521 (D. Md. Aug. 13, 2009) ......................................................................6, 7

*Niederklein v. PCS Edventures!.com, Inc.*,
    2011 WL 759553 (D. Idaho Feb. 24, 2011)..............................................................................8

*Palm Tran, Inc. – Amalgamated Transit Union Local 1577 Pension Plan v.*
    *Emergent Biosolutions Inc.*,
    2021 WL 6072812 (D. Md. Dec. 23, 2021)..............................................................................7

*Patel v. Reata Pharm., Inc.*,
    549 F. Supp. 3d 559 (E.D. Tex. 2021)...............................................................................12, 13

*Rice v. Genworth Fin. Inc.*,
    2017 WL 3699859 (E.D. Va. Aug. 25, 2017)...........................................................................7

*Shah v. GenVec, Inc.*,
    2012 WL 1478792 (D. Md. Apr. 26, 2012) ..............................................................................6

*Tchatchou v. India Globalization Cap., Inc.*,
    2019 WL 1004591 (D. Md. Feb. 28, 2019) ..............................................................................6

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77b(a)(1) ...............................................................................................................................11
    §78j(b)...................................................................................................................................1, 9
    §78t(a) ......................................................................................................................................1
    §78u-4(a)(3)(A)(i).....................................................................................................................2
    §78u-4(a)(3)(B)(i) .................................................................................................................1, 3
    §78u-4(a)(3)(B)(iii)...................................................................................................................2
    §78u-4(a)(3)(B)(iii)(I)...............................................................................................................3
    §78u-4(a)(3)(B)(iii)(II) ...........................................................................................................13

Federal Rules of Civil Procedure
    Rule 23 ..........................................................................................................................1, 2, 8, 9
    Rule 23(a)(3).............................................................................................................................9
    Rule 23(a)(4).............................................................................................................................9

Local Civil Rule
    83.1(F).....................................................................................................................................5

4890-7405-5976.v1

**INTRODUCTION**

As shown in their opening brief, Shirley Guthrie, Yong Kim, and Roger Caroway (the "IronNet Investor Group") meets all the qualifications for appointment as lead plaintiff as its members: (i) timely moved for appointment; (ii) suffered substantial losses (collectively, over $500,000); and (iii) satisfy the Rule 23 typicality and adequacy requirements (ECF 24 at 4-6). James Shunk does not contest the timeliness of the IronNet Investor Group's motion but makes the following arguments against its appointment: (i) the IronNet Investor Group is "inadequate" because its members are "unrelated" (ECF 38 at 3-4, 8-9); and (ii) the IronNet Investor Group should be disqualified because of an error in one member's initial loss calculations (*Id*. at 4, 9-10), even though Mr. Shunk concedes that the error is ***not material***. *Id*. at 10 n.5. As shown below, these arguments lack merit.

The IronNet Investor Group is a proper "group" that meets all of the Private Securities Litigation Reform Act of 1995's ("PSLRA") lead plaintiff requirements, and Ms. Guthrie's inadvertent (and subsequently corrected) omission in her Certification fails to rebut the presumption that the IronNet Investor Group is the "most adequate plaintiff" to represent the class as lead plaintiff in this action.

**STATEMENT OF MATERIAL PROCEEDINGS FOR APPOINTMENT AS
LEAD PLAINTIFF**

This is a putative securities fraud class action filed pursuant to the PSLRA on behalf of purchasers of securities issued by IronNet, Inc. ("IronNet") between September 15, 2021 and December 15, 2021, inclusive (the "Class Period"). The complaint alleges that IronNet and certain company officers violated §10(b) and §20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

The PSLRA requires that the Court appoint a lead plaintiff for the alleged class, who the Court determines to be the "most adequate plaintiff." *See* 15 U.S.C. §78u-4(a)(3)(B)(i). The

- 1 -

PSLRA sets forth a sequential procedure for making the lead plaintiff determination: (i) publication of notice of the action; (ii) timely filing of lead plaintiff motions; and (iii) the Court's determination of which candidate is the "most adequate plaintiff." The PSLRA also specifies certain requirements that a candidate must meet to be named lead plaintiff, including having "the largest financial interest" among the movants and meeting the typicality and adequacy requirements of Rule 23. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii). The PSLRA creates a ***rebuttable presumption*** that the movant who initially satisfies these requirements is the "most adequate plaintiff."

The plaintiff who filed the action published suitable notice of the pendency of this action. 15 U.S.C. §78u-4(a)(3)(A)(i). In response to the notice, the IronNet Investor Group moved for appointment as lead plaintiff and approval of their selection of lead and liaison counsel for the putative class. ECF 23. Four individuals also filed lead plaintiff motions: Xiao Ping Diana Dai (ECF 15); Todd M. Frenchman (ECF 16); Chris Reimer (ECF 19); and Mr. Shunk (ECF 26).

After these lead plaintiff motions were filed, the Court entered an order directing all movants to file "Response papers to any Lead Plaintiff Motion on or before July 6, 2022." ECF 30. As his response, Mr. Reimer stated that he did not oppose any other lead plaintiff motion, acknowledging that he does not have "the 'largest financial interest' in this litigation within the meaning of the PSLRA," and essentially conceding that he is not the "most adequate plaintiff." ECF 31.[1] Ms. Dai and Mr. Frenchman each withdrew their lead plaintiff motions. ECF 32-33. Thus, only the IronNet Investor Group and Mr. Shunk continue to seek appointment as lead plaintiff.

The IronNet Investor Group's opposition demonstrated that although Mr. Shunk reported the largest losses, 92% of his losses resulted from option trades rather than purchases of common stock, rendering him unable to meet the typicality and adequacy criteria for selection as lead plaintiff to represent a class largely consisting of stockholders. ECF 37. Aware of his dubious qualifications

---

[1]   Unless otherwise noted herein, all emphasis is added and citations and footnotes are omitted.

for lead plaintiff by virtue of his being an options trader, Mr. Shunk filed a brief "in further support of" his lead plaintiff motion combined with an opposition to the IronNet Investor Group's lead plaintiff motion.  ECF 38.  As directed by the Court, in support of its lead plaintiff motion, the IronNet Investor Group hereby replies to Mr. Shunk's arguments.

REPLY ARGUMENT

**I.      THE IRONNET INVESTOR GROUP QUALIFIES AS A "GROUP OF PERSONS" WHO MAY BE SELECTED AS LEAD PLAINTIFF**

Relying on caselaw from outside this District and pejorative labels (like "lawyer-driven"), Mr. Shunk argues that the IronNet Investor Group is "inadequate" to lead the class because it is a group of "unrelated" persons, "cobbled together … for the sole purpose of aggregating their losses," who failed to demonstrate "how the group intends to resolve disagreements and its decision-making process" ECF 38 at 8-9.  Those formulaic arguments find no footing in the law and the facts of this case.

The PSLRA does not ban a "group" of investors from being selected as lead plaintiff, nor even discourage that.  Rather, the PSLRA explicitly "provides in plain terms that the presumptive lead plaintiff may be a 'person *or* group of persons.'"  *In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 434 (E.D. Va. 2000) (quoting 15 U.S.C. §78u-4(a)(3)(B)(iii)(I) and citing 15 U.S.C. §78u-4(a)(3)(B)(i)) (emphasis in original).  Thus, it is a "now-common" practice for "unrelated" class members to form a group "to be named lead plaintiffs jointly."  *Id.*; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) (rejecting that the PSLRA "invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff," finding it decisive that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class'").  Thus, the IronNet Investor Group's lead plaintiff motion is well within the statutory parameters.

- 3 -

To enable the Court to determine whether to select a group as lead plaintiff, the group must "'explain and justify its composition and structure to the court's satisfaction.'" *MicroStrategy*, 110 F. Supp. 2d at 435.  In that analysis, the Court "may consider all relevant factors, such as 'descriptions of [the group's] members, including any pre-existing relationships among them; an explanation of how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation.'" *Id*.  "This approach, which relies on no single factor, allows a district court maximum flexibility to select a lead plaintiff who will best represent the interests of the class and exercise control of the litigation." *Id*.  The IronNet Investor Group easily satisfies these factors.

Judge Ellis adhered to this approach in appointing a group of unrelated investors as lead plaintiff in *MicroStrategy* finding it decisive that the group was small and had discussed "joining together as co-lead plaintiffs" prior to making a joint lead plaintiff motion, "which bodes well for coordination and cohesiveness among the group in the future."  110 F. Supp 2d at 439.  The same circumstances are found here.  The IronNet Investor Group also is small (three members), and the members conferred prior to filing their motion: "Before filing this motion, we communicated with counsel, and with each other, regarding this case.  This included discussions and other communications about the claims against defendants, serving jointly as lead plaintiff, and ensuring that the class's claims will be efficiently and zealously prosecuted by our oversight of our proposed lead counsel."  ECF 25-8 at ¶8 (Joint Declaration).  The IronNet Investor Group members "considered the benefits and potential drawbacks of proceeding individually or jointly as lead plaintiff," and due to the complex nature of the case, concluded that each member has "the incentive, ability, and desire to work together to control the litigation and maximize the recovery for the class. We agree that jointly seeking appointment as lead plaintiff is in the class's best interest in this case to ensure comprehensive, responsible, and vigorous representation of the class throughout the case."

- 4 -

*Id*. at ¶5.  These facts dispel Mr. Shunk's trumped-up concerns about the ability of the members of the IronNet Investor Group to act as a coherent and cohesive group.

Furthermore, the members of the IronNet Investors Group fully recognized the responsibilities they would assume as lead plaintiff:

> We understand that our duties as lead plaintiff include overseeing and monitoring the progress of the litigation and coordinating with counsel to vigorously prosecute the case on behalf of the class.  In performing these duties, we will, among other things, review significant pleadings and motion papers, obtain regular status reports on the progress of the litigation, participate in discovery, and have input into litigation decisions, including settlement negotiations.

*Id.* at ¶6.  And they further pledged that this would not be "lawyer-driven" litigation: "If appointed as lead plaintiff, we will work jointly to monitor and direct the efforts and activities of our proposed lead counsel, Johnson Fistel, LLP and Robbins Geller Rudman & Dowd LLP, in the prosecution of this action."  *Id*. at ¶7.  And finally, they set up lines of communications to address issues as they arose and make joint decisions.  *Id*. at ¶9.  Under the flexible, multi-factor analysis adopted by Judge Ellis in *MicroStrategy*, the IronNet Investor Group has sufficiently explained and justified its composition, operational structure, and lines of communication.

Moreover, the Court should give no weight to Mr. Shunk's contention that this will be "lawyer-driven" litigation if the IronNet Investor Group is appointed simply because three law firms would be involved – two firms as lead counsel (Johnson Fistel and Robbins Geller) and one as liaison counsel (Mr. Reilly).[2]  In *MicroStrategy*, the members of the lead plaintiff group also selected two firms as lead counsel (Milberg Weiss Bershad Hynes & Lerach LLP and Wolf Haldenstein Adler Freeman Herz LLP), with a third firm acting as liaison counsel (Richards McGettigan Reilly & West PC).  110 F. Supp. 2d at 440-41.  Judge Ellis found that the group's desire "to proceed with

---

[2]  The proposed lead counsel are nationally recognized class action litigators.  *See* ECF 24 at 6-8. Proposed liaison counsel serves as "local counsel" as required by Local Civil Rule 83.1(F) and has been counsel of record in numerous securities class actions in this Court.  *Id*. at 7-8.

two law firms as lead counsel was reasonable," that "allowing these two firms to act jointly would benefit the class," and that a two-firm lead counsel structure "is not complex" but would allow the firms "to share resources and divide labor" for the benefit of the class. *Id*. at 440-41. Thus, Mr. Shunk's criticisms are unfounded – indeed, contrary to beneficial dynamics of having more than one lead counsel.

In his brief (ECF 38 at 9 n.3), Mr. Shunk cites to an earlier passage in the *MicroStrategy* lead plaintiff decision where a different five-member group, which was not selected as lead plaintiff, had been questioned for proposing three law firms to serve as co-lead counsel. As Judge Ellis makes clear, however, proposing three firms was the least of the problems with that group's lead plaintiff motion as, more importantly, the group also "failed to present evidence with respect to its formation, its operational structure, or whether the members of the group had ever communicated with one another about their roles." *MicroStrategy*, 110 F. Supp. 2d at 437. The proposal of a three-firm lead structure merely suggested that the group lacked coherence, while the absence of evidence about "its formation" and "operational structure" as well as the failure to have communicated prior to making a joint motion were fatal flaws. *Id*. In contrast, the IronNet Investor Group made a full and proper disclosure of its formation and operational structure and proposes a two-firm lead counsel structure plus liaison counsel, like the one approved in *MicroStrategy*.

Finally, each member of the IronNet Investor Group *individually* suffered a larger loss than Mr. Riemer, the only other non-disqualified movant, and "courts have routinely approved of group appointments, ***especially where the groups are small and include individuals who independently possess largest financial interests in the outcome of the litigation***." *Klugmann v. Am. Cap. Ltd.*, 2009 WL 2499521, at *4 (D. Md. Aug. 13, 2009); *see also Shah v. GenVec, Inc.*, 2012 WL 1478792, at *2 (D. Md. Apr. 26, 2012) (quoting and following *Klugmann* to appoint a group); *Hirtenstein v. Cempra, Inc.*, 2017 WL 2874588, at *4 (M.D.N.C. July 5, 2017) (same); *Tchatchou v. India*

- 6 -

*Globalization Cap., Inc.*, 2019 WL 1004591, at *6-*8 (D. Md. Feb. 28, 2019) (following *Klugmann* and appointing a group of unrelated individuals); *Chamblee v. Terraform Power, Inc.*, 2016 WL 4039178, at *1 (D. Md. July 28, 2016) (same).[3]

Accordingly, the Court should reject Mr. Shunk's arguments that the IronNet Investor Group is an inadequate group.

## II.   INADVERTENT AND IMMATERIAL ERRORS IN A MOVANT'S CERTIFICATION ARE NOT DISQUALIFYING

Mr. Shunk's criticisms about the inadvertent and immaterial error in Ms. Guthrie's Certification should also be rejected. Mr. Shunk himself begrudgingly concedes that the error is immaterial (ECF 38 at 10 n.5), and such inadvertent errors are common and do not cast doubt on the movant's truthfulness or ability to lead the class. For example, in *MicroStrategy,* between the first and second round of lead plaintiff motions, it was discovered that one member of the group ultimately selected as lead plaintiff had "misstated" its losses, which, when corrected, increased from about $775,000 to over $900,000. 110 F. Supp. 2d at 438 & n.27. Judge Ellis excused that error of about $125,000 – far greater than Ms. Guthrie's error – as mere "lawyer oversight" and appointed the movant as lead plaintiff. And, the cases are legion in which inadvertent and immaterial miscalculations in a certification are deemed an insufficient basis on which to disqualify a lead plaintiff candidate. *E.g.*, *City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology Holdings, Inc.*, 2010 WL 2000040, at *6 (D. Idaho May 19, 2010) ("Inadvertent mistakes made in the sworn

---

[3]   *See also Rice v. Genworth Fin. Inc.*, 2017 WL 3699859 (E.D. Va. Aug. 25, 2017) (Payne, Senior U.S. Dist. J.) (denying appointment of movant with the largest financial interest due to unique defenses, and appointing a group of two and approving appointment of two firms as lead counsel); *In re Mills Corp.*, 2006 WL 2035391 (E.D. Va. May 30, 2006) (Lee, J.) (appointing a group of two as lead plaintiff and approving two firms as lead counsel); *Palm Tran, Inc. – Amalgamated Transit Union Local 1577 Pension Plan v. Emergent Biosolutions Inc.*, 2021 WL 6072812, at *5 (D. Md. Dec. 23, 2021) ("Not having a pre-litigation relationship does not disqualify a group" and appointing group based on its declaration demonstrating the group's ability and willingness to work together.).

certification that do not strike at the heart of the proposed plaintiff's ability to be truthful in representing the class generally do not serve as a basis for disqualification.").[4]

Here, the omission from Ms. Guthrie's Certification was inadvertent and immaterial, and she quickly, forthrightly, and voluntarily corrected the error (ECF 34), a correction which should be encouraged, not punished. *See Hansen v. Ferrellgas Partners, L.P*., 2017 WL 281742, at *5 (S.D.N.Y. Jan. 19, 2017) (courts should be "extremely reluctant to impose a rule that would force lead plaintiff movants to choose between leaving mistakes in their filings uncorrected or correcting the mistake and being summarily disqualified," especially where, like here, the corrections fall "well short of 'proof' that the [movant] 'will not fairly and adequately protect the interests of the class'"). In sum, Ms. Guthrie's corrected Certification is not grounds to disqualify her or the IronNet Investor Group from consideration for selection as lead plaintiff.

## III.   MR. SHUNK DOES NOT MEET THE TYPICALITY AND ADEQUACY REQUIREMENTS

While Mr. Shunk claims to have suffered the largest financial loss – about $776,772 as compared to the IronNet Investor Group's losses of about $500,000 – the analysis does not end

---

4   *Accord, e.g.*, *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at * 8 (S.D.N.Y. Jan. 24, 2012) ("[c]ourts routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive the court or the parties"); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 98-99 (S.D.N.Y. 2004) ("The temporary omission of certain transactions from class representatives' disclosures does not call into question the overall validity of their claim that they lost money because of defendants' manipulation of securities markets."), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006); *Niederklein v. PCS Edventures!.com, Inc.*, 2011 WL 759553, at *11 (D. Idaho Feb. 24, 2011) ("minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement"); *Ferrari v. Gisch*, 225 F.R.D. 599, 605 (C.D. Cal. 2004) (holding that "relatively minor miscalculations" of losses suffered by the presumptive most adequate plaintiff were not a legitimate basis for disqualification for lead plaintiff appointment); *see also Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 410-11 (D. Minn. 1998) (allowing presumptive most adequate plaintiff group to supplement certifications in order to correct technical deficiencies); *cf. In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 89 (E.D.N.C. 2009) (at the more stringent class certification stage, court rejected defendants' arguments that a lead plaintiff was inadequate due to possible errors in certification because "they were not the result of any intentional misrepresentation").

there. Mr. Shunk must also demonstrate that he meets Rule 23's typicality and adequacy criteria, something he has not, and cannot do. As a purchaser of call options – which constitute 92% of his losses – he is "an atypical investor" who engaged in transactions different from those "a typical investor contemplates," *i.e.*, purchases of common shares. *MicroStrategy*, 110 F. Supp. 2d at 436-37 (rejecting options trader as lead plaintiff movant). In their response, the IronNet Investor Group cited numerous cases declining to appoint movants who traded primarily in options because they are atypical investors. *See* ECF 37 at 3-6. And, because Mr. Shunk's options trades subject him to unique defenses, he is inadequate to represent the interests of the class.

A.      **Determining Rule 23 Typicality for Lead Plaintiff**

To find "typicality," the Court must "determine (i) whether the movant's 'claims or defenses . . . are typical of the claims or defenses of the class' and (ii) whether the movant 'will fairly and adequately protect the interests of the class.'" *MicroStrategy*, 110 F. Supp. 2d at 435 (quoting Fed. R. Civ. P. 23(a)(3)-(4)). "A person's claim is 'typical' 'when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id*. As shown below, under this criteria, an option trader's claims are "*atypical*," and so Mr. Shunk fails to meet the Rule 23 typicality requirement for selection as lead plaintiff.

The fraud claim at issue is brought under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder. ECF 1 at ¶2 (Complaint). "To establish liability under Section 10(b) of the Exchange Act and under Rule 10b-5, a plaintiff must allege that '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 628 (E.D. Va. 2000). To satisfy the third element, reliance, this class action

invokes the fraud-on-the-market theory.  ECF 1 at ¶¶39-41 (Complaint).  That well-established theory, has been explained as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. … Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. … The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  In this sort of claim, a purchaser of common stock is a *typical* investor, while an options trader is *atypical*.

In a typical securities fraud case under Rule 10b-5, like this action, defendants make false statements of material fact regarding the company's operations or business that inflate the value of the company's stock.  A *typical* investor buys common stock in an open and developed market at the falsely inflated price believing it accurately represents the stock's actual value, and suffers losses that are the difference between the purchase price and the actual value on the date of purchase.  Simple and direct.

To be sure, Mr. Shunk did purchase *some* common stock and suffered some losses that fit this typical pattern.  However, *92%* of his losses resulted from trading in options contracts in which he *did not purchase shares* of IronNet stock in an open and developed market.  Instead, in most transactions, Mr. Shunk purchased "call options" (ECF 27-3 (Mr. Shunk's Certification), which are "contract[s] that give the buyer the right to buy shares of an underlying stock at the strike price . . . for a specified period of time."  *See Investor Bulletin: An Introduction to Options* (SEC Mar. 18, 2015).[5]  Self-evidently, the first difference is that the option buyer has not made a purchase of common stock, but merely acquired the right to purchase common stock at a future date.

---

[5]    https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions.  Certainly, a call option meets the broad federal definition of a "security."  *See* 15 U.S.C. §77b(a)(1).  But given the

- 10 -

The first entry on Mr. Shunk's Schedule A (ECF 27-3) certifying his transactions provides a suitable illustration of his options trading:

| Date | Transaction Type | Security | Quantity | Price Per Share |
|---|---|---|---|---|
| 11/9/21 | BTO | IRNT 01/20/2023 Call $10.00 | 10 | $3.80 |

On November 9, 2021, IronNet common stock was priced at $11.08 per share.[6] On November 9, 2021, Mr. Shunk made a *call* option contract giving him the option to buy **10** shares of IronNet stock **(IRNT)** at the "strike price" of **$10.00**, which right expired on **01/20/23** (the "expiry date"), for which he paid an option price of **$3.80** per optioned share. In fact, this is just one of 18 call option transactions that Mr. Shunk made that day, and one of over a hundred he made during the Class Period. These were "**BTO**" transactions, meaning "buy to open," which are generally used by traders to open option positions in a stock. Obviously, Mr. Shunk's claim, based almost entirely on options trading losses, is neither simple nor direct.

On November 9, 2021, Mr. Shunk did not make these call option transactions in reliance on that day's quoted price of $11.08. Rather, he was speculating that sometime prior to the expiry date (01/20/23), the price would exceed $13.80 – that is, the strike price ($10.00) plus the cost of the option ($3.80) – and he would then realize a bargain by exercising his call option at the $10.00 strike price and, in SEC parlance, would be "in the money." If the stock does not attain that price on or before the expiry date, however, his call option, in SEC parlance, would be "out of the money."

Unlike the *typical* investor, who decides to purchase common stock at the quoted (but inflated) price as set by an open and defined market, Mr. Shunk was speculating that he could

---

wide variety of interests that are "securities," separating the typical from the atypical is necessary in a securities fraud class action.

[6]   On November 9, 2021, Mr. Shunk also purchased 1,000 shares of IronNet common stock at $11.08 per share (ECF No. 27-4) (Mr. Shunk's loss chart).

profitably buy a share of common stock at the strike price sometime in the future when the stock price was even higher. Mr. Shunk's trading decisions to speculate on a future purchase by agreeing to a strike price, options price, and expiry date, involve myriad factors beyond those involved in a simple purchase of shares at today's price, and so his transactions are ***atypical***.

Therefore, district courts frequently rule that individuals trading primarily in call options are "atypical and inadequate" lead plaintiff candidates because their option trading "would introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates." *In re Elan Corp. Sec. Litig.*, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009); *accord*, *e.g.*, *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (rejecting lead plaintiff application of call options purchaser because the group was "atypical" and would introduce "factual issues" such as "the maturity, the volatility of the price of the [company's] stock, the level of short term interest rates, and the competitive structure of the market in which the options were traded" that may "'become the focus of the litigation'" to the detriment of the class). As demonstrated in the IronNet Investor Group's opposition, these same considerations apply where, as here, the lead plaintiff movant's losses resulted ***primarily***, though ***not exclusively***, from call options. *See* ECF 37 at 3-6; *Patel v. Reata Pharm., Inc.*, 549 F. Supp. 3d 559, 566-68 (E.D. Tex. 2021) (rejecting call options purchaser as lead plaintiff movant).[7] These holdings compel a finding that Mr. Shunk is an ***atypical*** investor, and that he should not be selected to lead the class.

**B.      Mr. Shunk is Incapable of Adequately Representing the Class and is Subject to Unique Defenses**

Even if Mr. Shunk satisfied the typicality criteria (which he does not), any ***presumption*** that he is the "most adequate plaintiff" is rebutted because he is "'subject to unique defenses'" that render

---

[7]     Conversely, as set forth in the IronNet Investor Group's opposition, Ms. Guthrie, who does not claim any ***losses*** from her options trading, but merely offset her common stock losses with the $9,000 gain from her minimal options trading, is not atypical since all of the ***losses*** she suffered were from trades in IronNet common stock. *See* ECF 37 at 7 n.3 (citing cases).

him "'incapable of adequately representing the class.'" *MicroStrategy*, 110 F. Supp. 2d at 436 (quoting 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)).  Several district courts have held that a call options purchaser is subject to "'unique defenses' concerning damages," which serves to rebut the movant's status as the ***presumptive*** "most adequate plaintiff." *E.g.*, *Patel*, 549 F. Supp. 3d at 568-69 (citing cases on point).  Specifically, "'the price and value of a single share of common stock is very different from the price and value of a single call option' because '[t]he options' valuable lives are limited, their value is conditional, and there is a large disparity between their price and their potential value.'" *Id*. at 569.  Thus, "'comparing damage calculations for purchasers of stock and purchasers of options is like "comparing apples to oranges."'" *Id*.  For these same reasons, Mr. Shunk is potentially subject to unique defenses concerning damages and therefore is ineligible to serve as lead plaintiff.

Finally, even though Mr. Shunk is neither typical nor adequate to lead the class, he remains a member of the class, and there is no need to create a separate class (or sub-class) for options purchasers. *See MicroStrategy*, 110 F. Supp. 2d at 440 (declining to create a call options sub-class). And, while option traders are not typical or adequate to lead the stockholder class, the stockholders' and option traders' interests are "sufficiently similar" that a stockholder is an adequate plaintiff to serve as lead plaintiff of a class comprising both stockholders and options-holders. *Id*.  Therefore, because the IronNet Investor Group suffered losses only from stock trades, it is an adequate lead plaintiff for all potential claimants.

## IV.    CONCLUSION

For the reasons argued above and in the IronNet Investor Group's prior submissions (ECF 23-25, 34, 37), the Court should grant its motion for appointment as lead plaintiff, deny the other movants' motions, and approve the IronNet Investor Group's proposed counsel.

DATED:  July 11, 2022

Respectfully submitted,

THE OFFICE OF CRAIG C. REILLY
CRAIG C. REILLY, VSB #20942


_/s/ Craig C. Reilly_
CRAIG C. REILLY

209 Madison Street, Suite 501
Alexandria, VA  22314
Telephone:  703/549-5354
703/549-5355 (fax)
craig.reilly@ccreillylaw.com

Local Counsel

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS (259916)
JENNIFER N. CARINGAL (286197)
MICHAEL ALBERT (301120)
JUAN CARLOS SANCHEZ (301834)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
malbert@rgrdlaw.com
jsanchez@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead Plaintiff

- 14 -