# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

*In re IronNet, Inc. Securities Litigation*

**Case No. 1:22-cv-00449-RDA-JFA**

<u>CLASS ACTION</u>

# AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 1

II.    JURISDICTION AND VENUE ...................................................................... 8

III.   PARTIES ......................................................................................................... 9

IV.    SUBSTANTIVE ALLEGATIONS ............................................................... 10

       A.     Background ......................................................................................... 10

       B.     Defendants Take IronNet Public Through A SPAC Merger To Sell Investors On
              The Company's Future ....................................................................... 12

       C.     Defendants Continue to Conceal That the Guidance Materially Depended on
              Large and Unprecedented Public Sector Deals That Had No Realistic Chance of
              Providing Revenue in FY22 ................................................................ 17

       D.     Defendants Knowingly and Repeatedly Reaffirm IronNet's Radically
              Unachievable Guidance As a Public Company – Deceiving Investors ............... 19

       E.     Analysts Paid Close Attention to IronNet's ARR and Revenue Guidance – the
              Supposed Basis for Its Growth .......................................................... 22

       F.     After Touting IronNet's Guidance, Defendant Alexander Opportunistically Sells
              85% of His Available IronNet Shares For Over $5 Million ................................. 23

       G.     IronNet Finally Reveals Its Guidance Never Had Any Basis, Startling the Market
              and Sending IronNet Stock into Free Fall .......................................... 26

       H.     IronNet Fires Nearly 20% of Its Work Force, Analysts Begin to Track the NDAA
              in Relation to IronNet, and IronNet's Large Deals *Still* Fail to Transpire ............ 29

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 31

       A.     The September 14, 2021 Statements ................................................... 31

       B.     The September 20, 2021 Statements ................................................... 38

       C.     The September 22, 2021 Misstatements ............................................. 40

       D.     September 28, 2021 Misstatements .................................................... 43

       E.     The September 30, 2021 Misstatements ............................................. 46

VI.    DEFENDANTS REVEAL THE TRUTH: IRONNET'S GUIDANCE WAS
       UNREALISTIC AND UNACHIEVABLE ................................................... 50

VII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 53

    I.   Defendants Were Motivated to Commit Fraud ..................................................... 54

        1.   Defendant Alexander Was Motivated to Commit Fraud To Reap $5.1 Million From Insider Sales ....................................................... 54

        2.   Defendants Were Motivated to Continue Issuing The Guidance Because They Had Used It to Achieve the Merger and Did Not Want the Bottom to Fall Out on the Shock Quickly After IronNet Went Public ..................... 56

    J.   The Individual Defendants Knew Their Statements About The Guidance Were Misleading .......................................................................................... 57

        1.   After the Class Period, Defendant Alexander Admitted That, As He Knew All Along, the Guidance Was Unachievable for FY22 ........................... 57

        2.   Defendants, In Particular Defendant Gerber, Knew IronNet's Guidance Was Misleading Because It Failed to Comply With AICPA Guidelines . 58

    K.   Defendants Knew That Their Statements About IronNet's Customers and Contracts Were Misleading ............................................................................... 59

    L.   Chief Revenue Officer Sean Foster's Resignation is Suspicious In Timing And Supports His Scienter, Which Can Be Imputed To IronNet ............................... 60

VIII.   LOSS CAUSATION ...................................................................................................... 60

IX.   CLASS ACTION ALLEGATIONS ............................................................................... 62

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE .............................................. 64

XI.   NO SAFE HARBOR ...................................................................................................... 65

XII.   CAUSES OF ACTION ................................................................................................... 65

    **COUNT I.** Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........................................................................... 65

    **COUNT II.** Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ............................................................................................... 68

    **COUNT III.** Violation of Section 20A of the Exchange Act Against Defendant Alexander ................................................................................................. 69

XIII.   PRAYER FOR RELIEF ................................................................................................. 70

XIV.   JURY TRIAL DEMANDED .......................................................................................... 72

Lead Plaintiff James Shunk ("Lead Plaintiff") and additional named plaintiff Justin Gruetzmacher (together, "Plaintiffs") bring this amended complaint for violations of the federal securities laws against Defendants IronNet, Inc. ("IronNet" or the "Company"), Keith B. Alexander, James C. Gerber, and William E. Welch (collectively, the "Individual Defendants" and with IronNet, "Defendants").

Plaintiffs, individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following upon information and belief, except as to the allegations concerning Plaintiffs, which are based upon their personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, review and analysis of: (a) regulatory filings made with the Securities and Exchange Commission ("SEC"); (b) press releases, analyst reports, news articles, and other publications; (c) IronNet's earnings and other investor conference calls and interviews; (d) other public statements by Defendants; and (e) consultation with an accounting expert. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed through continued investigation and discovery. Plaintiffs bring this federal securities class action on behalf of themselves and all persons or entities who purchased IronNet securities from September 14, 2021 through December 15, 2021, inclusive (the "Class Period").

## I.      NATURE OF THE ACTION

1.      After IronNet became a public company in August 2021, Defendants repeatedly misled the market to believe that IronNet would achieve transformational revenue and annual recurring revenue ("ARR") growth (the "Guidance") in a matter of months, primarily due to large

new deals that would close before the 2022 fiscal year ended on January 31, 2022.  ("FY22").[1]
Unbeknownst to investors— who were told that IronNet's revenue from the public sector was not
significant— Defendants materially based the Company's Guidance on large and unprecedented,
multi-million dollar public sector deals that had no realistic chance of closing in FY22.  In fact,
Defendants knew from the start of the Class Period that these large new deals were subject to a
massive federal defense budget (the National Defense Authorization Act, or "NDAA") that
typically only passes in December.[2]  Moreover, as Defendant Keith Alexander[3] would later
explain, the passage of the NDAA was only the beginning of a very protracted process to deploy
approved funds.

2.      Despite that Defendants knew the timeline for these large new deals to contribute
to FY22 was radically unrealistic, Defendants repeatedly doubled down on IronNet's Guidance –
reaffirming it on September 14, 20, 22, 28, and 30, 2021, all during the Company's third quarter.
And, with IronNet securities artificially inflated by the Company's supposedly imminent growth,
Defendant Alexander cashed out more than $5 million of his IronNet stock.  On December 15,
2021, Defendants finally revealed that IronNet's growth story was just a pipedream because the
Guidance was materially based on large public sector deals that had no realistic chance of closing
in FY22.  Accordingly, Defendants massively slashed the Guidance, removing all large public
sector deals indefinitely, and pledged to be more "transparent" and "predictable" with investors in

---

[1] IronNet's fiscal year ends on January 31.  Thus, IronNet's FY22 was February 1, 2021 to January 31, 2022.  Unless otherwise noted, all emphasis is added.

[2] The NDAA specifies the annual budget and expenditures of the U.S. Department of Defense. The NDAA is passed annually and determines the agencies responsible for defense, establishes recommended funding levels, and sets the policies under which money will be spent.

[3] Defendant Alexander is IronNet's co-CEO and a retired four star general that Defendants tout as having unmatched government experience and relationships with key decision-makers.

the future.  IronNet securities plunged 31%, erasing tens of millions of dollars in shareholder value overnight on this devastating news.

3.      IronNet was founded in 2014 by Defendant Alexander as a private cybersecurity company.  The Company, which was never profitable, routinely relied on raising funds from private investors to operate.  In 2021, Defendants decided to take the cash-strapped company public to avail themselves of funding from public investors.  Rather than conduct a traditional IPO, Defendants elected to accelerate IronNet's access to market funding through a then-trendy SPAC (special purpose acquisition company, also called a blank check company) merger (the "Merger"). According to IronNet's co-CEO Defendant William Welch, a key reason for taking IronNet public in this way was to allow Defendants to issue projections about the Company's future.  Indeed, Defendants recognized that IronNet's growth story, rather than its past, was critical to successfully close the Merger and to justify IronNet's $1.2 billion valuation.

4.      Defendants sold investors on the Merger with LGL Systems Acquisition Company ("LGL"), *inter alia*, by touting imminent revenue and ARR growth and by leveraging Defendant Alexander's reputation to fuel that growth.[4]  Shortly after announcing the proposed Merger in March 2021, IronNet published its March 2021 Financial Plan, which included revenue guidance of $54.2 million for FY22; $110.8 million for FY23; $184.5 million for FY24; and $287.5 million for FY25.  In June 2021, IronNet repeated its FY22 revenue outlook of $54.2 million and added an ARR outlook of $68 million based on large new opportunities slated to close in the third quarter. Defendants did not provide further detail about these large new opportunities.

---

[4] ARR, or annual recurring revenue, is the key metric for IronNet because almost all of the Company's revenue was recurring subscription revenue on contracts that were continually renewed.  *See* ¶¶32-34.

5.      In August 2021, IronNet confidently increased its FY22 ARR guidance from $68 million to $75 million and reduced FY22 revenue guidance to $43-45 million in revenue due to supposed shifts in the anticipated closing of several large new contracts.  At this time, Defendants also presented the public sector as a fertile ground for new growth but told investors that IronNet's business with the public sector was not significant and "may never account for a significant portion of revenue".  *See* August 6, 2021 S-4 at 49.  Investors, thus, had no reason to suspect that IronNet's current-year Guidance materially hinged on large and unprecedented public sector deals.  IronNet's Merger successfully closed on August 26, 2021.

6.      On September 14, 2021, the start of the Class Period, IronNet published lackluster results from the first half of FY22 ($24 million in ARR and $12 million in revenue) after market-close.  Nevertheless, Defendants still confidently re-affirmed FY22 ARR guidance of $75 million and revenue guidance of $43-45 million.[5]  At that time, Defendants knew the NDAA had not yet been passed into law and that it typically only passes in December or later, but they doubled down nonetheless, highlighting IronNet's strong "new customer momentum" and "large deal formation", which they claimed put the Company "on pace to double ARR in the third quarter".  Defendant Alexander also characterized the growth of cyberattacks as "explosive" and "unprecedented" – providing a perfect market in which IronNet could sell its products.  The fact that Defendants confidently delivered such a strong message about the Guidance so late in the fiscal year, and by a four-star general no less, was significant.  Market commentators made much of Defendant

---

[5] Under the American Institute of Certified Public Accountants ("AICPA") guide, companies must have reasonable assumptions to support guidance.  Here, the Guidance's underlying assumptions were insupportable because it was substantially based on public-sector deals that could not realistically bring in revenue by January 31, 2022.

Alexander's 40 years of government and cybersecurity experience, stating that the Company's "leadership team could make a world of difference in differentiating IronNet."[6]

7.       On the next day, September 15, IronNet's common stock skyrocketed from $23.32 per share to close at $32.13 per share, a 38% increase.  IronNet's common stock surged so high, so fast, that the NYSE had to temporarily halt its trading.

8.       On September 20, 2021, Defendants participated in a fireside chat with Wells Fargo, during which Defendants again reiterated that IronNet was still on track to achieve its Guidance.  Defendant Gerber stated that IronNet was "pleased" that a set of "large transactions" were progressing and would finalize by the end of the fiscal year.  Defendant Welch also touted the Company's supposed "incredible transparency" with investors during this event.  On this news, IronNet shares again skyrocketed, this time by almost 20%, from a September 20, 2021 opening price of $27.95 to close that day at $33.34 on this news.

9.       Shortly thereafter, on September 22, 28, and 30, 2021, Defendants issued a registration statement, an amended registration statement, and a prospectus, respectively, in which they continued to represent that IronNet would meet its Guidance.  Additionally, Defendants reiterated in these documents that public sector deals "have not accounted for, and may never account for, a significant portion of our revenue".  As a result, investors remained in the dark about the fact that IronNet's Guidance was materially staked on tens of millions of dollars in unprecedented public sector deals that were subject to the as-yet unapproved NDAA, and that, even when approved, the funding from the NDAA would still need to be released to IronNet's contracts before FY22 end – an unachievable timeline.

---

[6] *See* September 28, 2021 Seeking Alpha article, "Is IronNet A Good Cybersecurity Stock To Buy Or Sell? A Decidedly Intriguing Stock To Watch."

10.     While IronNet securities were artificially inflated by Defendants' material misstatements and omissions about the Company's Guidance and near-term growth, Defendant Alexander pocketed over $5 million by selling *85%* of the IronNet shares he owned that were carved out of the lockup period – all in a compressed and suspiciously timed five-week time period from October 18, 2021 through November 22, 2021.

11.     Then, on December 15, 2021, Defendants astonished the market and revealed that a "majority" of the large deals supporting IronNet's Guidance were unprecedented large public sector deals, none had come through, and the timeline for them to have been factored into FY22 was never viable.  In light of the foregoing, Defendants radically reduced IronNet's Guidance to $30 million ARR and $26 million revenue (a staggering 60% and 40% reduction, respectively), and stated that IronNet was removing all large public sector deals from its guidance going forward. Defendant Alexander conceded that Defendants had failed to base Guidance on "predictable" measures and, later, that they had not been "transparent" with investors.  *See ¶¶*76, 82.  Defendants disclosed all this just two-and-a-half months after reaffirming the Guidance on September 30, 2021, and approximately three weeks after Defendant Alexander sold off a final tranche of his shares on November 22, 2021.  Defendants also announced that Chief Revenue Officer Sean Foster was leaving the Company.

12.     Notably, Defendants' devastating corrective disclosure was not at all blunted by the news that the NDAA was also passed on December 15, 2021, which should have been cause for celebration.  This was because, as Defendants knew all along, the passage of the NDAA was only the starting point of a still lengthy and unpredictable bureaucratic process for the funds from these large deals to trickle down to IronNet – a feat that had no realistic chance of occurring by January

31, 2022.  Defendant Alexander explained this on an earnings call held that day when pressed by

an analyst to provide some clarity on the timeline for the large public sector deals:

> As you noted correctly, it'll go to the president, he will sign it. It then goes to OMB, the
> Office of Management and Budget[, then] to the Defense Department, [then] to all the
> services and department agencies[, then] they can apply that to these contracts and
> others…. So, the President signs it, it doesn't happen overnight, but we think this is
> something that will happen in the next few months.

*See* "IronNet, Inc. (IRNT) CEO Keith Alexander on Q3 2021 Results – Earnings Call Transcript"
("Q3 2021 Results Tr."), *available* at https://seekingalpha.com/article/4475481-ironnet-inc-irnt-
ceo-keith-alexander-on-q3-2021-results-earnings-call-transcript).

13.     On this news, IronNet's stock plummeted 31% from a December 15, 2021 closing

price of $6.80 to close on December 16, 2021 at only $4.66.

14.     Analysts were astonished after Defendants re-defined IronNet's ARR and revenue

Guidance and issued radically lower FY22 guidance.  A December 15, 2021 BTIG report

characterized IronNet's explanation as misleading and stated that it strained credulity "given that

almost every other security company [ ] met or exceeded forecasts this earnings season."  The

report also emphasized that removing large sales opportunities from IronNet's ARR guidance was

"***a massive reduction from prior guidance which implied just over 190% growth***."

15.     Similarly, a December 16, 2021 report published by an analyst on Seeking Alpha

took Defendants to task for not being forthcoming about the Guidance sooner, highlighting that

"[t]his newly revised guidance is made substantially worse when one considers that just 90 days

ago, management had stated that it was expecting to "meet [its] growth objectives for the full

year." *Available at*, https://seekingalpha.com/article/4475500-ironnet-stock-earnings-guidance-
avoid-this-name).  This report also noted how important the forecast was to investor trust:  "[The]

problem boils down to investor trust. If investors don't trust management's forecast, the stock will

never get the multiple it deserves."

16.     To this day, IronNet has still not secured any of the large public sector deals that supposedly undergirded the FY22 Guidance, and IronNet stock now trades at around only $2 – down 95% from its September 2021 high of $47.50  during the Class Period.

17.     As a direct and proximate result of Defendants' fraud, IronNet investors lost tens of millions of dollars.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and certain rules promulgated by the SEC. Specifically, this Complaint asserts claims under: (1) Section 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; (2) Section 20(a) of the Exchange Act ("§20(a)"), *see* 15 U.S.C. § 78t(a)); and (3) Section 20A of the Exchange Act ("§20A"), *see* 15 U.S.C. § 78t-1.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendant IronNet maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

20.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

### III.    PARTIES

22.    Lead Plaintiff James Shunk purchased IronNet securities at artificially inflated prices during the Class Period. Shunk also purchased shares of IronNet common stock contemporaneously with Defendant Alexander's Class Period sales of IronNet common stock. *See* ECF No. 27-3; ¶69.

23.    Plaintiff Justin Gruetzmacher purchased IronNet securities at artificially inflated prices during the Class Period. *See* Exhibit A.

24.    Defendant IronNet is incorporated in Delaware and headquartered in McLean, Virginia. IronNet purports to design and develop solutions for cyber-attacks, including a suite of advanced cybersecurity capabilities for detection, alerting, situational awareness and hunt/remediation combined into a comprehensive collective defense platform.  The Company's common stock trades on the NYSE under the ticker symbol "IRNT."

25.    Defendant Keith B. Alexander ("Alexander") is the founder of IronNet and is its Co-Chief Executive Officer ("CEO") and Chairman of its Board of Directors (the "Board"). Defendant Alexander founded legacy IronNet in 2014 and has served as the Chairman of its Board since inception.  Defendant Alexander was IronNet's sole Chief Executive Officer until February 2019 and its co-Chief Executive Officer thereafter, becoming President, Co-Chief Executive Officer and Chairman upon the closing of the Merger.  Prior to founding IronNet, Defendant Alexander served as the Commander of U.S. Cyber Command from 2010 to 2014 and Director of the National Security Agency ("NSA") and Chief of the Central Security Service from 2005 to 2014.  Defendant Alexander has also served as a Deputy Chief of Staff for Intelligence, Department of the Army; Commanding General of the U.S. Army Intelligence and Security Command; Director of Intelligence for United States Central Command, and Deputy Director for Requirements, Capabilities, Assessments and Doctrine for the Joint Chiefs of Staff.  Defendant

Alexander was the longest serving Director of the NSA until he retired.  Defendant Alexander is a retired four-star General and served in the U.S. Government for 40 years.

26.     Defendant William E. Welch ("Welch") is Co-CEO of IronNet and is a Board member.  Welch served as IronNet's co-Chief Executive Officer since February 2019 and became co-Chief Executive Officer of the Company upon the closing of the Merger.  From June 2018 to September 2018, Defendant Welch served as President and Chief Operating Officer of Duo Security, Inc., a cybersecurity company.  Defendant Welch was also previously President and COO of Zscaler, Inc., a cloud-based cybersecurity company.

27.     Defendant James C. Gerber ("Gerber") is IronNet's Chief Financial Officer ("CFO").  Defendant Gerber has over 30 years of experience working in finance and information technology.  Defendant Gerber has served as IronNet's Chief Financial Officer since 2016.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.  Background

28.     IronNet was founded in 2014 by Defendant Alexander as a private cybersecurity company.  Defendants Gerber and Welch joined the Company in 2016 and 2019, respectively.  In August 2021, IronNet was taken public through a SPAC Merger discussed *infra*.

29.     IronNet purports to design and develop solutions for cyber-attacks, including a suite of advanced cybersecurity capabilities for detection, alerting, situational awareness and hunt/remediation combined into a comprehensive collective defense platform (the "Platform"). This Platform is IronNet's primary line of business.

30.     The Platform is comprised of two flagship products, IronDefense and IronDome. IronNet describes IronDefense as an advanced network detection and response (NDR) solution that uses AI-driven behavioral analytics to detect and prioritize anomalous activity inside individual enterprises. IronNet claims to leverage advanced AI/ML (artificial intelligence/machine

learning) algorithms to detect previously unknown threats, which are those that have not been identified and "fingerprinted" by industry researchers, in addition to screening known threats, and prioritizes the severity of the behaviors.

31.     IronNet describes IronDome as a threat-sharing solution that facilitates a crowdsource-like environment in which the IronDefense threat detections from an individual company are shared among members of a Collective Defense community.  IronNet claims that IronDome analyzes threat detections across the community to identify broad attack patterns and provides anonymized intelligence back to all community members in real time, giving all members early insight into potential incoming attacks.

32.     IronNet's Platform is available for use by the Company's customers through on-premises hardware, through a cloud (public or private), and in hybrid environments.  IronNet's typical customer contracts and subscriptions range from one to five years. IronNet typically invoices customers in advance for its multi-year contracts (three to five years).  August 6, 2021 Form S-4 at 225.  IronNet recognizes revenue ratably over the expected term with the customer.

33.     IronNet derives almost all of its revenues from sales of software subscriptions, subscription-like software products and software support contracts, which accounted for 96% of FY22 revenue as of September 30, 2021.  Because 99% of IronNet's customers reportedly renew their contracts with the Company, ARR – the Company's ***recurring*** subscription revenue – is IronNet's key metric.  Indeed, IronNet specifically categorized ARR.  As explained in the September 22, 2021 Form S-1:

Annual Recurring Revenue ("ARR")

ARR is calculated at a particular measurement date as the annualized value of our then existing customer subscription contracts and the portions of other software and product contracts that are to be recognized over the course of the contracts and that are designed to renew, assuming any contract that expires during the 12 months following the

11

measurement date is renewed on its existing terms. We believe this is a reasonable assumption as less than 1% of an approximate total of $160 million in cumulative ARR that would have been reported over the last 12 quarters through the end of fiscal year 2021 did not renew their contract.

34.    IronNet also touted its ARR growth in this filing, in relevant part, as follows:

|  | July 31, | |
| --- | --- | --- |
|  | **2021** | **2020** |
|  | (in millions) | |
| Annual recurring revenues | $24.1 | $19.5 |
| Year-over-year growth | 24% | 21% |

|  | January 31, | |
| --- | --- | --- |
|  | **2021** | **2020** |
|  | (in millions) | |
| Annual recurring revenues | $25.8 | $15.0 |
| Year-over-year growth | 72% | 37% |

35.    From its inception, IronNet's business was predominately with private sector customers. Leading up to the Merger, Defendants noted that the largely "untapped" public sector was a potential growth driver, but not a significant part of IronNet's revenue profile. *See* SEC Form 425 at 29 (Virtual Analysts Day Transcript) (June 7, 2021), available at https://www.sec.gov/Archives/edgar/data/1777946/000119312521190217/d472786d425.htm. Nevertheless, IronNet represented in its August 6, 2021 Form S-4 that Defendant Alexander's understanding of the public sector "is important to IronNet's future growth as he provides access to key decisionmakers within government agencies and the private sector, and his leadership role at [IronNet] would be difficult to replace." SEC Form 424(b)(3) (Aug. 6, 2021), *available at* https://www.           sec.gov           /Archives/edgar/data/0001777946/000119312521239390/d472786d424b3.htm.

**B.  Defendants Take IronNet Public Through A SPAC Merger To Sell Investors On The Company's Future**

36.     Although IronNet was in business for seven years as a private company, since 2014, it never turned a profit in that time (and still has not done so to this day).  Since its inception, IronNet has stayed afloat by raising capital from investors.  As a private company, IronNet raised over $100 million in funding from various private investment funds.  In 2021, IronNet badly needed more capital.  Rather than go back to private investors, IronNet decided to avail itself of funding from investors in the public markets.

37.     IronNet specifically chose to go public through a SPAC Merger, rather than a traditional IPO, because, as explained by the Company's co-CEO Defendant Welch on September 20, 2021, Defendants believed (albeit incorrectly) that this route would provide them with a generous leash to discuss IronNet's future:

> One of the things, I've done an IPO as you know in Zscaler, and now I've been able to be participating in taking this company through a SPAC, they're very different go to market models. ***And when I say very different is that as you know, leading up to an IPO, you can only tell everybody what you've done. You don't really talk about futures. The one thing that we like about with this SPAC and the merger was we were able to talk about our long-term horizon, what we're going to be doing as a company. If anything, it gives incredible transparency to the investor community of where we are and where we're going***. It's very detailed.

(emphasis added). *See* September 20, 2021 Fireside Chat ("Fireside Chat"), *available at* https://ir.ironnet.com/news-events/events-presentations/detail/7489/tech-talk-fireside-chat-with-wells-fargo.

Indeed, Defendants knew IronNet had not yet turned a profit and had a history of burning through investor cash; accordingly, they needed to sell the Company based on its future, not its past. Defendants found a willing partner to carry out the SPAC Merger in LGL.

38.     LGL had filed its own IPO Preliminary Prospectus and Registration Statement (the "LGL Prospectus") on October 7, 2019 and completed its IPO on November 12, 2019.[7]  The

---

[7] *See* SEC Form S-1 (Oct. 7, 2019), *available at* https://www.sec.gov/Archives/edgar/data/0001777946/000121390019019 903/fs12019_lglsystemacq.htm.

prospectus stated that LGL was "formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities, which we refer to as our initial business combination. … *we intend to focus our search on companies in the aerospace, defense and communications industries with enterprise valuations in the range of $350 million to $1 billion*."

39.     After four months of due diligence, IronNet and LGL announced the proposed Merger in March 2021.  Shortly thereafter, IronNet publicly released its March 2021 Financial Plan, which included revenue guidance of $54.2 million for FY22; $110.8 million for FY23; $184.5 million for FY24; and $287.5 million for FY25.

40.     On May 14, 2021, IronNet filed an S-4 Registration Statement and Prospectus with the SEC.[8] IronNet's Registration Statement and Prospectus repeated the FY22 outlook of $54.2 million in revenue.  When describing the Merger, IronNet represented that its revenue outlook for the current and subsequent fiscal years was a critical component of the merger transaction:

> *The key elements of the forecasts provided to LGL are … strong revenue forecast for 2022— 2025* based on the clear plans for the acquisition of primary customers as well as the ability to expand the customer base through network effects and to expand revenues per customer through upsales.  (Emphasis added).

41.     On June 1, 2021, LGL filed a Form 425 with the SEC disclosing additional written communications pursuant to Rule 425 of the Securities Act. The slide deck attached to the filing provided investors with a revised Management Presentation prepared by IronNet.  The June 2021 Management Presentation again forecasted FY22 revenue of $54.2 million and now included IronNet's ARR outlook for the first time, which was $68 million for FY22, $129 million for FY23;

---

[8] The registration statement was amended several times before being declared effective.  .*See* Form S-4 available at https://www.sec.gov/Archives/edgar/data/0001777946/000119312521161945/d472786ds4.htm.

$207 million for FY24, and $319 million for FY25.   Defendants did not elaborate on the composition of these ARR and revenue figures at the time.   *See* SEC Form 425 (Management Presentation)          (June          1,          2021),          *available*          *at* https://www.sec.gov/Archives/edgar/data/0001777946/000119312521178420/d66257d425.htm.

42.     One week later, on June 7, 2021, IronNet hosted a Virtual Analyst Day where it held a Q&A session with investors.   During the event, IronNet provided investors with information regarding its existing customers base. Notably, Defendant Gerber explained that in June 2021, approximately 80% of the Company's revenue was from private sector companies and the remaining 20% was from the public sector.   *See* SEC Form 425 at 28 (Virtual Analysts Day Transcript)          (June          7,          2021),          *available*          *at* https://www.sec.gov/Archives/edgar/data/1777946/000119312521190217/d472786d425.htm.

43.     Defendant Gerber also stated during the Analyst Day that Defendants remained confident in IronNet's FY22 revenue guidance, and reiterated that the Company's growth was tied to customers who were already under contract:

> ***Let me elaborate as well on why we're so confident in our revenue increase now with $55 million this year. We've primed the pump with well over 50% of that revenue coming from customers already under contract.*** We have an experienced sales force and enablement team already in the field with 24 fully ramped sales reps and more coming on board. We also have strong KPIs and strong tailwinds behind us that you've been hearing about. IronNet has a strong recurring revenue base with sticky customer relationships. *Id.*

44.     In response to an investor question, Defendants started touting IronNet's purported large sales opportunities.   Specifically, Defendant Gerber emphasized that based on his visibility into the sales pipeline, the Company's FY22 Guidance was reliable – or even conservative since IronNet's "really large opportunities" were only growing:

> Q: Then ***how much of that ramp do you have visibility on*** with the pipeline today versus what you have to go out and win over the next eight months?

15

A: ***We continue to have—be blessed with some really large opportunities that are getting bigger right at the moment.*** I think what we're focused on is that ARR built through the year and we like the momentum we're seeing here. *Id.*

45.   Defendants did not specifically quantify what "really large opportunities" meant in terms of dollars and cents at this time; nor did they give a customer break-down of the make up these large opportunities.  When analysts asked Defendants about government sales opportunities, Defendants did not reveal that such deals materially made up IronNet's Guidance either.  Thus, the market had no reason to focus on the public sector vis a vis IronNet, and they certainly were not cued to focus their attention on the NDAA timeline for FY22.  To the contrary, Defendants repeatedly represented – including on August 6, 2021, August 10, 2021 and September 30, 2021 – that the public sector was not a significant revenue driver and may never become one for IronNet. *See* August 6, 2021 S-4 at 49.

46.   On August 10, 2021, IronNet issued a press release and filed a corresponding Form 425 with the SEC in which it increased its ARR outlook for FY22 and decreased its revenue outlook for FY22.  In the release, which was entitled "IronNet Updates Certain Internally Prepared Forecasts Included in Proxy Statement/Prospectus", IronNet represented that the Company "has several pending large contracts that it expects to close in the third quarter of fiscal 2022. Due to the increase in these larger contract opportunities, ***IronNet now expects its annual recurring revenue (ARR) to increase to $75 million by the end of fiscal 2022*** and to continue its expansion to $129 million by the end of fiscal 2023."  The same press release also touted IronNet's new partnership with private sector company FireEye/Mandiant and explained that "IronNet has seen expansion in its opportunities to contract for entire communities of suppliers and to more comprehensively protect larger enterprise customers."  *See* August 10, 2021 press release, https://www.sec.gov/Archives/edgar/data/0001777946/000119312521241630/d181777d425.htm.

16

47.     IronNet further stated in the August 10, 2021 press release that "[d]ue to shifts in the anticipated closing of several large new customer contracts and the resulting impact to current year revenue recognition, IronNet now estimates that its fiscal year 2022 revenue will be between $43 and $45 million as compared to forecasted revenue of $54.2 million." IronNet did not specify what large customer contracts were "shifting" their anticipated closing dates or what caused the delays, but the Company did enthusiastically assure investors that the large deals underlying its increased ARR more than made up for any delay and were still on track to close in the latter half of FY22. Significantly, the market still had no reason to believe that these large opportunities were public sector deals. In fact, Defendants again represented that "sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of the [IronNet's] revenue."

48.     On August 26, 2021, LGL shareholders voted to approve the Merger. Thereafter, on August 27, 2021, the Merger was finalized and IronNet became a publicly traded company on the NYSE.

**C. Defendants Continue to Conceal That the Guidance Materially Depended on Large and Unprecedented Public Sector Deals That Had No Realistic Chance of Providing Revenue in FY22**

49.     Because Defendants repeatedly told the market that IronNet's public sector business was not significant and may never be significant, investors had no way of knowing that large new public sector deals materially comprised IronNet's current-year Guidance. Investors likewise had no way of knowing that these large public sector deals were subject to the as-yet unapproved NDAA and the deployment of funds from that budget – the timeline for which made these deals incapable of contributing revenue and ARR for FY22.

50.     The NDAA specifies the annual budget and expenditures of the U.S. Department of Defense, including for cybersecurity, and determines the agencies responsible for defense,

establishes recommended funding levels, and sets the policies under which money will be spent. The NDAA is passed annually, typically in December or later.  Indeed, ***in five of the last six years***, the NDAA was signed into law on December 12 or later.  NDAA for fiscal year 2022, Pub.L. 117–81; NDAA for fiscal year 2021, Pub.L. 116–283; NDAA for fiscal year 2020, Pub.L. 116-92; NDAA for fiscal year 2019, Pub.L. 115–232; NDAA for fiscal year 2018, Pub.L. 115–91; NDAA for fiscal year 2017, Pub.L. 114–328.

51.     The timeline for the passage of the 2022 NDAA, which was not abnormal, was, in relevant part, as follows:

- September 2, 2021: House Armed Services Committee approved the House's version of the NDAA.  https://armedservices.house.gov/hearings?ID=17A5703B-CC87-4525-B6E1-F68E1A8C6DF9

- September 7, 2021: House Rules Committee announces process and deadline for submitting amendments for the bill. *See* AMENDMENT PROCESS FOR H.R. 4350 – National Defense Authorization Act for Fiscal Year 2022, Sept. 7, 2021 (available at: https://rules.house.gov/news/announcement/amendment-process-announcement-hr-4350-national-defense-authorization-act-fiscal).

- September 10, 2021: House Armed Services Committee publishes its report and the bill is placed on the Union Calendar, Calendar No. 83. H.Rept. 117-118 (Committee Report published on September 10, 2021).

- September 17, 2021: Supplemental report filed by the Committee on Armed Services. See H. Rept. 117-118, Part II.

- September 21, 2021: House Rules Committee provides rules for debate on bill. *See* Congressional Record Vol. 167 No. 163 (available at: https://www.congress.gov/117/crec/2021/09/21/167/163/CREC-2021-09-21.pdf).

- September 23, 2021: House passes its version of the NDAA. See Roll Call 293, Bill Number: H. R. 4350. [9]

---

[9] The Senate passed a previous version of the bill on June 9, 2021 that did not reflect the 780 amendments that were made in markup by the House Committee between July 28, 2021 and August 31, 2021. Accordingly, to move forward with the bill, Congress had to reconcile the versions and naturally proceeded with the House's operative version of the bill.  Additionally, a competing version of the same bill was introduced in the Senate on September, 22, 2021 which was never debated.

- October 18, 2021: Bill received in Senate and added to Senate Legislative Calendar under General Orders, Calendar No. 144.

- November 15, 2021: Senate begins to proceed with consideration of the bill.  *See* Congressional Record, Vol. 167, No. 198, S8071.

52.     The NDAA was eventually passed on December 15, 2021 and was signed by the President into law on December 27, 2021, just one month before IronNet's FY22 end, predictably providing insufficient time for IronNet's large deals to contribute to FY22 revenue or ARR.

53.     Even after the NDAA is eventually passed into law, which it has been every year for the past six decades, the approved funding does not appear overnight.  Far from it.  There is typically a long and unpredictable bureaucratic process from the time the NDAA passes to the time approved funds make their way down to companies like IronNet.  Indeed, as Defendant Alexander knew all along, but only belatedly acknowledged on December 15, 2021, the day the NDAA was passed, funding "***doesn't happen overnight, but we think this is something that will happen in the next few months***."  *See*  ¶75.  Defendant Alexander intimately knew about the NDAA's lag time in funding as he worked in the public sector for more than 40 years and directed the NSA for almost 10 years.

54.     Although the NDAA is important to many cybersecurity companies, analysts covering IronNet were not closely tracking the NDAA in relation to the Company because, as detailed *supra*, Defendants did not disclose that IronNet's Guidance materially depended on large and unprecedented public sector deals subject to the NDAA.  In fact, Defendants had told the market that IronNet did not have significant business with the public sector at that time.

**D.  Defendants Knowingly and Repeatedly Reaffirm IronNet's Radically Unachievable Guidance As a Public Company – Deceiving Investors**

19

55.     On September 14, 2021, after market close and the first day of the Class Period, IronNet announced its financial results for the second quarter of FY22 as a public company. *See* SEC Form 8-K, Ex. 99.1 (September 14, 2021) *available at*, https://www.sec.gov/Archives/edgar/data/0001777946/000119312521272930/d193819dex991.htm. The press release reported $12.4 million revenue for the 6-month period ending July 31, 2021, substantially down from $14.8 million in revenue during the same period the year prior.  The release also reported revenue of $6.1 million for Q2 2022, compared to $7.9 million for Q2 2021, as well as Q2 2022 ARR of $24.1 million compared to $19.5 million in Q2 2021.  Despite these results, and with IronNet now well over halfway through FY22, Defendants doubled down and repeated their confidence in the same Guidance – with even less time to achieve it.  As with the Merger, Defendants wanted investors to continue to focus on the future not the past.

56.     Defendants assured investors that IronNet's sales pipeline was flush with large sales opportunities that would close before the end of year.  Defendant Gerber claimed in that release that because of "large deal formation" in IronNet's sale pipeline, the Company was "on pace to double ARR in the third quarter" from $24 million to $48 million in just three months, and that IronNet was on track to nearly triple its ARR in four and a half months – by the end of the fiscal year.  Defendant Welch further provided, in relevant part, that:

> ***We are on target with our first half guidance…New customer momentum so far in the second half of our fiscal year is strong*** and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group.  *Id.*

57.     In sum, Defendants confidently reassured investors that despite that IronNet was already in the third quarter of FY22, the results were "on target" and "***consistent with the most recent guidance***" and thus IronNet still expected "revenue of $43-45 million; ARR of $75 million as of end of the fiscal year," which was just four and a half months away.  In fact, Defendants

knew the Guidance was groundless since it was staked on public sector deals that could not even begin to move forward until the NDAA was approved and the funds from the NDAA were deployed.

58.     Unsurprisingly, Investors took the bait hook line and sinker and were excited about IronNet's near-term and seemingly meteoric growth. The following day, September 15, 2021, on market open, IronNet's stock price soared 38%.  IronNet stock also skyrocketed the next day, September 16, 2021 – rising from a September 15, 2021 closing price of $32.13 to close on September 16, 2021 at $41.40.  In fact, shares of IronNet shot up so much so fast that NYSE temporarily halted trading in IronNet common stock.

59.     The following week, on September 20, 2021, the Individual Defendants participated in a fireside chat with Wells Fargo during which they continued to tout IronNet's FY22 Guidance.

60.     With respect to the Guidance, Defendant Gerber boasted in the chat that IronNet's sales pipeline was ripe with large, new deals:

> We've been seeing these larger contracts coming along. So that's been the primary focus on the guidance…We're very pleased to see an outsized set of larger transactions out in front of us. So there is opportunity, but we're focused on executing to the [$]75 [million in ARR] and making sure that's where we deliver for the year.

61.     Andrew Nowinski, the host of the event, pointedly asked for clarity on whether the large deals were the same deals included in the Guidance that Defendants repeatedly gave. Defendant Gerber affirmed that the large deals were an "important part" of the ARR outlook for FY22, but continued to shroud in secrecy the customer-base that made up these large deals:

> Q: "***Should we assume that those larger deals that are still forming are in that 75 million*** or is that, would you consider that upside to the [$]75 million [in ARR] guidance?"

> A: "***[T]hey make up an important part of the [$]75*** [million in ARR guidance].  Any good company has got to build its business on everything from singles and doubles all

21

the way up to the big transactions. We're very pleased to see an outsized set of larger transactions out in front of us. So there is opportunity, but we're focused on executing to the 75 and making sure that's where we deliver for the year.

62.    Defendant Welch also frankly admitted during the event that Defendants chose to go public through the SPAC Merger to highlight the Company's future growth – and even claimed this only increased the Company's "incredible transparency" with the market:

[SPACs are] different go to market models. And when I say very different is that as you know, leading up to an IPO, you can only tell everybody what you've done. You don't really talk about futures. The one thing that we like about with this SPAC and the merger was we were able to talk about our long-term horizon, what we're going to be doing as a company. ***If anything, it gives incredible transparency to the investor community of where we are and where we're going***. It's very detailed.

63.    On September 22, 28, and 30, 2021, Defendants confidently reiterated the Guidance and again stated that government sales opportunities did not form a significant part of IronNet's business – and might never do so.

### E.  Analysts Paid Close Attention to IronNet's ARR and Revenue Guidance – the Supposed Basis for Its Growth

64.    Following the September 14, 2021 announcements – after which IronNet's common stock rose from $23.32 per share to close at $32.13 per share on September 15, 2021 (a 38% increase) – analysts expressed optimism and maintained their positions in IronNet.  For example, Anja Soderstrom, an analyst from Sidoti & Co., wrote a September 17, 2021 report titled, "[IronNet Is] Making Strides On Its Plan To Reach $300 Million In Revenue By F2025; Customer Acquisition Strategy Appears To Be Efficient; Maintain $17 Price Target And Moderate Risk Rating." The report focused on the Company's increased ARR forecast and provided:

The company is making good progress on its initiatives and the customer acquisition strategy appears to be working. IRNT reported 51 customers at the end of 2Q:F22, up from 22 at the end of 2Q:F21. ***Annual recurring revenue (ARR) increased to $24.1 million from $19.5 million at the end of 2Q:F21 and is expected to double in 3Q:F22***. (emphasis added).

65.    As late as December 10, 2021 – just five days before shocking the market with the revelation that its Guidance was groundless and needed to be fundamentally re-worked – Sidoti's Soderstrom maintained confidence in Defendants' Guidance:

> While management does not provide quarterly guidance, the F2022 revenue guidance range is $43 million-$45 million. We project $14.5 million for 3Q:F22 and $17.0 million in 4Q:F22. This implies $44 million in revenue for F2022, at the midpoint of the guidance range and implying a 50% increase year over year....management [also] noted it anticipates recurring revenue to double in 3Q:F22.
>
> We maintain our $17 price target, which is based on 10x our F2025 revenue estimate of $305 million.

66.    Had Defendants disclosed that IronNet's Guidance required closing the "large" public sector deals, which depended on funds from the NDAA, analysts would have closely monitored the status of the legislation and baked into their estimates the time that is required to secure funding once the NDAA is passed each year.  Investors, likewise, would have understood the – at best – radically tenuous nature of IronNet's Guidance.

### F.  After Touting IronNet's Guidance, Defendant Alexander Opportunistically Sells 85% of His Available IronNet Shares For Over $5 Million

67.    Knowing that IronNet would never receive NDAA funding in time to close the large deals touted by the Company and meet its Guidance, Defendant Alexander cashed in on the artificially inflated price of IronNet's stock before the market learned the truth.

68.    Under a September 7, 2021 lock-up agreement signed in connection with the Merger, Defendant Alexander was allowed to sell a maximum of 568,525 shares of IronNet between September 30, 2021 and February 26, 2022 (six months from the closing of the Merger), which time period includes the whole Class Period:

> On March 15, 2021, certain stockholders of the Issuer, including the Reporting Person, entered into an agreement with respect to the Issuer's Common Stock, through the date that is 180 days after the closing of the Business Combination (the "Lock-Up Agreement") providing that they will not, subject to certain exceptions and early release provisions, (i) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any

23

option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder, with respect to any shares of Issuer Common Stock held by them (such securities, collectively, the "Lock-Up Securities"), (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of the Lock-Up Securities, in cash or otherwise, or (iii) publicly announce any intention to effect any transaction specified in clause (i) or (ii); ***provided, however, that the Reporting Person was granted relief from the restrictions of the Lock-Up Agreement to sell up to an aggregate of 568,525 shares of Issuer Common Stock, with such shares eligible for sale upon the effectiveness of the Resale Registration Statement described below, subject to compliance with applicable securities laws***.[10] (emphasis added)

*See also* October 18, 2021 Form 4 (on September 30, 2021, the lockup agreement expired with "respect to an aggregate of 568,525 shares held by the Reporting Person"). https://www.sec.gov/Archives/edgar/data/0001777946/000120919121061144/xslF345X03/doc4. xml.

69.   Defendant Alexander sold 477,625 shares – approximately **85%** of his shares available for sale – starting only two weeks after certain of his shares became eligible for sale on September 30, 2021.  Defendant Alexander sold these shares over six days from October 18, 2021 to November 22, 2021, netting him total proceeds of over $5.1 million:

| Sales Date | Number of Shares | Unit Price | Proceeds |
|---|---|---|---|
| | | | |
| 10/18/21 | 93,525 | $10.25 | $958,631.00 |
| 10/25/21 | 90,000 | $10.13 | $911,700.00 |
| 11/01/21 | 4,003<br>85,997 | $12.76<br>$11.98 | $51,078.30<br>$1,030,240.00 |

---

[10] SEC Form Schedule 13D (Sept. 7, 2021), *available at* https://ir.ironnet.com/financials/all-sec-filings/content/0001193125-21-266632/0001193125-21-266632.pdf.

| | | | |
|---|---|---|---|
| 11/08/21 | 90,000 | $11.03 | $992,700.00 |
| 11/15/21 | 90,000 | $10.34 | $930,600.00 |
| 11/22/21 | 24,100 | $10.12 | $243,892.00 |
| | **477,625** | | **$5,118,841.30** |

70.     Defendant Alexander not only sold his shares shortly after Defendants had repeatedly and confidently reiterated the Guidance, but he did so with absolute clarity into the fact that the NDAA, which is typically passed in December, would not be approved in time to contribute to FY22 ARR and revenues.  Indeed, Defendant Alexander sold the vast majority of his shares before the Senate even began to review the operative version of the NDAA bill, which consisted of nearly 1,000 pages of text, on November 15, 2021.  The Senate received this version on October 18, 2021 – the same day Defendant Alexander began to sell his IronNet shares – and was immediately calendared for consideration on November 15, 2021.  Defendant Alexander sold his last 24,100 shares on November 22, 2021, while the Senate was still debating the operative version of the NDAA bill.  In sum, Defendant Alexander opportunistically sold his shares at artificially inflated prices just before the window closed for him to do so as IronNet would soon be forced to come clean about its Guidance.

71.     Under Defendant Alexander's employment agreement, he was paid a base salary of $360,000 per year and was eligible for an annual bonus of up to $200,000 subject to performance of the Company's global sales teams and overall performance.  Defendant Alexander's $5.1 million in insider trading proceeds was, thus, more than ***14 times larger*** than his yearly salary.

72.     Defendant Alexander, who worked in the military and government for more than 40 years, knew all along – and, indeed, belatedly admitted (*see* ¶12) that even after the NDAA is

25

signed into law, the timeline for receiving funding is very protracted.  Accordingly, when the NDAA was still pending in Congress in late-November and agencies had no visibility into when they could even begin the process of deploying NDAA funding, Defendant Alexander knew the Guidance was unachievable and that a coming stock collapse was inevitable.  Yet Defendant Alexander unloaded over $5 million worth of IronNet stock to unwitting investors, including Lead Plaintiff, who purchased IronNet shares on November 15 and 22, 2021.

**G. IronNet Finally Reveals Its Guidance Never Had Any Basis, Startling the Market and Sending IronNet Stock into Free Fall**

73.     On December 15, 2021 – less than three months after reiterating the Guidance and the same day the NDAA was passed by Congress – Defendants revealed that IronNet's Guidance was just a pipedream because it was materially based on large and unprecedented public sector deals that were subject to NDAA approval and the subsequent protracted deployment of approved funding that could not realistically have contributed revenue or ARR for FY22.  As a result of the continued unpredictability surrounding the timeline for these deals, Defendants "reset" how IronNet accounted for its guidance – announcing that it would remove all large public sector deals indefinitely.

74.     Defendants' re-vamped guidance devastatingly slashed the ARR FY22 outlook 60% -- from $75 million to $30 million, and the revenue FY22 outlook by 40% – from $43 million to $45 million to $26 million.  In a Form 8-K filed on December 15, 2021, Defendants claimed, in relevant part, that:

> ***Our prior outlook for both the quarter and fiscal year was supported by what we assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector***. We had previously expected to finalize these opportunities in the second half of the fiscal year, however they remain pending primarily due to government delays in getting funding through to federal budgets. These continue to be viable opportunities in our pipeline. ***Given the difficulty in predicting when they will close, we have removed them from our ARR guidance***.

26

SEC Form 8-K, Ex. 99.1 (Dec. 15, 2021), *available at*
https://www.sec.gov/Archives/edgar/data/0001777946/000119312521357948/d249328dex991.ht
m

75.    On IronNet's third quarter earnings call that day, Defendant Alexander went a step

further, admitting that the Company should never have included the large public sector deals in its

Guidance because the timeline for the deals to contribute to the Guidance was never achievable:

> With respect to the strategic opportunities that we have and what we're seeing in the
> marketplace, first, the passage of the NDAA, or the National Defense Authorization
> Act, today means that we could start to see some of these move forward….
>
> ***I'll handle the first part on that with respect to the NDAA. As you noted correctly,
> it'll go to the president, he will sign it. It then goes to OMB, the Office of
> Management and Budget. They take that and they push that out to the Defense
> Department, which then breaks it down and pushes it out to all the services and
> department agencies. Once they had that money and they know now what their
> full authorization levels are, they can apply that to these contracts and others***.
>
> I talked to some of our partners in the defense industrial base, some of the strategic
> partners, they face the same problem that we face here. They're having the same
> issue. And they believe that this will help. It won't change overnight. ***So, the
> President signs it, it doesn't happen overnight, but we think this is something that
> will happen in the next few months***. *Id.*

76.    In fact, even though the NDAA passed that same day (December 15, 2021), which

should have been cause for celebration, Defendants Alexander and Gerber conceded that the

Company still **had no idea** when the public sector revenues underlying the Guidance would come

in – which is why IronNet was "reset[ting]" its Guidance altogether:

> [Alexander] Our confidence remains high in the strategic opportunities. ***We've
> revised our guidance for the year, and it reflects the fact that we aren't confident
> on what quarter they will actually come in***, but we see these as viable opportunities
> for the future. We recognize that you want us to have a predictable business, and
> we can accomplish that with our transactional side, and we're going to do that, and
> these strategic deals will add momentum into our revenue as we move forward."
>
> * * *
>
> [Gerber:] I think you were just asking about our guidance for this year of the $26
> million for revenue. ***As we've noted, what we've significantly done here is to
> completely remove all of these larger strategic transactions that are still out there,***

27

*but difficult to predict. So, we've reset the guidance at this point to not include them. Our guidance from August [and September] had included them*. *Id.* (emphasis added)

77.     Relatedly, in the December 15, 2021 8-K, the Company also announced that its Chief Revenue Officer, Sean Foster, was leaving the Company.  *See* SEC Form 8-K (Dec. 15, 2021),        available        at        https://www.sec.gov/Archives/edgar/data/0001777946/ 000119312521357948/d249328d8k.htm.

78.     The Company's 10-Q filed with the SEC the same day also announced the abysmal results.  Specifically, the Company reported total revenue for the nine months ending October 31, 2021 of $19.3 million. This represents a decrease of $2.5 million or 11% in year to date 2022 compared to year to date 2021. Similarly, IronNet reported that for the nine-month period ending October 31, 2021, its ARR was just $27.5 million. This represented a mere $3.4 million increase from the $24.1 million in ARR at the end of the prior quarter.  Put another way, in one quarter, or 25% of the year, IronNet added just 4.8% of its fiscal year 2022 outlook for ARR – when less than three months earlier Defendants assured investors that IronNet was on track to double its ARR in the third quarter of the fiscal year.  *See* SEC Form 10-Q (Dec. 15, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001777946/000095017021005216/irnt-20211031.htm.

79.     The catastrophic December 15, 2021 news sent IronNet's stock reeling.  IronNet's stock price plummeted from $6.80 per share on December 15, 2021 to a close of $4.66 per share the following day, a 31% decline.

80.     As a result of these revelations, analysts were very critical of IronNet's management for their lack of credibility.  A December 15, 2021 BTIG Analyst Report authored by Gray Powell and entitled "A Very Bad Night for IRNT. Significantly Cutting Ests Post FQ3

28

Print. Maintain Neutral" noted that IronNet's peers "met or exceeded forecasts this earnings season" and that IronNet slashed its forecasted ARR by a staggering 60%. Powell found IronNet's about-face on ARR guidance "eye-popping":

> IRNT reported very disappointing FQ3 results and dramatically lowered its full year recurring revenue outlook. Specifically, IRNT's FQ3 ARR of $27.5MM missed our $38MM est by almost 30%. Furthermore, *the company reduced its year-end ARR target by an eye-popping 60% to $30MM (+16% y/y) from $75MM (+191% y/y) previously*. As reasons for the massive shortfall, the company highlighted that large late-stage strategic deals in the U.S. public sector were delayed but continue to be viable opportunities in the pipeline…. *We think the company will have a lot of work ahead to rebuild creditability with investors given that almost every other security company [ ] met or exceeded forecasts this earnings season" IronNet* and [*the Individual Defendants*] *"will have a lot of work ahead to rebuild credibility with investors*.

81.     A December 16, 2021 report published by an analyst on Seeking Alpha was also highly critical of Defendants for the shocking revelation about the Guidance:

> IronNet puts out guidance last night that rather than growing its revenues during fiscal 2022 by 48% y/y as we can see above, it now appears that its revenues are actually contracting by 10% y/y to $26 million for fiscal 2022. *This newly revised guidance is made substantially worse when one considers that just 90 days ago, management had stated that it was expecting to "meet [its] growth objectives for the full year." Why is this a problem? The first problem boils down to investor trust. If investors don't trust management's forecast, the stock will never get the multiple it deserves. The second problem I see here is that management would likely have known that there was a chance it wouldn't meet its growth objectives for this fiscal year when just 90 days ago it reaffirmed its guidance*.

*See* https://seekingalpha.com/article/4475500-ironnet-stock-earnings-guidance-avoid-this-name.

## H. IronNet Fires Nearly 20% of Its Work Force, Analysts Begin to Track the NDAA in Relation to IronNet, and IronNet's Large Deals *Still* Fail to Transpire

82.     Four months after the close of the Class Period, in an April 6, 2022 conference call, Defendant Alexander again noted that public sector sales opportunities were at the heart of IronNet's Guidance collapse – and admitted the Company's lack of transparency:

> As we stated last quarter, anticipated strategic deals were delayed, so we took them out of our forecast and we will continue to do so. *Most of these strategic customers are in the U.S. public sector and were impacted by delays in federal funding*…. [The public sector deals] are still in our line of sight. It's just a question of when they come in. So we

thought it was appropriate to be completely transparent with you and others to say, we're going to gauge everything on the transactional side. And then every time a strategic deal comes in, we'll announce it and we'll adjust our guidance as appropriate.

*See* SEC Form 8-K, ex. 99.2 (Apr. 8, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1777946/000119312522099164/d342240dex992.htm

83.     A June 14, 2022 press release shows that IronNet was still – six months after the end of the Class Period – nowhere near securing these sales opportunities:

For the fiscal year 2023, IronNet still expects:

Revenue of approximately $34 million, representing nearly 25% growth year over year
ARR of approximately $48 million at the end of the fiscal year, representing 50% growth year over year.

*See* SEC Form 8-K, ex. 99.1 (June 14, 2022), *available at* https://www.sec.gov/Archives/edgar/data/0001777946/000119312522173859/d353963dex991.htm. For comparison, in August 2021, IronNet projected $111 million revenue and $129 million in ARR for FY23. As of June 2022, IronNet projected just $34 million in revenue and $48 million in ARR for FY23. Accordingly, IronNet would need to outperform its FY23 ARR guidance by 50% just to achieve the FY22 numbers it sold investors on.

84.     A June 15, 2022 BTIG analyst report entitled "IRNT: Q1 light. Guidance maintained. Maintain Neutral" by Gray Powell noted the "continu[ed] lack of visibility of when certain deals will close" – the same deals that underlay IronNet's Guidance:

Concerning decline in ARR. IRNT's FQ1'23 ARR of $30.1MM represents a $1.7MM sequential decline. ***There continues to be a lack of visibility on the timing of when certain deals will close***. However, management remains confident in FY23 topline forecasts and the ability of delayed deals to close at some point in the year. Estimates are now further back-end loaded…

85.     Defendant Welch continued to tell the market the opportunities were still pending in June 2022:

Our topline results were consistent with our expectation that certain customers in our transactional business would be delayed in signing or renewing their contracts, resulting

30

in reduced ARR and revenue from the prior quarter. We would like to reiterate that we see these opportunities as pending rather than lost," said William Welch, co-CEO of IronNet.

*See* SEC Form 8-K, ex. 99.1 (June 14, 2022), *available at*, https://www.sec.gov/Archives/edgar/data/0001777946/000119312522173859/d353963dex9 91.htm.

86.     Just seven months after Defendant Alexander finished pocketing over $5 million when selling 85% of his available IronNet shares at artificially inflated prices, the Company he founded laid off 17% of its workforce.

87.     The Sidoti analyst covering IronNet now closely follows the status of the NDAA. A March 24, 2022 analyst report by from Soderstrom of Sidoti entitled "View 4Q:F22 As Revenue Trough; Maintain $6 Price Target, Highly Risky Rating Until We See Consistent Revenue Growth; Recent Financing Removes Funding Overhang" stated:

> Management has been anticipating some larger deals or strategic opportunities come to fruition that are pending budget approval from the government. The delay in the strategic opportunities were attributed to the delay of Senate approval of the $770 billion defense policy bill, The National Defense Authorization Act (NDAA). Management anticipate it will take a couple of months for the bill to reach its potential strategic clients and pulled these opportunities from its guidance at the conclusion of last quarter.

88.     A June 15, 2022 analyst report from the same analyst stated that "[m]anagement pins the bottleneck on the delay of [the] National Defense Authorization Act (NDAA)."

89.     IronNet stock now trades around $2 – far below its Class Period high of $47.50. As of this date, none of IronNet's large public sector deals, which Defendants materially based FY22 Guidance on, have closed.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     The September 14, 2021 Statements

90.     On September 14, 2021, the first day of the Class Period, after market close, IronNet issued a press release announcing its second quarter and half year results for FY22.  The

31

release, which was filed with the SEC on Form 8-K and signed by Defendant Gerber, addressed

IronNet's Guidance for the remainder of the year, in pertinent part, as follows:

> Our cloud-based subscription revenue -- which grew to 60% of product revenue in the first half of the year, a 65% year-over-year growth rate – is a strong proof point for the business and underscores the fully recurring aspect of our financial model. ***Our cloud focus coupled with the large deal formation that we are seeing reflects IronNet's ease of deployment and increasing market recognition, which keeps us on pace to double ARR in the third quarter and meet our growth objectives for the full year***.
>
> ***For the fiscal year 2022 and consistent with its most recent guidance for the year, IronNet currently still expects: Revenue of $43-45 million; ARR of $75 million as of end of the fiscal year.***

*See* SEC Form 8-K, Ex. 99.1 (Sept. 14, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001777946/000119312521272930/d193819dex991.htm.

91.     The bolded statements, which were made in IronNet's third-quarter of FY22, were

materially false and misleading and omitted material facts when made because Defendants knew

but did not disclose to investors that:

(i)      Despite that Defendants told investors that IronNet's public sector business was not significant and may never be significant, which Defendants reiterated in this press release (*see* ¶49), IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals (*see* ¶73);

(ii)     Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which required the approval of both the House of Representatives and Senate – neither of which had occurred as of September 14, 2021 (*see* ¶51);

(iii)    The NDAA is typically approved each year in December or later (*see* ¶50) and then needs to be signed into law by the President;

(iv)     Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

(v)      When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

(vi)     The precise timeline for NDAA funds to be deployed was unpredictable, but, Defendants knew and belatedly conceded the process would still be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event

that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vii)    Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22; and

(viii)    As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

92.    In the September 14, 2021 Form 8-K, Defendants also reported revenue for IronNet of $6.1 million for Q2 2022 compared to $7.9 million for Q2 2021, which missed expectations by $1.3 million.  IronNet further announced Q2 2022 ARR of $24.1 million compared to $19.5 million in Q2 2021 and a net loss of $17.2 million compared to $14.3 million for Q2 2021. Although IronNet's results were lackluster, and IronNet would need to ramp up business significantly to meet its Guidance by the close of FY22, Defendant Gerber confidently justified the Company's Guidance by pointing to key "larger deployments" and "large new customer contracts" that supposedly emerged in the first half of FY22 and were now imminent:

> "In the first half of fiscal 2022, ***IronNet was invited into larger deployments that shifted the anticipated closing of several large new customer contracts into the third quarter***, including some that involve contracts for entire supply chain communities at once," said James Gerber, CFO of IronNet.

*See* SEC 8K, Ex. 99.1 (9/14/2021) *available at*, https://www.sec.gov/Archives/edgar/data/0001777946/000119312521272930/d193819dex991.htm

93.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(i)    Despite that Defendants told investors that IronNet's public sector business was not significant and may never be significant (*see* ¶49), the "larger deployments" and "large new customer contracts" referenced by Defendant Gerber, which materially made up IronNet's Guidance, were unprecedented multi-million dollar public sector deals (*see* ¶73);

     (ii)     Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which required the approval of both the House of Representatives and Senate – neither of which had occurred as of September 14, 2021 (*see* ¶51);

     (iii)    The NDAA is typically approved each year in December or later (*see* ¶50) and then needs to be signed into law by the President;

     (iv)    Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

     (v)     When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

     (vi)    The precise timeline for NDAA funds to be deployed was unpredictable, but, Defendants knew and belatedly admitted the process would still be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

     (vii)   Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals before the end of FY22 was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22; and

     (viii)   As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

94.     In the same Form 8-K, Defendant Welch likewise misleadingly supported IronNet's Guidance and customer momentum, in relevant part, as follows:

> William Welch, Co-CEO of IronNet, commented, "***We are on target with our first half guidance*** and are encouraged to begin our journey as a public company this month following the recent completion of our business combination with LGL. ***New customer momentum so far in the second half of our fiscal year is strong and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group***." *Id.*

95.     The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

     (i)     IronNet's "first half guidance" did not place the Company "on target" to achieve its Guidance, and its supposedly "strong" "new customer momentum" could not do

34

so either.  In fact, IronNet's Guidance was materially based on large multi-million dollar public sector deals that had no realistic chance of contributing revenue in FY22;

(ii)     Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which required the approval of both the House of Representatives and Senate – neither of which had occurred as of September 14, 2021 (*see* ¶51);

(iii)    The NDAA is typically approved each year by December or later (*see* ¶50) and then needs to be signed into law by the President;

(iv)    Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

(v)     When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

(vi)    The precise timeline for NDAA funds to be deployed was unpredictable, but, , Defendants knew and belatedly admitted the process would still be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vii)   Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals before FY22 end was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22, let alone for them to close in the ***third quarter*** without NDAA approval; and

(viii)  As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

96.     IronNet's press release also told investors that "[y]ou should carefully consider the…risks and uncertainties described under the heading 'Risk Factors' in LGL's proxy statement/prospectus filed with the Securities and Exchange Commission (SEC) pursuant to Rule 424(b)(3) on August 6, 2021."  The August 6, 2021 proxy statement/prospectus referenced by the press release provided the following boilerplate warnings concerning IronNet's exposure to business with the public sector:

*IronNet's business depends, in part, on sales to government organizations, and significant changes in the contracting or fiscal policies of such government organizations could have an adverse effect on the Combined Company's business and results of operations. IronNet's future growth depends, in part, on increasing sales to government organizations. Demand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles.* IronNet has made significant investments to address the government sector, but we cannot assure you that these investments will be successful, or that [IronNet] will be able to maintain or grow its revenue from the government sector. *Although we anticipate that they may increase in the future, sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of [IronNet's] revenue.* U.S. federal, state and local government sales are subject to a number of challenges and risks that may adversely impact the Combined Company's business. Sales to such government entities include the following risks:

- selling to governmental agencies can be highly competitive, expensive and time-consuming, often requiring significant upfront time and expense without any assurance that such efforts will generate a sale;

- government certification requirements applicable to IronNet's products may change and, in doing so, restrict the Combined Company's ability to sell into the U.S. federal government sector until it has attained the required certifications…

- *government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform*;

- *government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform*;

- governments routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government refusing to continue buying IronNet's platform, which would adversely impact the Combined Company's revenue and results of operations, or institute fines or civil or criminal liability if the audit were to uncover improper or illegal activities;

- interactions with the U.S. federal government may be limited by post-employment ethics restrictions on members of IronNet's management;

- foreign governments may have concerns with purchasing security products from a company that employs former NSA employees and officials, which may negatively impact sales; and

- governments may require certain products to be manufactured, hosted, or accessed solely in their country or in other relatively high-cost manufacturing locations, and the Combined Company may not manufacture all products in locations that meet these requirements, affecting its ability to sell these products to governmental agencies.

*See* SEC 424(b)(3) (Aug. 6, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001777946/000119312521239390/d472786d424b3.htm.

97.     The bolded statements were materially false and misleading and omitted material information when made because they were generic and hypothetical and failed to warn investors of IronNet's already material dependence on public sector deals subject to the NDAA to achieve the Guidance.  At the time these statements and omissions were made Defendants knew but failed to disclose to investors that:

(i)     IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals;

(ii)     These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds, after the NDAA is passed into law (*see* ¶¶53, 73-76);

(iii)     Thus, Defendants mischaracterized "public sector budgetary cycles and funding authorizations" and "delays" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance; and

(iv)     Further, because Defendants also represented that IronNet's public sector business was not significant to the Company's revenue (*see* ¶49), and claimed that it may never become significant to the Company (*see id.*), investors could not appreciate that IronNet's ability to achieve the current-year Guidance materially depended on large and unprecedented public sector deals at the mercy of the NDAA.

98.     IronNet's stock price skyrocketed 38% immediately following the alleged false and misleading statements made in ¶¶90, 92, 94, and 96, which supposedly placed IronNet on the cusp of imminent transformational growth due by FY22 end (January 31, 2022).  Investors had no

37

reason to believe IronNet's Guidance was so deeply dependent on large deals with the public sector that were conditioned on receiving NDAA funding.

**B.      The September 20, 2021 Statements**

99.      Less than one week later, during a September 20, 2021 investor fireside chat with Wells Fargo, Defendant Gerber again confidently reiterated IronNet's Guidance and stressed multiple large deals that would close in the second half of the year.  He also went so far as to suggest that the $75 million ARR Guidance was conservative:

Q: "You said you're looking at, you're trying to provide more visibility into the long-term view. Why don't you just start by summarizing the guidance that we've got currently out there for the remainder of the year?"

A: "Yeah. So we summarize that. In fact, we've put out of subsequent 8-K along those lines just last week*. So the primary affects that we've been seeing with the momentum in the marketplace is what's really driving the primary forward metric of ARR, the annual recurring revenues. So we did increase the guidance on that. We've been seeing these larger contracts coming along. So that's been the primary focus on the guidance*, somewhat to the expense of revenue starts, but we're a SaaS company so we recognize revenue all along the course of contracts. *We've seen some really significant ARR builds, and that was the core of the guidance*."

Q: Okay. Now, correct me if I'm wrong, but I think you've guided to 75 million for fiscal '22 for your ARR."

A: "That's right. *When we originally did our outlook for the year at the very first S-4, we saw that at about 68 million and really that's where evolving contracts have caused us to increase our guidance up to 75.*"

Q: "Okay. So I want to maybe just drill into that really quick. You've talked about some of those larger deals that are forming in the back half of the year. Should we assume that those larger deals that are still forming are in that 75 million or is that, would you consider that upside to the 75 million guidance?"

A: "Well, *they make up an important part of the 75. Any good company has got to build its business on everything from singles and doubles all the way up to the big transactions. We're very pleased to see an outsized set of larger transactions out in front of us. So there is opportunity, but we're focused on executing to the 75 and making sure that's where we deliver for the year*."

Fireside Chat, *available at* https://ir.ironnet.com/news-events/events-presentations/detail/7489/tech-talk-fireside-chat-with-wells-fargo

100.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not inform investors that:

(i)      Despite that Defendants told investors that IronNet's public sector business was not significant and may never be significant, IronNet's "increased" Guidance was materially based on large and unprecedented multi-million dollar public sector deals (*see* ¶73);

(ii)     Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which required the approval of the House of Representatives and the Senate and the signature of the President, which had not occurred and typically occurs in December or later (*see* ¶51);

(iii)    Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

(iv)     When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

(v)      The precise timeline for NDAA funds to be deployed was protracted and unpredictable, and Defendants knew the process would be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vi)     Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22;

(vii)    As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable; and

(i)      In, light of the foregoing, the notion that IronNet's "increased" $75 million ARR guidance for FY22 could be considered conservative had no basis or support.

101.    Following the fireside chat in which Guidance was confidently reiterated and IronNet's supposedly "large" new deals were touted by Defendants, IronNet's stock price climbed

over 19% from a closing price of $27.95 on September 19, 2021 to a closing price of $33.34 on

September 20, 2021.

C.   **The September 22, 2021 Misstatements**

102.   On September 22, 2021, IronNet filed with the SEC a registration statement, which

was signed by the Individual Defendants.   This registration statement addressed IronNet's "large

contracts" and Guidance and provided, in relevant part, that the Company still expected to achieve

Guidance with a slight improvement of gross margins in FY22:

Gross Profit and Gross Margin

Mix changes in cost of revenue resulted in a decrease in software gross margin to 71.1%
in quarter to date 2022 compared to 83.7% in quarter to date 2021, and a decrease in
professional services gross margin to 52.0% in quarter to date 2022 compared to 90.1%
in quarter to date 2021. Quarter to date 2021 margin was unusually high as we onboarded
2 significant revenue customers which hadn't yet ramped their full cloud costs in period
and finalized delivery of key significant service contract in EMEA. Professional services
margin will continue to be volatile contract to contract as we scale the business.  ***We
expect that gross margins for the rest of fiscal 2022 to improve slightly to achieve our
full year guidance. Margins may remain volatile compared to fiscal 2021 due to the
continuing presence of large contracts in our revenue mix***. (emphasis added).

103.   The bolded statements were materially false and misleading and omitted material

facts when made because Defendants knew but did not disclose to investors that:

(i)    Gross margins were not the real impediment to IronNet achieving its increased
       Guidance, nor could a slight improvement in gross margins allow for the Company
       to meet its Guidance;

(ii)   Despite that Defendants told investors that IronNet's public sector business was not
       significant and may never be significant, which Defendants reiterated in this press
       release (*see* ¶49), IronNet's Guidance was materially based on large and
       unprecedented multi-million dollar public sector deals (*see* ¶73);

(iii)  Most, if not all, of these large public sector deals were subject to the passage of the
       NDAA, which required the approval of the House of Representatives and the Senate
       and the signature of the President, which had not occurred and typically occurs in
       December or later (*see* ¶51);

40

(iv)     Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

(v)      When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

(vi)     The precise timeline for NDAA funds to be deployed was unpredictable, but, Defendants knew and belatedly conceded the process would still be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vii)    Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22; and

(viii)   As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

104.    This registration statement also contained boilerplate, non-specific risk warnings about supposedly unpredictable risks, including with doing business with government entities.

The registration statement, in relevant part, provided as follows:

> ***Our sales cycles can be long and unpredictable***, and our sales efforts require considerable time and expense.
>
> ***Our revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for our platform, particularly with respect to large organizations and government entities***. Customers often view the subscription to our platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify our platform and solutions prior to entering into or expanding a relationship with us. Large enterprises and ***government entities in particular often undertake a significant evaluation process that further lengthens our sales cycle.*** *Id.*

105.    The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i)      IronNet's Guidance was already materially based on large and unprecedented multi-million dollar public sector deals (*see* ¶73);

41

(ii)     These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds (*see* ¶¶53, 73-76);

(iii)    Thus, Defendants mischaracterized "unpredictable sales cycles" for government entities as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance;

106.    This registration statement also contained other material misstatements and/or omissions about IronNet's potential and forward-looking risks with doingbusiness with the government:

**Broaden reach into the U.S. federal government vertical**

We spent the first five years of our life building foundational customer relationships in the commercial sector. This was intentional, as the company mission required it first to build the technology and business basis required to protect the private side of the public/private partnership. ***We are now actively investing in the acquisition of customers in the U.S. federal government vertical.*** We are FedRAMP Ready and are registered with the Department of Homeland Security Continuous Diagnostics & Monitoring program approved products list to provide federal agencies with innovative security tools. In addition, our platform is deployed in the AWS GovCloud. We are pursuing opportunities in the civilian, defense, and intelligence sectors…

Our business depends, in part, on sales to government organizations, and significant changes in the contracting or fiscal policies of such government organizations could have an adverse effect on our business and results of operations. *Id.*

Our future growth depends, in part, on increasing sales to government organizations. Demand from government organizations is often unpredictable, ***subject to budgetary uncertainty and typically involves long sales cycles***. We have made significant investments to address the government sector, but we cannot assure you that these investments will be successful, or that we will be able to maintain or grow our revenue from the government sector. ***Although we anticipate that they may increase in the future, sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of our revenue***. U.S. federal, state and local government sales are subject to a number of challenges and risks that may adversely impact our business.  *Id.*

107.    The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i)     IronNet's Guidance was already materially based on large and unprecedented multi-million dollar public sector deals (*see* ¶73);

(ii)    These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds from when the NDAA is passed into law (*see* ¶¶53, 73-76);

(iii)   Thus, Defendants mischaracterized "budgetary uncertainties" and "long sales cycles" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance; and

(iv)    Further, because Defendants also represented that IronNet's public sector business was not significant to the Company's revenue (*see* ¶49), and claimed that it may never become significant to the Company (*see id.*), investors could not appreciate that IronNet's ability to achieve current-year Guidance materially depended on large and unprecedented public sector deals at the mercy of the NDAA.

**D.    September 28, 2021 Misstatements**

108.    On September 28, 2021, IronNet filed an amended registration statement on Form S-1/A with the SEC, which was signed by the Individual Defendants.  As with the September 22, 2021 registration statement, this amended registration statement dictated IronNet's Guidance and provided, in relevant part:

Gross Profit and Gross Margin

Mix changes in cost of revenue resulted in a decrease in software gross margin to 71.1% in quarter to date 2022 compared to 83.7% in quarter to date 2021, and a decrease in professional services gross margin to 52.0% in quarter to date 2022 compared to 90.1% in quarter to date 2021. Quarter to date 2021 margin was unusually high as we onboarded 2 significant revenue customers which hadn't yet ramped their full cloud costs in period and finalized delivery of key significant service contract in EMEA. Professional services margin will continue to be volatile contract to contract as we scale the business. ***We expect that gross margins for the rest of fiscal 2022 to improve slightly to achieve our full year*** guidance. Margins may remain volatile compared to fiscal 2021 due to the continuing presence of large contracts in our revenue mix.

109.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(i)     Gross margins were not the real impediment to IronNet achieving its increased Guidance, nor could a slight improvement in gross margins allow for the Company to meet its Guidance;

(ii)    Despite that Defendants told investors that IronNet's public sector business was not significant and may never be significant, IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals (*see* ¶73);

(iii)   Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which still required the approval of the Senate and the signature of the President, the latter of which typically occurs in December or later (*see* ¶51);

(iv)    Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see* ¶75);

(v)     When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see* ¶75);

(vi)    The precise timeline for NDAA funds to be deployed was unpredictable, but, Defendants knew and belatedly admitted the process would still be long and protracted from when the NDAA was first signed into law (*see* ¶¶73-76) – an event that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vii)   Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22; and

(viii)  As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

110.    This amended registration statement also contained misleading statements and omissions about supposedly unpredictable risks with large or government contracts, in relevant part, as follows:

*Our sales cycles can be long and unpredictable*, and our sales efforts require considerable time and expense.

*Our revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for our platform, particularly with respect to large organizations and government entities*. Customers often view the

subscription to our platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify our platform and solutions prior to entering into or expanding a relationship with us. Large enterprises and *government entities in particular often undertake a significant evaluation process that further lengthens our sales cycle. Id.*

111.   The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i)     IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals;

(ii)    These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds, from when the NDAA is passed into law (*see* ¶¶50, 73-76);

(iii)   Thus, Defendants mischaracterized "budgetary uncertainties" and "long sales cycles" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance; and

(iv)    Further, because Defendants also represented that IronNet's public sector business was not significant to the Company's revenue, and claimed that it may never become significant to the Company, investors could not appreciate that IronNet's ability to achieve current-year Guidance materially depended on large and unprecedented public sector deals at the mercy of the NDAA.

112.   This amended registration statement also contained other material misstatements and omissions about IronNet's future work for the government, in relevant part, as follows:

**Broaden reach into the U.S. federal government vertical**

We spent the first five years of our life building foundational customer relationships in the commercial sector. This was intentional, as the company mission required it first to build the technology and business basis required to protect the private side of the public/private partnership. *We are now actively investing in the acquisition of customers in the U.S. federal government vertical.* We are FedRAMP Ready and are registered with the Department of Homeland Security Continuous Diagnostics & Monitoring program approved products list to provide federal agencies with innovative security tools. In addition, our platform is deployed in the AWS GovCloud. We are pursuing opportunities in the civilian, defense, and intelligence sectors...

Our business depends, in part, on sales to government organizations, and significant changes in the contracting or fiscal policies of such government organizations could have an adverse effect on our business and results of operations. Id.

Our future growth depends, in part, on increasing sales to government organizations. Demand from government organizations is often unpredictable, ***subject to budgetary uncertainty and typically involves long sales cycles***. We have made significant investments to address the government sector, but we cannot assure you that these investments will be successful, or that we will be able to maintain or grow our revenue from the government sector. ***Although we anticipate that they may increase in the future, sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of our revenue***. U.S. federal, state and local government sales are subject to a number of challenges and risks that may adversely impact our business. *Id.*

113.    The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i)      IronNet's Guidance was already materially based on large and unprecedented multi-million dollar public sector deals;

(ii)     These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds from when the NDAA is passed into law (*see* ¶¶53, 73-76);

(iii)    Thus, Defendants mischaracterized "budgetary uncertainties" and "long sales cycles" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance;

(iv)     Further, because Defendants also represented that IronNet's public sector business was not significant to the Company's revenue, and claimed that it may never become significant to the Company, investors could not appreciate that IronNet's ability to achieve current-year Guidance materially depended on large and unprecedented public sector deals at the mercy of the NDAA.

### E.    The September 30, 2021 Misstatements

114.    On September 30, 2021, IronNet filed with the SEC a prospectus in connection with an amended September 28, 2021 registration statement, which was signed by the Individual Defendants.  The prospectus was filed in connection with the issuance of 64,020,756 shares of

46

IronNet common stock based on the sale of warrants.   In this prospectus, Defendants again reiterated IronNet's Guidance, stating:

Gross Profit and Gross Margin

Mix changes in cost of revenue resulted in a decrease in software gross margin to 71.1% in quarter to date 2022 compared to 83.7% in quarter to date 2021, and a decrease in professional services gross margin to 52.0% in quarter to date 2022 compared to 90.1% in quarter to date 2021. Quarter to date 2021 margin was unusually high as we onboarded 2 significant revenue customers which hadn't yet ramped their full cloud costs in period and finalized delivery of key significant service contract in EMEA. Professional services margin will continue to be volatile contract to contract as we scale the business.  *We expect that gross margins for the rest of fiscal 2022 to improve slightly to achieve our full year guidance*. Margins may remain volatile compared to fiscal 2021 due to the continuing presence of large contracts in our revenue mix.

115.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(i)      Gross margins were not the real impediment to IronNet achieving its increased Guidance, nor could a slight improvement in gross margins allow for the Company to meet its Guidance;

(ii)     Despite that Defendants told investors that IronNet's public sector business was not significant and may never be significant, IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals (*see ¶*73);

(iii)    Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which still required the approval of the Senate and the signature of the President, the latter of which typically occurs in mid-December or later (*see ¶¶*50-51);

(iv)    Only after being signed into law could NDAA funds begin to go to the OMB and then to the Defense Department, which would then break the funds down for distribution to the various services and department agencies (*see ¶*75);

(v)     When the funds reached the appropriate agencies, and the agencies learned their full authorization levels, they could begin to deploy the funds to contracts like the ones Defendants materially based IronNet's Guidance on (*see ¶*75);

(vi)    The precise timeline for NDAA funds to be deployed was unpredictable, but, Defendants knew and belatedly admitted the process would still be long and protracted from when the NDAA was first signed into law (*see ¶¶*73-76) – an event

that typically occurs in mid-December – only six weeks before IronNet's fiscal year-end (January 31);

(vii) Accordingly, the timeline for NDAA funds to be deployed to IronNet's large public sector deals was unrealistic and unsupportable. It was impossible for the revenues from these deals to benefit IronNet in FY22; and

(viii) As a result, IronNet's Guidance and growth story that Defendants confidently led investors to believe would imminently occur between mid-September 2021 and January 31, 2022 was unachievable.

116. Much like in the September 14 Form 8-K and the registration statements, the prospectus contained materially misleading statements and omissions about supposedly unpredictable risks associated with doing business with the government:

> ***Our sales cycles can be long and unpredictable***, and our sales efforts require considerable time and expense.
>
> ***Our revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for our platform, particularly with respect to large organizations and government entities***. Customers often view the subscription to our platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify our platform and solutions prior to entering into or expanding a relationship with us. Large enterprises and ***government entities in particular often undertake a significant evaluation process that further lengthens our sales cycle.*** *Id.*

117. The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i) IronNet's Guidance was materially based on large and unprecedented multi-million dollar public sector deals;

(ii) These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds, when the NDAA is passed into law (*see* ¶¶53, 73-76); and

(iii) Thus, Defendants mischaracterized "long and unpredictable … sales cycles" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance;

118.    The prospectus further misleadingly discussed IronNet's anticipated future work with the government, in relevant part, as follows:

**Broaden reach into the U.S. federal government vertical**

We spent the first five years of our life building foundational customer relationships in the commercial sector. This was intentional, as the company mission required it first to build the technology and business basis required to protect the private side of the public/private partnership. *We are now actively investing in the acquisition of customers in the U.S. federal government vertical.* We are FedRAMP Ready and are registered with the Department of Homeland Security Continuous Diagnostics & Monitoring program approved products list to provide federal agencies with innovative security tools. In addition, our platform is deployed in the AWS GovCloud. We are pursuing opportunities in the civilian, defense, and intelligence sectors…

*Our business depends, in part, on sales to government organizations, and significant changes in the contracting or fiscal policies of such government organizations could have an adverse effect on our business and results of operations.* **Id.**

Our future growth depends, in part, on increasing sales to government organizations. Demand from government organizations is often unpredictable, *subject to budgetary uncertainty and typically involves long sales cycles*. We have made significant investments to address the government sector, but we cannot assure you that these investments will be successful, or that we will be able to maintain or grow our revenue from the government sector. *Although we anticipate that they may increase in the future, sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of our revenue*. U.S. federal, state and local government sales are subject to a number of challenges and risks that may adversely impact our business. *Id.*

119.    The bolded statements were materially false and misleading and omitted material information when made because Defendants knew but failed to disclose to investors that:

(i)     IronNet's Guidance was already materially based large and unprecedented multi-million dollar public sector deals;

(ii)    These large public sector deals were already subject to known risks that eliminated their chances of realistically contributing revenue to FY22, including the timeline for NDAA approval, which typically occurs in December or later (*see* ¶50), and the protracted timeline for the deployment of NDAA funds when the NDAA is passed into law (*see* ¶¶53, 73-76);

(iii)    Thus, Defendants mischaracterized "budgetary uncertainty" and "long sales cycles" as possible potential risks when they knew these precise risks already fatally undermined IronNet's Guidance; and

(iv)    Further, because Defendants also represented that IronNet's public sector business was not significant to the Company's revenue, and claimed that it may never become significant to the Company, investors could not appreciate that IronNet's ability to achieve current-year Guidance materially depended on large and unprecedented public sector deals at the mercy of the NDAA.

## VI.    DEFENDANTS REVEAL THE TRUTH: IRONNET'S GUIDANCE WAS UNREALISTIC AND UNACHIEVABLE

120.    On December 15, 2021 – just two and a half months after Defendants re-affirmed IronNet's Guidance on September 30, 2021, Defendants revealed that IronNet's Guidance was materially dependent on large public sector deals that had no hope of closing by FY22-end, and that as a result the Company would massively miss its Guidance.  In addition to slashing IronNet's FY22 ARR outlook by 60% and its FY22 revenue outlook by 40%, Defendants also admitted that they should never have included the large public sector deals in IronNet's Guidance to begin with. Accordingly, Defendants also restructured how IronNet calculated guidance to remove these deals indefinitely.  Defendants stated, in relevant part, as follows:

> *Our prior outlook for both the quarter and fiscal year was supported by what we assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector. We had previously expected to finalize these opportunities in the second half of the fiscal year, however they remain pending primarily due to government delays in getting funding through to federal budgets.* These continue to be viable opportunities in our pipeline. *Given the difficulty in predicting when they will close, we have removed them from our ARR guidance.*
>
> **Third Quarter Fiscal 2022 Financial & Operating Highlights…Revenue:** $6.9 million compared to $7.0 million in the same quarter last Year… **Annual Recurring Revenue (ARR)**: $27.5 million compared to $21.2 million at the end of the same quarter last year and $24.1 million at the end of the prior quarter.
>
> **Outlook**
> For the fiscal year 2022, IronNet now expects: *Revenue of approximately $26 million; ARR of approximately $30 million to exit the fiscal year*.

50

*See* SEC Form 8-K, Ex. 99.1 (Dec. 15, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001777946/000119312521357948/d249328dex991.htm

121.    Far from being unpredictable, Defendant Alexander revealed on a Q3 2021 earnings call the same day that IronNet's large public sector deals quite predictably could not have contributed to FY22 Guidance.  Most of these deals were dependent on the NDAA, which typically is approved in some form in December or later, and then there is a very protracted funding time lag that is highly unpredictable, as Defendant Alexander himself conceded.

122.    When pressed by an analyst on the timeline for when these supposedly large public sector deals would come through, Defendant Alexander explained that even after the NDAA passed, which it had that day, IronNet still could not predict when it would receive NDAA funding: "It won't change overnight. So, the President signs it, it doesn't happen overnight, but we think this is something that will happen in the next few months."  *See ¶¶*73-76.

*See* Q3 2021 Results Tr., *available at* https://seekingalpha.com/article/4475481-ironnet-inc-irnt-ceo-keith-alexander-on-q3-2021-results-earnings-call-transcript.

123.    In fact, Defendant Alexander admitted that despite the passage of the NDAA, which occurred that day, IronNet still had *no idea during what quarter* the substantial public sector revenues underlying the now-scrapped guidance would come in, and in fact, it has been nearly a year and none of those deals have yet to come through:

> [Alexander] Our confidence remains high in the strategic opportunities. *We've revised our guidance for the year, and it reflects the fact that we aren't confident on what quarter they will actually come in*, but we see these as viable opportunities for the future. We recognize that you want us to have a predictable business, and we can accomplish that with our transactional side, and we're going to do that, and these strategic deals will add momentum into our revenue as we move forward." *Id.*

124.   On the same call, Defendant Gerber also addressed the complete reset of IronNet's Guidance – only ten weeks after re-affirming it on September 30, 2021 due to lack of visibility into the timing for the large public sector deals that Guidance was materially based on:

> [Gerber:] I think you were just asking about our guidance for this year of the $26 million for revenue. As we've noted, what we've significantly done here is to ***completely remove all of these larger strategic transactions that are still out there, but difficult to predict***. So, we've reset the guidance at this point to not include them. Our guidance from August [and September] had included them.  *Id.*

125.   Also, Defendants revealed for the first time some detail about IronNet's supposedly large opportunities which materially comprised the Company's Guidance:

> [Defendant Alexander] With respect to the strategic opportunities that we have and what we're seeing in the marketplace, first, the passage of the NDAA, or the National Defense Authorization Act, today means that we could start to see some of these move forward. We've seen a slowdown in public sector, especially in the ones we're dealing with based on the congressional lack of moving on the NDAA.  *Id.*

126.   Moreover, Defendant Alexander specifically discussed two of the public contracts that never should have been included in the Guidance to begin with, including a $10 million contract worth at least 15% of the FY22 ARR, which was tied to one sales opportunity entirely dependent on federal funding:

> Let me give you several examples that may help illuminate these delays. The first is a double digit, million dollar ARR opportunity with a branch of the military that is held up as part of the federal funding delays playing out in Washington. This contract continues to grow, but at a reduced pace.

> The second is another multimillion dollar defense industrial base customer whose contract with us is making its way more slowly through government procurement than we anticipated. We have several deals with states that are gaining momentum as the American RescuePlan funds are arriving and being approved by state legislatures.

> We also have a large multi-million dollar opportunity with an international government that was working through political turmoil and the impacts of the pandemic.  *Id.*

127.   After the December 15 news, IronNet's stock price plummeted from $6.80 per share on December 15, 2021 to close at $4.66 per share the following day, a 31% decline.

128.     As a result of these revelations, analysts heavily criticized IronNet's management for its total lack of credibility – particularly when almost every one of IronNet's competitors met or exceeded their forecasts for the year.  ¶¶80-81.

129.     A report by a market commentator published on December 16, 2021 by Henrik Alex on Seeking Alpha explained that "[a]fter listening to the conference call, I have very little faith in the company closing any of the alleged 'late-stage multi-million dollar strategic customer opportunities' in the short term or even at all as management already hinted to them not being part of the company's upcoming FY2023 guidance."  *See* IronNet – Total Disaster – Get Out or Even Get Short, available at https://seekingalpha.com/article/4475564-ironnet-total-disaster-get-out-or-get-short.  That article added that "[q]uite frankly, I am having a hard time envisioning the company still being in business two years from now given elevated cash burn and year-over-year declines in revenues."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

130.     As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding IronNet, their control over, and/or receipt and/or modification of IronNet allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IronNet, participated in the fraudulent scheme alleged herein.

131.     Specifically, during the Class Period the Individual Defendants that the Guidance was dependent upon large sales opportunities with the public sector and that these sales opportunities could not conceivably close prior to the end of IronNet's fiscal year, nor could they provide revenues for FY22 ARR and revenue because of the timeline for securing money through the NDAA.

### I.   Defendants Were Motivated to Commit Fraud

#### 1.   Defendant Alexander Was Motivated to Commit Fraud To Reap $5.1 Million From Insider Sales

132.     Defendant Alexander was motivated to artificially inflate IronNet's stock to increase the value of his stock before selling it.

133.     Defendant Alexander sold 85% of his available IronNet stock in a highly-compressed time period – just five weeks – and beginning just two weeks after re-affirming the Guidance on September 30, 2021 (*see* ¶¶67-70).

134.     Defendant Alexander sold his shares with absolute clarity into the fact that the NDAA would not be approved in time to contribute to IronNet's FY22 revenue or ARR.

135.     Defendant Alexander opportunistically sold these shares at artificially inflated prices just before the window closed for him to do so, executing his final trade – which alone netted him almost a quarter million dollars – just three weeks before IronNet was forced to come clean about its Guidance.

136.     During the Class Period, Defendant Alexander made the following sales at artificially inflated prices:

| Sales Date | Number of Shares | Unit Price | Proceeds |
|---|---|---|---|
| | | | |
| 10/18/21 | 93,525 | $10.25 | $958,631.00 |

54

| | | | |
|---|---|---|---|
| 10/25/21 | 90,000 | $10.13 | $911,700.00 |
| 11/01/21 | 4,003<br>85,997 | $12.76<br>$11.98 | $51,078.30<br>$1,030,240.00 |
| 11/08/21 | 90,000 | $11.03 | $992,700.00 |
| 11/15/21 | 90,000 | $10.34 | $930,600.00 |
| 11/22/21 | 24,100 | $10.12 | $243,892.00 |
| | **477,625** | | **$5,118,841.30** |

137.    Defendant Alexander effected these sales pursuant to a Rule 10b5-1 trading plan adopted by Defendant Alexander during the Class Period, on September 17, 2021, as well as a Lock-Up Agreement entered into in connection with the Merger Agreement.  *See* ¶68.

138.    Under the terms of the Lock-Up Agreement, Defendant Alexander was eligible to sell a maximum of 568,525 shares of IronNet beginning on September 30, 2021, which was also the last date on which Defendants reaffirmed the Guidance.[11]  Defendant Alexander sold 85%, or 477,625, of these shares within five weeks during the Class Period.

139.    Defendant Alexander's $5.1 million in insider proceeds is more than ***14 times greater*** than his annual base salary of $360,000.[12]

140.    Defendant Alexander's sales violated IronNet's Code of Business Conduct and Ethics (the "Code").  The Code was approved by the Company's Board of Directors and became effective on August 26, 2021. The Code explicitly prohibits the actions that Defendant Alexander engaged in and informs "every employee, officer and director" of the Company that using material

---

[11] The lock-up period expired*, i.e.,* Alexander became eligible to sell the remainder of his shares, on February 26, 2022, 180 days after the SPAC merger closed.

[12]              *See*              Alexander              Employment              Agreement, https://www.sec.gov/Archives/edgar/data/0001777946/000119312521223163/d472786dex1013.htm.

non-public information in connection with selling securities is illegal. The Code states that: "Employees, officers and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes. All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities… is illegal."

141.    Defendant Alexander's stock sales were unusual in amount, suspicious in timing, and in violation of the Company's ethics code.

**2.    Defendants Were Motivated to Continue Issuing The Guidance Because They Had Used It to Achieve the Merger and Did Not Want the Bottom to Fall Out on the Shock Quickly After IronNet Went Public**

142.    Prior to the Class Period, IronNet raised over $100 million in funding from private investment funds. Yet, this wasn't enough and in 2021, IronNet desperately needed more capital. Specifically, IronNet reported having $31 million in cash equivalents on January 31, 2021 and $14 million in cash equivalents on July 31, 2021. *See* September 14, 2021 Form 8-K at 11.  Because the Company on average burned $12 million to $16 million of cash per quarter, without obtaining additional capital, the Company would likely have run out of cash by around November 2021.  As such, IronNet needed funding from the SPAC Merger to sustain its operations.

143.    As alleged above, to consummate the SPAC Merger, IronNet repeatedly pushed unachievable projections rather than its past results. *See supra* Section IV.C. (Defendants issued Guidance on March 15, 2021, May 14, 2021, June 4, 2021, August 6, 2021, and August 10, 2021).

144.    Less than a week prior to the LGL shareholder vote on whether the approve the SPAC Merger, IronNet's August 10, 2021 Guidance affirmed the fiscal year 2023 revenue and ARR outlook, increased the outlook for ARR for fiscal 2022, and decreased its outlook for fiscal year 2022 revenue.  Defendants explained that the increased ARR and decreased revenue for fiscal

year 2022 was "[d]ue to shifts in the anticipated closing of several new customer contracts." Relying in part on these projections, LGL shareholders voted in favor of the Merger resulting in an infusion of much needed capital for IronNet to sustain its operations.

145.    Thereafter, nine months into the year and less than a month after becoming a publicly traded Company, Defendants were loath to correct the FY22 Guidance after heavily relying on it to execute the SPAC merger.  To walk back the context (and pretext) for the SPAC Merger right after closing the deal was unthinkable and would fatally undermine management's credibility only weeks after IronNet shares became publicly traded.  It would also invariably cause the stock price to collapse almost immediately after the Company becoming public.

146.    Accordingly, Defendants were motivated to affirm the Guidance during the Class Period to continue the narrative they used to consummate the Merger.

### J.  The Individual Defendants Knew Their Statements About The Guidance Were Misleading

#### 1.    After the Class Period, Defendant Alexander Admitted That, As He Knew All Along, the Guidance Was Unachievable for FY22

147.    Defendant Alexander worked in the government for 40 years prior to his position as Co-CEO of IronNet.  *See* ¶25.  During the Class Period, Defendant Alexander knew the process by which IronNet's potential public sector customers obtained funds and contracted with private sector companies such as IronNet to spend such funds. The Company acknowledged Defendant Alexander's knowledge of the inner workings of the government (*see* ¶35), as well as his key "access to key decisionmakers within government agencies and the private sector."

148.    Defendant Alexander knew that the Guidance materially depended on securing large contracts with public sector agencies – which Alexander conceded after the Class Period were subject to protracted processes by which agencies receive and deploy funding after the passage of the NDAA, which typically occurs in December.  *See* ¶50.

57

149.     Accordingly, Defendants knew IronNet's FY22 Guidance had no basis because, as of the start of the Class Period on September 14, 2021, neither chamber of Congress had even begun debating the operative version of the NDAA, let alone passed the NDAA, and even when the NDAA is passed in December the time lag on disbursing the funding would make it impossible for any contracts to contribute to IronNet's FY22 revenues since the Company's FY22 ended on January 31, 2022.

### 2. Defendants, In Particular Defendant Gerber, Knew IronNet's Guidance Was Misleading Because It Failed to Comply With AICPA Guidelines

150.     Defendant Gerber is the CFO of IronNet.  He has served in this role since 2016 and has over 30 years of experience in the finance industry. Prior to IronNet Defendant Gerber served as a CFO for various companies since at least 1995.   www.linkedin.com/in/james -gerber-3baab814.

151.     The American Institute of Certified Public Accountants ("AICPA") is the national professional organization of Certified Public Accountants. This AICPA Guide has been developed to assist management in the preparation of financial forecasts and projections.

152.     The 2008 AICPA Guide 6.49 provides that "Prospective financial information presents important statements of the expected future financial results of an entity. The ultimate responsibility for prospective financial information rests with the responsible party at the highest level of authority, the same level as for historical financial statements." Accordingly, Gerber and the Individual Defendants are responsible for the Guidance.

153.     AICPA Guide 6.34 provides that "[a]ssumptions are the essence of developing prospective financial information and are the single most important determinant of such information. The quality of the underlying assumptions largely determines the quality of prospective financial information."  AICPA Guide 6.35 provides that "[t]he attention devoted to

the appropriateness of a particular assumption should be commensurate with the likely relative impact of that assumption on the prospective results. Assumptions with greater impact should receive more attention than those with less impact."

154.    AICPA Guide 8.25 provides that "[t]he disclosure of significant assumptions is essential to the reader's understanding of the prospective financial statements; accordingly, the responsible party should disclose those assumptions deemed to be significant to the statements. The basis or rationale for the assumptions should preferably be disclosed to assist the user of the prospective financial statements to understand the presentation and make an informed judgment about them."

155.    During the Class Period, Defendants misled investors conceding that that public sector opportunities comprised most of the Guidance. Specifically, Defendants did not provide the market with information regarding the ***chief assumption underlying the Guidance*** – that the NDAA would be passed and the protracted process of deploying funds under the NDAA completed in time to provide revenues for IronNet's FY22.

156.    As alleged in detail above, this assumption was insupportable.  *See* ¶¶50-53.

157.    IronNet's violation of AICPA guidelines supports a finding that Defendants, particularly Defendant Gerber, knowingly made the misstatements and omissions alleged herein.

### K.  Defendants Knew That Their Statements About IronNet's Customers and Contracts Were Misleading

158.    In addition to repeatedly touting the Guidance, Defendants also repeatedly discussed the Company's customers and particularly large new deals.  For example, Defendants

discussed "new customer momentum", "new customer contracts", and "larger transactions".  *See* ¶¶43, 56, 60.

159.    Defendants knew that statements about IronNet's customers were materially false and misleading and omitted material facts when made because (i) these new customers and larger transactions included a "majority" (*see* ¶74) of public sector entities dependent on the NDAA for funding; and (ii) revenues from these new customers and larger transactions could not come in IronNet's FY22 because of the protracted time lag Defendant Alexander acknowledged at the end of the Class Period.  *See* ¶51-53.

### L.  Chief Revenue Officer Sean Foster's Resignation is Suspicious In Timing And Supports His Scienter, Which Can Be Imputed To IronNet

160.    On December 15, 2021 – the same day that IronNet completely re-vamped how it measured revenue and ARR, IronNet announced that Chief Revenue Officer Sean Foster was leaving the Company.

161.    As Chief Revenue Officer, it is axiomatic that Foster intimately knew about the Company's revenue and ARR guidance.

162.    On December 31, 2021, Chief Revenue Officer Sean Foster left the Company.

163.    The timing of Foster's leaving the Company – announced the same day as a fundamental re-vamping of IronNet's guidance – is highly suspicious and supports a strong inference that he knew the Guidance was fundamentally flawed.

164.    Under the doctrine of corporate scienter, Foster's scienter can be imputed to IronNet.

### VIII.  LOSS CAUSATION

165.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of IronNet securities, by publicly issuing false and/or misleading statements

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about IronNet's business, operations, and prospects as alleged herein.

166.    During the Class Period, as detailed herein, IronNet's securities were artificially inflated due to Defendants' misleading statements and omissions. When Defendants' misrepresentations and omissions were disclosed and became apparent to the market, the price of IronNet securities fell as the prior artificial inflation came out.

167.    As a result of purchases of IronNet securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the securities laws.

168.    The decline in the price of IronNet securities after the corrective disclosure on December 15, 2021, was a direct result of Defendants' misrepresentations being revealed to investors and the market.

169.    The decline in the price of IronNet securities was also the result of the materialization of the concealed investment risks concerning IronNet.

170.    Defendants' materially false and misleading statements and omissions relate to the Guidance, as well as to IronNet's large new transactions, which, unbeknownst to investors, were mainly with public sector customers.

171.    The corrective disclosure on December 15, 2021 revealed for the first time that the Guidance was materially based on large public sector deals subject to the NDAA that realistically could not contribute revenues to IronNet's FY22 due to protracted funding time lags – which Defendants knew of throughout the Class Period.  Accordingly, Defendants had to massively slash Guidance and removed these public sector deals from the Guidance indefinitely.

61

172.     After this disclosure, IronNet stock fell over 30%.

173.     Analysts' statements after the disclosure show the importance of Defendants' revelations. *See* ¶¶80-81.

174.     The timing and magnitude of the price declines in IronNet securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of IronNet securities when Defendants' misrepresentations were revealed.

## IX.   CLASS ACTION ALLEGATIONS

175.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired IronNet securities during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants, present and former officers and directors of the Company members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

176.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IronNet securities were actively traded on the national securities exchanges. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

177.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

178.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

179.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants violated the Exchange Act;

- Whether statements made by Defendants were materially false and misleading

- Whether Defendants omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants caused IronNet to issue false and misleading filings during the Class Period;

- Whether the price of IronNet securities as artificially inflated during the Class Period;

- Whether members of the Class have sustained damages and, if so, what is the proper measure of damages.

180.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

X.      **APPLICABILITY OF PRESUMPTION OF RELIANCE**

181.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the market- doctrine in that:

- IronNet securities met the requirements for listing, and were actively traded on the NYSE, an efficient market;

- As a public issuer, IronNet filed periodic public reports;

- IronNet regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- IronNet was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

182.    Based on the foregoing, the market for IronNet securities promptly digested current information regarding IronNet from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

183.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## XI.   NO SAFE HARBOR

184.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. To the extent that certain of the statements alleged to be false or misleading may be characterized as forward looking, Defendants are liable for those forward-looking statements because they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at that time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of IronNet who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

**COUNT I.**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

185.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

186.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase IronNet securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

187.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for IronNet securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

188.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about IronNet's financial well-being and prospects, as specified herein.

189.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IronNet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about IronNet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

190.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

191.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein. Thus, Defendants' material misrepresentations and/or omissions were done knowingly to conceal material problems with IronNet's business and financial results from the investing public and supporting the artificially inflated price of its securities.

192.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of IronNet securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired IronNet securities during the Class Period at artificially high prices and were damaged thereby.

193.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems

that IronNet was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their IronNet securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

194.     By virtue of the foregoing, the Defendants named in this Count violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II.
## Violation of Section 20(a) of the Exchange Act
## Against the Individual Defendants

195.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

196.     The Individual Defendants acted as controlling persons of IronNet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants, on the basis of stock ownership and Board control, had significant access to information and control over IronNet.

198.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, The Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT III.**
**Violation of Section 20A of the Exchange Act Against**
**Defendant Alexander**

199.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count III is brought pursuant to §20A of the Exchange Act against Defendant Alexander on behalf of Plaintiffs and members of the Class who were damaged by the insider trading of Alexander.

200.    As detailed herein, Defendant Alexander committed an underlying violation by violating Section 10(b) and Rule 10b-5.

201.    As further detailed herein, Defendant Alexander was in possession of material non-public information concerning IronNet, including the Company's inability to include revenue from public sector opportunities in FY22.

202.    Defendant Alexander took advantage of his inside knowledge to obtain over $5 million in insider trading profits during the Class Period.

203.    This was also a violation of IronNet's Code which prohibits insiders from trading in the stock while in possession of material nonpublic information.

204.    During the Class Period, Defendant Alexander sold IronNet shares contemporaneously with Lead Plaintiff's IronNet purchases, including twice on the very same day, November 15 and 22, 2021.  *See* ECF 27-4.

205.    Lead Plaintiff bought IronNet shares on November 9, 2021, November 10, 2021, November 15, 2021, November 17, 2021, November 18, 2021, and November 22, 2021.  *See* ECF 27-4.

206.    Defendant Alexander sold IronNet shares on October 18, 2021, October 25, 2021, November 1, 2021, November 8, 2021, November 15, 2021, and November 22, 2021.

207.    Lead Plaintiff and members of the Class who purchased IronNet securities contemporaneously with sales by the Defendant Alexander suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

208.    Accordingly, under Section 20A of the Exchange Act, Defendant Alexander is liable to Lead Plaintiff and the Class for all profits gained and losses avoided by them as a result of his sales of securities.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

70

(A)     Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B)     Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 29, 2022                    Respectfully submitted,

**THE KAPLAN LAW FIRM**

/s/ Matthew B. Kaplan
Matthew B. Kaplan (VSB # 51027)
THE KAPLAN LAW FIRM
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22205
Tel: (703) 665-9529
mbkaplan@thekaplanlawfirm.com

*Local Counsel for Lead Plaintiff James Shunk,
Additional Named Plaintiff Justin Gruetzmacher
and Proposed Local Counsel for the Proposed
Class*

**BERNSTEIN LIEBHARD LLP**
Laurence J. Hasson
Joseph R. Seidman, Jr.
Jeffrey R. McEachern
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  lhasson@bernlieb.com
            seidman@bernlieb.com
            jmceachern@bernlieb.com

*Lead Counsel for Lead Plaintiff James Shunk,
Additional Named Plaintiff Justin Gruetzmacher
and the Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022, I will electronically file the foregoing with

the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

Dated: August 29, 2022

/s/ *Matthew B. Kaplan*
Matthew B. Kaplan (VSB # 51027)
THE KAPLAN LAW FIRM
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22205
Tel: (703) 665-9529
mbkaplan@thekaplanlawfirm.com