**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| *In re IronNet, Inc. Securities Litigation* | **Case No. 1:22-cv-00449-RDA-JFA** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>**

Robert T. Cahill (VSB 38562)
Reston Town Center
11951 Freedom Drive
14th Floor
Reston, VA  20190-5656
Telephone:    (703) 456-8000
Facsimile:    (703) 456-8100
Email: rcahill@cooley.com

Aric H. Wu (*pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone:    (212) 479-6000
Facsimile:    (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Defendants IronNet, Inc., Keith B.
Alexander, William E. Welch, and James C.
Gerber*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

I.  IronNet and The Individual Defendants ........................................................... 4

II.  IronNet's Business Model ................................................................................. 4

III.  In March 2021, IronNet Announces Plan To Become A Publicly Traded Company Through A Merger With LGL Systems Acquisition Corp. ............................................. 5

IV.  Both LGL and IronNet Disclose IronNet's Active Pursuit of Public Sector Customers And The Risks Associated With Public Sector Customers ......................... 5

V.  On August 10, 2021, IronNet Reduces Its Revenue Forecast .......................... 7

VI.  On September 14, 2021, IronNet Maintains Its Revenue and ARR Forecasts ............. 8

VII.  On December 15, 2021, IronNet Reduces Its Revenue and ARR Forecasts ................. 9

VIII.  This Lawsuit ..................................................................................................... 11

LEGAL STANDARDS ................................................................................................ 12

ARGUMENT ............................................................................................................... 13

I.  All Of Plaintiffs' Claims Should Be Dismissed Because Plaintiffs' "New NDAA Dependency Theory" Ignores The $688.6 Billion in Funds Already Authorized For Spending From A Then-Existing NDAA And Erroneously Presumes That IronNet's Forecasts Were Limited To Prospective Deals With The DoD .................. 133

II.  Plaintiffs' Section 10(b) Claim Should Be Dismissed For Additional Reasons .......... 16

A.  The September 14, 2021 Revenue And ARR Forecasts Are Protected Under the PSLRA's Safe Harbor for Forward-Looking Statements .................. 16

1.  The Forecasts Were Accompanied By Meaningful Cautionary Language ... 17

2.  The Amended Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Actual Knowledge of Falsity ............................. 200

B.  The Other Challenged September 2021 Statements Are Not Actionable .......... 211

C.  The Amended Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter On The Part Of Any Defendant ................ 255

III.  Plaintiffs' Section 20(a) Claim Should Be Dismissed ............................................. 300

IV.  Plaintiffs' Section 20A Claim Should Be Dismissed .............................................. 300

CONCLUSION .............................................................................................................. 300

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ash v. PowerSecure Int'l, Inc.*,
2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)...........................................................................4

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................................29

*In re Cable & Wireless, PLC*,
321 F. Supp. 2d 749 (E.D. Va. 2004) ......................................................................................22

*Chapman v. Fennec Pharm. Inc.*,
2021 WL 7209981 (M.D.N.C. Dec. 16, 2021) .................................................................4, 16

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ........................................................................................ *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................................12

*Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc.*,
2013 WL 4014978 (W.D.N.C. Aug. 6, 2013)..........................................................................20

*In re Federal–Mogul Corp. Sec. Litig.*,
166 F. Supp. 2d 559 (E.D. Mich. 2001)...................................................................................18

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021).......................................................................................21

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
42 F.3d 204 (4th Cir. 1994) ........................................................................................18, 21, 24

*In re Human Genome Scis. Inc. Sec. Litig.*,
933 F. Supp. 2d 751 (D. Md. 2013) ...........................................................................................4

*Johnson v. Pozen Inc.*,
2009 WL 426235 (M.D.N.C. Feb. 19, 2009).............................................................................4

*Katyle v. Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ...................................................................................................12

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ......................................................................................... *passim*

*Knurr v. Orbital ATK Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) ................................................................................4, 29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
    2006 WL 1367428 (M.D.N.C. May 18, 2006) ........................................................19

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)......................................................................15

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) .........................................................................13, 26

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 ..............................................................................................................23

*In re Mindbody Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)....................................................................25

*In re Neustar Sec.*,
    83 F. Supp. 3d 671 (E.D. Va. 2015) .........................................................18, 19, 23

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) ..................................................................................28

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
    918 F.3d 312 (4th Cir. 2019) ..................................................................................19

*In re PEC Sols., Inc. Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005) ..................................................................................28

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*,
    966 F. Supp. 2d 525 (M.D.N.C. Aug. 14, 2013).....................................................19

*Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*,
    2021 WL 1439680 (E.D. Va. Mar. 24, 2021)..........................................4, 12, 26, 29

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................................................20

*Raab v. General Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ......................................................................................24

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..................................................................................27

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ......................................................................................25

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
    2020 WL 571724 (D. Md. Feb. 4, 2020) ...............................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Slayton v. Am. Exp. Co.*,
 604 F.3d 758 (2d Cir. 2010)..........................................................................16, 19

*Smith v. Circuit City Stores, Inc.*,
 286 F. Supp. 2d 707 (E.D. Va. 2003) ...................................................................21

*Teachers' Ret. Sys. Of LA v. Hunter*,
 477 F.3d 162 (4th Cir. 2007) ...............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..........................................................................................1, 4

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
 272 F. Supp. 3d 740 (E.D.N.C. 2017).............................................................16, 30

*Wochos v. Tesla, Inc.*,
 985 F.3d 1180 (9th Cir. 2021) ..............................................................................17

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ..........................................................................27, 30

**Statutes, Rules & Regulations**

15 U.S.C.
 § 78j(b)............................................................................................... *passim*
 § 78t(a)...............................................................................................12, 31, 32
 § 78t-1...............................................................................................12, 31, 32
 § 78u-4(b)(2)(A)...................................................................................21, 27
 § 78u-5(i)(1)(A) and (C) ............................................................................17
 § 78u-5(i)(1)(D) .......................................................................................17
 § 78u-5(c) .................................................................................................17
 § 78u-5(c)(1)(B)(i) .....................................................................................27
 § 78u-5(c)(iii) ...........................................................................................21

17 C.F.R.
 § 240.10b-5 ...............................................................................................25
 § 240.10b-5(a) ...........................................................................................25
 § 240.10b-5(b) ...........................................................................................25
 § 240.10b-5(c) ...........................................................................................25

Fed. R. Civ. P. 8(a) .............................................................................................25

Fed. R. Civ. P. 9(b) ............................................................................13, 22, 25, 26

**Other Authorities**

S. Rep. No. 104-98 (1995).......................................................................................1

## INTRODUCTION

No one has a crystal ball.  Predicting financial results is always uncertain.  Companies know that.  Investors know that.  And Congress knew that when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Too "often," Congress found, plaintiffs' lawyers "file frivolous 'strike' suits" based upon "a company's announcement of bad news, not evidence of fraud."  S. Rep. No. 104-98, at 4 (1995).  Congress thus enacted the PSLRA as "a check against abusive litigation," imposing "[e]xacting pleading requirements" and exempting most forward-looking statements from federal securities liability.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

On March 15, 2021, IronNet, a cybersecurity software company founded by Defendant Keith B. Alexander, a retired four-star General of the United States Army, announced its plan to become a publicly traded company through a merger with LGL Systems Acquisition Corp.  On May 14, 2021, LGL filed with the Securities and Exchange Commission ("SEC") a registration statement, which cautioned investors that "IronNet's revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for its platform, particularly with respect to large organizations and government entities."  The registration statement also disclosed that while "IronNet [had] spent the first five years of its life building foundational customer relationships in the commercial sector," it was "now actively investing in the acquisition of customers in the U.S. federal government vertical" and was "pursuing opportunities in the civilian, defense, and intelligence sectors."  It cautioned, however, that "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform."

On August 10, 2021, in advance of an August 26, 2021 vote by LGL shareholders on the proposed merger, IronNet reduced its revenue forecast for its fiscal year ending January 31, 2022 ("FY 2022") from $54.2 million to $43-45 million, due to shifts in the anticipated closing of several large new customer contracts and their impact on the timing of revenue recognition, and increased its forecast for annual recurring revenue ("ARR"—the annual value of all existing customer contracts, assuming the contracts are renewed on existing terms) from $68 million to $75 million due to large contracts it expected to close in the third quarter of its FY 2022.

On September 14, 2021, IronNet reported its financial results for the second quarter of its FY 2022 and provided the same revenue and ARR forecasts for FY 2022 as it did on August 10. In a December 15, 2021 press release, IronNet reported its third quarter FY 2022 financial results and provided reduced FY 2022 forecasts of $26 million in revenue and $30 million in ARR.  The press release explained that IronNet had expected to finalize in the second half of FY 2022 "what we assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector," but that these opportunities were now unlikely to be finalized in FY 2022 "primarily due to government delays in getting funding through to federal budgets."

Rather than view the change in financial guidance between September 14 and December 15, 2021 as IronNet responsibly updating its outlook, Plaintiffs attribute it to fraud.  But, as the Fourth Circuit explained in affirming the dismissal of a securities fraud claim based on the defendant company's reduction of its revenue forecast by $800 million, less than three months after it reaffirmed the forecast, the "short amount of time between positive announcements and statements announcing negative financial information" fails to satisfy the heightened pleading requirements of the PSLRA because it "amounts to little more than pleading fraud by hindsight." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612-13 (4th Cir. 2021).

Plaintiffs' Amended Complaint (ECF No. 46) is a study in impermissible fraud-by-hindsight pleading.  Plaintiffs rely entirely on the December 15, 2021 press release and statements on an earnings call that day to claim that IronNet knew, but concealed, that the August 10 and September 14, 2021 forecasts were "materially based" on "large and unprecedented multi-million dollar public sector deals," which had "no realistic chance of closing in FY 22."  Plaintiffs contend that it was "impossible" to close these deals by January 31, 2022 because they were prospective deals with the U.S. Department of Defense ("DoD") that "were subject to [passage of] a [new] massive federal defense budget (the National Defense Authorization Act, or 'NDAA') that typically only passes in December."

Plaintiffs' "New NDAA Dependency Theory" entirely ignores that, at the time of the August 10 and September 14, 2021 forecasts, significant funds were already authorized for spending from a then-existing NDAA.  Indeed, U.S. federal government departments and agencies were operating with $1.6 trillion in funds that Congress approved in December 2020; out of that $1.6 trillion, $688.06 billion was reserved for the DoD under the NDAA passed in December 2020.  Plaintiffs' attempt to impute circumstances that existed on December 15, 2021, when the funds authorized for the DoD from the December 2020 NDAA had already lapsed, to August 10 and September 14, 2021, is thus dead on arrival.  Plaintiffs also erroneously presume that the public sector deals included in IronNet's August 10 and September 14, 2021 forecasts were limited to prospective deals with the DoD.  As IronNet disclosed, its public sector customers encompassed U.S. federal government departments and agencies, U.S. state agencies, and foreign governments, and its pursuit of U.S. federal government opportunities was *not* limited to the defense sector.

For these and all the other reasons herein, Plaintiffs' Amended Complaint should be dismissed with prejudice.

# FACTUAL BACKGROUND

## I.  IRONNET AND THE INDIVIDUAL DEFENDANTS

IronNet is a cybersecurity software company headquartered in McLean, Virginia.  ¶ 24.[1]

IronNet products detect cybersecurity threats in real-time and share information through

"Collective Defense," an interactive network through which customers can collaborate to address

those threats.  ¶¶ 29-32.

Defendant Keith Alexander, a retired four-star General of the United States Army, founded

IronNet in 2014.  ¶ 25.  Previously, he was Director of the National Security Agency, Chief of the

Central Security Service, and Commander of Cyber Command.  *Id.*  He serves as IronNet's CEO,

President, and Chairman of the Board of Directors.  *Id.*  During the putative class period, Defendant

William Welch served as Co-CEO and Defendant James Gerber served as CFO.  ¶¶ 26, 27.

## II.  IRONNET'S BUSINESS MODEL

IronNet primarily generates revenue through multi-year subscriptions to its cybersecurity

software.  ¶ 33; Ex. 4 (Transcript of 6/7/21 Virtual Analyst Day) at 30.  IronNet refers to customers

generating more than $5 million a year in revenues as "strategic" customers.  *Id.* at 28.

---

[1] "¶" refers to paragraphs of the Amended Complaint.  "Ex." refers to the exhibits attached to the
Declaration of Aric H. Wu, dated October 26, 2022, which are documents that may be properly
considered on this motion to dismiss—*i.e.*, "documents incorporated into the complaint by
reference," *Tellabs,* 551 U.S. at 322, documents otherwise integral to and referred to in the
complaint, *Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *15 (E.D. Va.
Mar. 24, 2021), and public SEC filings, articles, press releases, earnings call transcripts and other
documents containing judicially noticeable facts, *id.* at *18 ("public records"); *Chapman v. Fennec
Pharm. Inc.*, 2021 WL 7209981, at *7 (M.D.N.C. Dec. 16, 2021), *report and recommendation
adopted*, 2022 WL 613378 (M.D.N.C. Mar. 2, 2022) (SEC filings); *Knurr v. Orbital ATK Inc.*,
272 F. Supp. 3d 784, 789 (E.D. Va. 2017) (conference call transcripts, analyst reports, and chart
summarizing "historical stock prices"); *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *5
(E.D.N.C. Sept. 15, 2015) (SEC filings); *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp.
2d 751, 758 (D. Md. 2013) ("[D]istrict courts in this circuit 'routinely take judicial notice of
newspaper articles, analysts' reports, and press releases in order to assess what the market knew
at particular points in time, even where the materials were not specifically referenced in the
complaint.'") (quoting *Johnson v. Pozen Inc.*, 2009 WL 426235, at *2 (M.D.N.C. Feb. 19, 2009)).

IronNet's private sector customers include energy, financial services, oil and gas, and global technology companies. *See* Ex. 6 (8/6/21 Prospectus/Proxy) at 184-185, 189-90; Ex. 8 (8/10 Press Release); Ex. 14 (9/22 S-1) at 94. IronNet's public sector customers include U.S. federal government departments and agencies, U.S. state agencies, and foreign governments. *See* Ex. 2 (5/14 S-1) at 154; Ex. 4 at 20; Ex. 7 (8/6/21 S-4) at 186, 189, 191; Ex. 14 at 76.

### III. IN MARCH 2021, IRONNET ANNOUNCES PLAN TO BECOME A PUBLICLY TRADED COMPANY THROUGH A MERGER WITH LGL SYSTEMS ACQUISITION CORP.

On March 15, 2021, IronNet announced its plan to become a publicly traded company by October 2021 through a merger with LGL, a special purpose acquisition company ("SPAC"), which is a company formed to raise capital through an initial public offering for the purpose of acquiring or merging with an existing company. ¶ 39.

### IV. BOTH LGL AND IRONNET DISCLOSE IRONNET'S ACTIVE PURSUIT OF PUBLIC SECTOR CUSTOMERS AND THE RISKS ASSOCIATED WITH PUBLIC SECTOR CUSTOMERS

On May 14, 2021, LGL filed with the SEC a Registration Statement and Prospectus, which, in its description of IronNet's business, cautioned investors that "IronNet's revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for its platform, particularly with respect to large organizations and government entities. Customers often view the subscription to its platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify its platform and solutions prior to entering into or expanding a relationship with it. Large enterprises and government entities in particular often undertake a significant evaluation process that further lengthens its sales cycle." Ex. 2 at 44-45; *see also* Ex. 6 at 47 (same).

The May 14 Registration Statement also disclosed that while "IronNet [had] spent the first five years of its life building foundational customer relationships in the commercial sector," it was "now actively investing in the acquisition of customers in the U.S. federal government vertical,"

had "registered with the Department of Homeland Security Continuous Diagnostics & Monitoring program approved products list to provide federal agencies with innovative securities tools," had its platform "deployed in the AWS GovCloud," and was "pursuing opportunities in the civilian, defense, and intelligence sectors." Ex. 2 at 173; *see also* Ex. 6 at 186 (same).

In a June 1, 2021 filing with the SEC, LGL attached a May 2021 IronNet Management Presentation, ¶ 41, which included a financial plan projecting $54.2 million in revenue and $68 million in annual recurring revenue ("ARR")[2] for the fiscal year ending January 31, 2022 ("FY 2022").[3] Ex. 3 (6/1/21 Management Presentation) at 23-24. While noting that 81% of IronNet's revenue was currently from the private sector, *id.* at 7, the presentation identified factors providing "significant momentum" for the adoption of Collective Defense by the public sector. *Id.* at 11. In a June 7, 2021 Virtual Analyst Day, ¶ 42, Mr. Gerber similarly noted that "[o]ver 80% of our product revenue is from the private sector," but that "the government market is largely untapped and we're ramping up rapidly there." Ex. 4 at 28.

Both before and during the putative class period of September 14 to December 15, 2021, IronNet warned that there were numerous risks associated with IronNet's pursuit of additional business from public sector customers, including that "[d]emand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles," ¶¶ 96, 106; Ex. 2 at 47; Ex. 6 at 49; Ex.14 at 19-20; Ex. 15 (9/28/21 S-1 Am. No. 1) at 19-20, and that "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting

---

[2] ARR is the annual value of all existing customer contracts, assuming the contracts are renewed on existing terms. Ex. 6 at 223.

[3] IronNet's fiscal years commence in February and end in January; thus, IronNet's FY 2022 was from February 1, 2021 through January 31, 2022.

public sector demand for its platform." *Id.* For public sector customers that are U.S. federal government departments and agencies, Congress allocates funds to be spent by September 30 of each year, and funds that are not spent by September 30 are usually cancelled;[4] however, the President and Congress may pass continuing resolutions ("CRs") to provide temporary funding to federal government departments and agencies past September 30. *See* Ex. 24 at 2; Ex. 26. On December 27, 2020, Congress approved $1.6 trillion in government spending through September 30, 2021, with $688.06 billion reserved for the DoD. *See* Exs. 5, 23.

## V.   ON AUGUST 10, 2021, IRONNET REDUCES ITS REVENUE FORECAST

On August 6, 2021, LGL filed a proxy statement and prospectus ("August 6 Prospectus") that, among other things, provided notice of an August 26, 2021 special meeting of LGL stockholders to vote on the proposed merger with IronNet. Ex. 6.

In an August 10, 2021 press release, IronNet reduced its revenue forecast for FY 2022 from $54.2 million to $43-45 million, due to shifts in the anticipated closing of several large new customer contracts and their impact on the timing of revenue recognition, and increased its ARR forecast for FY 2022 from $68 million to $75 million due to large contracts it expected to close in the third quarter of its FY 2022. Ex. 8. IronNet "cautioned" investors "not to rely on the forecast . . . as the forecast may be materially different than actual results." *Id.*

On August 26, 2021, LGL stockholders voted to approve the proposed merger, and on August 27, IronNet became a publicly traded company on the New York Stock Exchange. ¶ 48. "Certain IronNet stockholders" were made "subject to a 180-day lockup period for all shares . . . held by such persons, subject to customary carve-outs." Ex. 7 at 112. General Alexander, who was issued 11,370,495 shares in connection with the merger, was one of the individuals subject to

---

[4] U.S. GAO, "Federal Budget: A Few Agencies and Program-Specific Factors Explain Most Unused Funds," available at https://www.gao.gov/products/gao-21-432.

the 180-day lockup, subject to a 5% carveout that allowed him to sell up to 568,525 of his 11,370,495 shares during the lockup period. *See* Ex. 10 (9/7/21 Schedule 13D).

## VI.   ON SEPTEMBER 14, 2021, IRONNET MAINTAINS ITS REVENUE AND ARR FORECASTS

On September 14, 2021, the first day of the putative class period, IronNet issued a press release announcing its second quarter and first half FY 2022 financial results. ¶ 55. While revenue for the quarter was "$6.1 million compared to $7.9 million in the same quarter last year," "[s]ubscription revenue grew to $5.8 million from $5.3 million in the same quarter last year" and ARR was "$24.1 million compared to $19.5 million at the end of the same quarter last year." Ex. 11. The press release also provided revenue and ARR forecasts for FY 2022 that were the same as the financial guidance provided in its August 10, 2021 press release: $43-45 million in revenue and $75 million in ARR. *Id.* In the press release, Mr. Welch noted that "[n]ew customer momentum so far in the second half of our fiscal year is strong and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group," and Mr. Gerber noted that the Company had been "invited into larger deployments that shifted the anticipated closing of several large new customer contracts into the third quarter." *Id.* On September 20, 2021, Mr. Gerber told investors that the Company was "very pleased to see an outsized set of larger transactions out in front of us" and that IronNet was "seeing these larger contracts coming along," which was "the primary focus on the [financial] guidance" for FY 2022. ¶ 99.

When IronNet issued its September 14, 2021 press release, U.S. federal government departments and agencies were operating with the $1.6 trillion in funds that Congress approved in December 2020 for spending through September 30, 2021. *See* Exs. 5, 23, 26.

On September 17, 2021, General Alexander entered into a Rule 10b5-1 trading plan for the shares subject to the 5% carveout from the 180-day lockup period. ¶ 137. Under the trading plan,

if IronNet stock reached a certain price, a pre-determined number of General Alexander's shares would automatically be sold. *See* Ex. 18 (Form 4s). The Rule 10b5-1 plan was triggered in October and November 2021, collectively resulting in the sale of 477,625 shares, ¶¶ 132-39, or approximately 4% of General Alexander's total holdings in IronNet stock. *See* Ex. 18 at 1.

On September 30, 2021, President Biden signed CRs extending funding for U.S. federal government departments and agencies to December 3, 2021. *See* Ex. 17.

## VII.   ON DECEMBER 15, 2021, IRONNET REDUCES ITS REVENUE AND ARR FORECASTS

On December 15, 2021, the last day of the putative class period, IronNet issued a press release announcing its third quarter FY 2022 financial results. ¶ 120. While revenue for the quarter was "$6.9 million compared to $7.0 million in the same quarter last year," "[s]ubscription revenue grew to $3.8 million from $2.2 million in the same quarter last year," ARR was "$27.5 million compared to $21.2 million of the end of the same quarter last year," and customer count was "74 compared to 25 at the end of the same quarter last year." Ex. 19 (12/15/21 8-K). Despite this positive growth, IronNet reduced its FY 2022 forecasts to $26 million in revenue and $30 million in ARR. *Id.* The press release stated that the Company had expected to finalize in the second half of FY 2022 "what we assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector," but that these opportunities had yet to be finalized and were now unlikely to be finalized in FY 2022 "primarily due to government delays in getting funding through to federal budgets." *Id.*

On an earnings call that day, an analyst asked about "these budgeting issues that you're seeing." Ex. 20 at 5. General Alexander explained that "[w]e've seen a slowdown in public sector, especially in the ones we're dealing with, based on the congressional lack of movement on the NDAA." *Id.* The NDAA is the National Defense Authorization Act. Ex. 1. As part of the

budgetary cycle for U.S. government departments and agencies, the NDAA authorizes funding for the DoD, among other things, through September 30 of each year.  *See* Exs. 1, 22, 26.

On December 15, 2021, Congress passed the NDAA to provide DoD funding through September 30, 2022.  ¶ 52.  In the earnings call that day, General Alexander noted that the "passage of the NDAA . . . today means that we can start to see some of these [customer opportunities] move forward."  Ex. 20 at 5.  General Alexander explained, however, that there would be a process before funds from the NDAA passed by Congress on December 15, 2021 would become available: "[I]t'll go to the President, he will sign it.  It then goes to OMB, the Office of Management and Budget.  They take that, and they push that out to the Defense Department which then breaks it down and pushes it out to all the services and department agencies" that can apply the money to contracts once "they know now what their full authorization levels are."  *Id.* at 5.

Mr. Gerber explained on the earnings call that, given the difficulty predicting when larger strategic transactions would close, IronNet decided to "reset" its guidance approach by removing all large strategic transactions, whether with DoD, other U.S. federal government departments or agencies, state governments, foreign governments, or private sector clients, from its revenue forecasts and, going forward, would only include such transactions when they are closed:

> I think you were just asking about our guidance for this year of the $26 million for revenue.  As we've noted, what we've significantly done here is to completely remove all of these larger strategic transactions that are still out there but difficult to predict.  So, we've reset the guidance at this point to not include them.  Our guidance from August had included them.  As so, we're setting ourselves up here so that we can be sure that as they come in and add materially to our number, that we get that information out.  We will update our guidance accordingly.

Ex. 20 at 9; *see also id.* at 3 (General Alexander: "Given the delayed timing, we have removed these strategic opportunities from our fiscal year ARR outlook.").

Indeed, General Alexander provided examples of four different types of strategic customer opportunities IronNet had expected to finalize in the second half of FY 2022, but that remained

pending and were removed from the Company's updated guidance on December 15, 2021 for FY 2022: (1) an "ARR opportunity with a branch of the military that [wa]s held up as part of the federal funding delays playing out in Washington"; (2) a "defense industrial base customer whose contract with us [wa]s making its way more slowly through government procurement than we anticipated"; (3) "several deals with states that are gaining momentum as the American Rescue Plan funds are arriving and being approved by state legislatures;" and  (4) "an international government that was working through political turmoil and the impacts of the pandemic."  ¶ 126.

**VIII.   THIS LAWSUIT**

In the Amended Complaint, Lead Plaintiff James Shunk and named plaintiff Justin Gruetzmacher (collectively, "Plaintiffs") purport to bring claims on behalf of a putative class of those who purchased IronNet securities between September 14 and December 15, 2021.

Plaintiffs' core contention is that, on September 14, 2021, IronNet knowingly provided revenue and ARR forecasts for FY 2022 that were unachievable, and that the "truth" was not revealed until December 15, 2021, when IronNet reduced its revenue forecast from $43 – 45 million to $26 million and its ARR forecast from $75 million to $30 million.  Neither IronNet's December 15, 2021 press release nor any IronNet representative on the earnings call that day stated that the revenue and ARR forecasts the Company provided in its August 10 and September 14, 2021 press releases were based primarily on anticipated transactions with DoD or relied on the passage of a new NDAA.  Nonetheless, Plaintiffs claim that IronNet knew, but concealed, that the FY 2022 forecasts it provided in September were "materially based" on "large and unprecedented multi-million dollar public sector deals," which had "no realistic chance of closing in FY22" because they "were subject to a massive federal defense budget (the National Defense Authorization Act, or 'NDAA') that typically only passes in December."  ¶ 1.

Plaintiffs also claim that General Alexander's stock sales in October and November 2021 were made "with absolute clarity into the fact that the NDAA would not be approved in time to contribute to IronNet's FY22 revenue or ARR." ¶ 134.  Although General Alexander's stock sales were made pursuant to a Rule 10b5-1 trading plan and amounted to only 4% of his total holdings, Plaintiffs characterize his stock sales as a fraud that resulted in him "pocketing over $5 million when selling 85% of his available IronNet shares."  ¶ 86.

Based on alleged misrepresentations and/or omissions in the September 14, 2021 press release and subsequent statements that month, ¶¶ 90-119, Plaintiffs assert a Section 10(b) claim against IronNet and the Individual Defendants, ¶¶ 185-94, and a Section 20(a) control person claim against the Individual Defendants, ¶¶ 195-98.  Plaintiffs also purport to assert a Section 20A claim against General Alexander on behalf of all investors who purchased IronNet stock contemporaneously with his stock sales in October and November 2021.  ¶¶ 199-208.

## LEGAL STANDARDS

To state a Section 10(b) claim for securities fraud, a plaintiff must allege particularized facts showing (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  The court "examine[s] the facts as a whole, including facts found in 'documents incorporated into the complaint by reference,'" *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008), and "matters of which a court may take judicial notice." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).  While a court should "construe facts in the light most favorable to the plaintiff and draw all reasonable inferences in her favor . . . [it] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  *Evolent*, 2021 WL 1439680, at *15.

Moreover, Plaintiffs must "must clear the hurdle" of the heightened pleading standards for fraud under Fed. R. Civ. P. 9(b) and the PSLRA. *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." *Cozzarelli,* 549 F.3d at 629. The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all facts on which that belief is formed. Plaintiffs must also state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind, i.e., scienter." *Evolent*, 2021 WL 1439680, at *15.

## ARGUMENT

I.   **All Of Plaintiffs' Claims Should Be Dismissed Because Plaintiffs' "New NDAA Dependency Theory" Ignores The $688.06 Billion In Funds Already Authorized For Spending From A Then-Existing NDAA And Erroneously Presumes That IronNet's Forecasts Were Limited To Prospective Deals With The DoD**

Plaintiffs challenge IronNet's September 14, 2021 forecasts for FY 2022 revenue and ARR and various other statements in the month. ¶¶ 90-119. The alleged falsity of these statements, and Defendants' alleged knowledge of the falsity of these statements, are all premised on the same alleged dependency on the passage of a new NDAA. According to Plaintiffs:

(i)   IronNet's September 14, 2021 forecasts for revenue and ARR, which were the same as its August 10, 2021 forecasts, were "materially based on large and unprecedented multi-million dollar public sector deals";

(ii)   "Most, if not all, of these large public sector deals were subject to the passage of the NDAA, which required the approval of both the House of Representatives and Senate – neither of which had occurred as of September 14, 2021";

(iii)   "The NDAA is typically approved each year in December or later";

(iv)   Even after being signed into law, the timeline for NDAA funds to be deployed is "unpredictable" because the funds must first "go to the OMB and then to the Defense Department, which would then break the funds down for

distribution" and only when "agencies learned their full authorization levels . . . they could begin to deploy the funds to contracts"; and

(v)   Defendants therefore knew it was "impossible" for revenues from the "large and unprecedented multi-million dollar public sector deals" to close in IronNet's FY 2022 (*i.e.*, by January 31, 2022).

¶ 91; *see also* ¶¶ 93, 95, 97, 100, 103, 105, 107, 109, 111, 113, 115, 117, 119.

The problem with Plaintiffs' "New NDAA Dependency Theory" is that it entirely ignores that, at the time of the August 10 and September 14, 2021 forecasts, there were funds already authorized for spending from a then-existing NDAA.  Indeed, when IronNet provided its August 10 and September 14, 2021 forecasts, U.S. federal government departments and agencies were operating with the $1.6 trillion in funds that Congress approved in December 2020 for spending through September 30, 2021; out of that $1.6 trillion, ***$688.06 billion was reserved for the DoD***. *See* Exs. 5, 23, 26.

Plaintiffs do not, and cannot, allege that, as of August or September 2021, the $688.06 billion reserved for the DoD had failed to "go to the OMB and then to the Defense Department, which would then break the funds down for distribution" and only when "agencies learned their full authorization levels . . . they could begin to deploy the funds to contracts."  ¶ 91.  Nor do Plaintiffs allege that, as of August or September 2021, the $688.06 billion reserved for the DoD had been spent such that it was "impossible" for IronNet to close any transactions with the DoD without the passage of a new NDAA.  ¶ 91.

Plaintiffs misguidedly rely on General Alexander's statement during a December 15, 2021 earnings call that there would be a process before funds from the new NDAA passed by Congress that day would become available.  ¶ 122.  Far from "reveal[ing]" that "IronNet's large public sector deals quite predictably could not have contributed to [the] FY22 Guidance" provided three and fourth months earlier in August and September, ¶ 121, General Alexander was addressing the state

14

of affairs *as of December 15, 2021*, after the authorization to spend the $688.06 billion in funds authorized for the DoD from the prior NDAA had already lapsed. *See* Ex. 5. Plaintiffs cannot contrive a claim by imputing circumstances that existed in December to August and September. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) ("without *contemporaneous* falsity, there can be no fraud").

Plaintiffs' "New NDAA Dependency Theory" also erroneously presumes that the public sector deals included in IronNet's forecasts for revenue and ARR in August and September 2021 were limited to prospective deals with the DoD. As disclosed to investors, IronNet's public sector customers encompassed U.S. federal government departments and agencies, U.S. state agencies, and foreign governments. *See* Ex. 4 at 20; Ex. 7 at 186, 189; 191; Ex. 2 at 154; Ex. 14 at 76. Moreover, with regard to U.S. federal government departments and agencies, IronNet disclosed that it was "pursuing opportunities in the civilian, defense, and intelligence sectors." Ex. 2 at 173; *see also* Ex. 6 at 186 (same). As explained on the December 15, 2021 earnings call, IronNet "reset" its guidance approach by removing all potential large strategic transactions, whether with DoD or otherwise, from its revenue forecasts and, going forward, would only include such transactions when they are closed. Ex. 20 at 5  General Alexander illustrated this point by providing examples of strategic opportunities with customers other than the DoD that were removed from guidance, including "several deals with states that are gaining momentum as the American Rescue Plan funds are arriving and being approved by state legislatures" and "an international government that was working through political turmoil and the impacts of the pandemic." ¶ 126; Ex. 20 at 3.

Because all of Plaintiffs' claims rely on their baseless "New NDAA Dependency Theory," all of Plaintiffs' claims should be dismissed.

## II.   PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR ADDITIONAL REASONS

### A.   The September 14, 2021 Revenue And ARR Forecasts Are Protected Under The PSLRA's Safe Harbor For Forward-Looking Statements

IronNet's September 14, 2021 revenue and ARR forecasts, ¶ 90, as well as the assumptions underlying those forecasts, ¶¶ 90, 94, are protected under the PSLRA's "safe harbor for forward-looking statements," which provides that a defendant "shall not be liable" for any forward-looking statement that is either (i) "identified as a forward-looking statement,[5] and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (ii) "immaterial;" or (iii) not "made with actual knowledge by [the speaker] that the statement was false or misleading."   15 U.S.C. § 78u-5(c).   "The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."   *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017) (citing *Slayton v. Am. Express. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).

IronNet's September 14, 2021 forecasts and related assumptions are protected under two, independent prongs of the safe harbor: (1) they were identified as forward looking and accompanied by meaningful cautionary language; and (2) Plaintiffs fail to allege particularized facts creating a strong inference that they were made with actual knowledge of their falsity.[6]

---

[5] "[W]hether a statement is forward-looking is determined by examining the statement, not the fact allegedly omitted."   *Chapman*, 2021 WL 7209981, at *7.

[6] The challenged statements made at a September 20, 2021 Fireside Chat hosted by Wells Fargo included the same forecasts and assumptions provided on September 14, 2021, *compare* ¶ 99 *with* ¶¶ 90, 94, and are protected under the PSLRA safe harbor for the same reasons discussed herein.

1.    **The Forecasts Were Accompanied By Meaningful Cautionary Language**

IronNet's September 14, 2021 forecasts fit squarely within the PSLRA's definition of forward-looking statements, as they addressed a "projection of revenues" and "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A) and (C).   Statements regarding the "assumptions underlying or relating to" the forecasts also fit squarely within the definition.  15 U.S.C. § 78u-5(i)(1)(D).  The forecasts and related assumptions were also expressly identified as forward-looking.  *See* Ex. 11 (September 14, 2021 press release contains "'forward-looking statements' within the meaning of the 'safe harbor' provisions" of the PSLRA, including "statements regarding IronNet's future outlook and revenue guidance for fiscal 2022 and ARR growth in the third and fourth fiscal quarters, the deployment of its solutions to a new customer group, IronNet's ability to . . . execute on its business strategy, and the expansion of the cybersecurity market and demand for IronNet's products and services"); Ex. 13 (September 20, 2021 Fireside Chat presentation contains "forward-looking statements within the meaning of" the PSLRA, including "expectations regarding future revenue [and] annual recurring revenue").

IronNet's forward-looking forecasts and related assumptions, such as that IronNet was "on pace" to meet its forecasts, ¶¶ 6, 56, 90, *see also* ¶¶ 8, 47, 56, 78, and that "momentum in the marketplace" with larger "evolving contracts" was behind IronNet's ARR forecast of $75 million, ¶ 99, were accompanied by meaningful cautionary language.  *See also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (holding that "Tesla's various statements that it was 'on track' to achieve this goal and that 'there are no issues' that 'would prevent' Tesla from achieving the goal are . . . forward-looking statements" and affirming dismissal of Section 10(b) claim based on

"Plaintiffs' theory that Tesla's year-end goal rested on scheduling assumptions that Tesla knew it was unlikely to meet" because "on track" statements were protected under PSLRA safe harbor).[7]

The September 14, 2021 press release warned investors that IronNet's financial guidance and other forward-looking statements "are not guarantees of future performance" and involve "a number of known and unknown risks, uncertainties, [and] assumptions" that "could cause actual results or outcomes to differ materially from those discussed," and directed investors to "carefully consider" the "risks and uncertainties described under the heading 'Risk Factors'" in the August 6 Prospectus. Ex. 11 at 3-4;[8] *see also In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *12 (D. Md. Feb. 4, 2020) ("A forward-looking statement may incorporate by reference earlier cautionary statements made in SEC filings."). The August 6 Prospectus, Ex. 6, identified a number of risks and uncertainties, including that:

- IronNet's "limited operating history makes it difficult to evaluate its current business . . . including its ability to plan for and model future growth." *Id.* at 37.

- "IronNet's revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for its platform, particularly with respect to large organizations and government entities. Customers often view the subscription to its platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify its platform and solutions prior to entering into or expanding a relationship with it. Large enterprises and government entities in particular often undertake a significant evaluation process that further lengthens its sales cycle." *Id.* at 47.

---

[7] The challenged assumption statements, ¶¶ 6, 56, 90, 99, are also "[i]ndefinite statements of corporate optimism, also known as puffery, [that] are generally non-actionable." *In re Neustar Sec.,* 83 F. Supp. 3d 671, 680 (E.D. Va. 2015). For example, courts routinely hold that statements that a company is "on target" with its projections to be inactionable. *See Hillson Partners Ltd. P'ship v. Adage, Inc.,* 42 F.3d 204, 212–14 (4th Cir. 1994) (statement that company is "on target toward achieving the most profitable year in its history" is "the type of vague prediction[] of growth that we [have] held . . . not to be material as a matter of law"); *In re Federal–Mogul Corp. Sec. Litig.,* 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (statement that "the Company is on target to achieve projected synergies and cost savings" was inactionable puffery).

[8] A slide presented at the beginning of the September 20, 2021 Fireside Chat contained the same cautionary statements and likewise directed investors to "carefully consider" the "risks and uncertainties described under the header 'Risk Factors'" in the August 6 Prospectus. Ex. 13.

- "Demand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles." *Id.* at 49.

- "[G]overnment demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform." *Id.*

These risk disclosures put investors on notice that public sector budgetary cycles and funding authorizations, which would encompass any issue arising from NDAA funding, could adversely impact IronNet's business. *See* ¶¶ 96, 104, 106, 110, 112, 116, 118. This more than adequately satisfies the standard for meaningful cautionary language under the PSLRA. Indeed, while cautionary language must "convey[] substantive information," it "need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 771, 772-73; *see also In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *5 (M.D.N.C. May 18, 2006) ("In order to be meaningful, Defendants' cautionary language need not identify specific competitors in its risk disclosures, but instead should be enough to properly warn an investor of significant risks similar to that actually realized so as to put the investor on notice").

Because the September 14, 2021 forecasts and related assumptions were accompanied by meaningful cautionary language, Plaintiffs' Section 10(b) claim relating to them is foreclosed by the PSLRA safe harbor.[9] *See Neustar,* 83 F. Supp. 3d at 682 (forward-looking statements accompanied by cautionary language protected by PSLRA safe harbor); *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 548, 550 (M.D.N.C. Aug. 14, 2013) (earnings projections accompanied by cautionary language protected under PSRLA safe harbor); *Elec.*

---

[9] Plaintiffs' claim is also foreclosed by the bespeaks caution doctrine, under which "claims are 'subject to dismissal if cautionary language . . . negates the materiality of the alleged misrepresentations or omissions.'" *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 319 (4th Cir. 2019) (affirming dismissal of Section 10(b) claim).

*Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc.*, 2013 WL 4014978, at *10 (W.D.N.C. Aug. 6, 2013) (holding revenue guidance was protected under PSLRA safe harbor and rejecting plaintiffs' contention that cautionary language was not specific, boilerplate, and vague); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("Because the cautionary language [regarding financial projections] was sufficient, the forward-looking statements are exempt under the PSLRA's safe harbor provision").

### 2. The Amended Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Actual Knowledge Of Falsity

The September 14, 2021 forecasts are inactionable for another, independent reason: Plaintiffs do not adequately allege they were made with "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(iii). The PSLRA requires Plaintiffs to plead particularized facts creating a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Plaintiffs do not identify any contemporaneous internal Company documents contradicting the September 14, 2021 forecasts. Nor do they purport to have identified a single witness who had access to the Company's internal forecasts at the time and has represented that those internal forecasts contradicted the forecasts provided in the September 14, 2021 press release. *See Cozzarelli*, 549 F.3d at 622–26 (rejecting any inference of where plaintiffs "have not alleged the existence of any internal documents . . . or other direct statements contradicting the inference that defendants acted with a lawful intent").

Instead, Plaintiffs rely on their "New NDAA Dependency Theory," which as discussed in Section I above, is baseless. Plaintiffs also attempt to rely on the mere temporal proximity between the September 14, 2021 forecasts and December 15, 2021 change in guidance. *See e.g.*, ¶¶ 11, 56,

57, 73, 78, 120.   But this type of "fraud by hindsight" pleading or "Monday morning quarterbacking" has been repeatedly rejected.  *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003).  In *KBC*, for example, the Fourth Circuit affirmed the dismissal of a Section 10(b) claim based on the defendant company's reduction of its revenue guidance by $800 million, less than three months after it reaffirmed the original guidance.  19 F.4th at 606.  The Fourth Circuit rejected plaintiffs' attempt to rely on the "short amount of time between positive announcements and statements announcing negative financial information," because it "amount[ed] to little more than pleading fraud by hindsight."  *Id*. at 612.  Here, as in *KBC*, the three-month time period between the challenged forecast and the change in guidance fails to create a strong inference of fraudulent intent.  *See also Hillson*, 42 F.3d at 215 (affirming dismissal of Section 10(b) claim because "timing alone is not sufficient, without additional supporting facts and circumstances, to withstand the strict requirements of Rule 9(b)"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 311 (S.D.N.Y. 2021) (dismissing Section 10(b) claim based on October 2019 withdrawal of revenue guidance provided in June 2019).

Because Plaintiffs have not alleged facts giving rise to any inference of scienter, let alone a "strong" one, Plaintiffs' claim relating the September 14, 2021 forecasts should be dismissed.

### B. The Other Challenged September 2021 Statements Are Not Actionable

Plaintiffs' claims relating to other challenged statements in September 2021, ¶¶ 90-119, should likewise be dismissed for multiple independent reasons.

***Statements regarding customer development***.   Plaintiffs challenge statements from IronNet's September 14, 2021 press release and September 20, 2021 Fireside Chat (and the August 6 Prospectus incorporated by reference by each therein), September 20 and 28, 2021 registration statements, and September 30, 2021 prospectus about the current status and future prospects of customer acquisitions and negotiations.  *See* ¶¶ 92, 94, 96, 99, 106, 112, 118.

Plaintiffs do not plead any facts contradicting the accuracy of statements of historical fact such as "[i]n the first half of fiscal 2022, IronNet was invited into larger deployments," ¶ 92 (citing September 14, 2021 press release); "[n]ew customer momentum" already included "an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group," ¶ 94 (citing September 14, 2021 press release); "state and local governmental agencies have not accounted for . . . a significant portion of [IronNet's] revenue." ¶ 96 (citing September 20, 2021 Fireside Chat transcript).[10]

Plaintiffs also challenge the statement in the September 14, 2021 press release that "[n]ew customer momentum so far in the second half of our fiscal year is strong," ¶ 94, and the statement in the September 20, 2021 Fireside Chart that there was "momentum in the marketplace," ¶ 99, but statements of corporate optimism are inactionable as a matter of law. *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) (holding that statements touting company's "healthy growth" and "exceptionally strong finances" were non-actionable statements of corporate optimism upon which investors do not rely).  Moreover, Plaintiffs fail to plead contemporaneous facts showing that new customer momentum as of September 14 was not strong or that, at the time, IronNet did not believe there was momentum in the marketplace.

Furthermore, because none of the challenged statements about customer development even mention financial guidance, none of the challenged statements were rendered misleading by the failure to disclose that IronNet's revenue and ARR forecasts were "materially based on large and

---

[10] Plaintiffs also fail to plead contemporaneous facts showing that IronNet did not "anticipate" that sales to U.S. federal, state and local government agencies "may increase in the future." ¶¶ 96, 106, 112, 118.  Moreover, IronNet cautioned that "sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of [IronNet's] revenue."  *Id.*  IronNet's forward-looking statement is thus protected under both prongs of the PSLRA safe harbor.  *See supra,* Argument Sections II.A.1 and 2.

unprecedented multi-million dollar public sector deals" that depended on the passage of new NDAA.  ¶¶ 107, 111, 119.  *See Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44, 44-45(2011) (an omission is not actionable unless it renders a challenged statement misleading).

In addition to failing to plead an actionable misrepresentation or omission, Plaintiffs fail to plead any facts creating any inference, much less a strong inference, that any defendant believed the statements about customer development to be false when made.  *See Neustar*, 83 F. Supp. 3d at 685 (dismissing Section 10(b) claim because companies are "allowed to remain optimistic about its business prospects" and plaintiffs failed to adequately plead facts showing that any defendant subjectively believed that the challenged statements were false when made).

***Expected gross margins***.  In May and August 2021 Management Presentations filed with the SEC, IronNet projected gross margins of 74% for FY 2022.  Ex. 3 at 22; Ex. 9 (August 2021 Management Presentation) at 11.  In its September 22 and 28 registration statements and its September 30 prospectus, IronNet reported gross margins for the second quarter of FY 2022 of 71.1%, ¶¶ 102, but stated "[w]e expect that gross margins for the rest of fiscal 2022 to improve slightly to achieve our full year guidance."  ¶¶ 108, 114; *see also* Ex. 14 at 58; Ex. 15 at 58; Ex. 16 at 58.  Plaintiffs conflate and confuse IronNet's revenue and ARR forecasts with its gross margins projection when they contend that:  "Gross margins were not the real impediment to IronNet achieving its increased Guidance, nor could a slight improvement in gross margins allow for the Company to meet its Guidance."  ¶¶ 103, 109, 115.  The "full year guidance" in the challenged statements regarding gross margins referred to IronNet's projected gross margins of 74% for FY 2022, not IronNet's revenue and ARR forecasts, Ex. 3 at 22, Ex. 9 at 11, and Plaintiffs make no attempt to plead facts showing that IronNet could not achieve gross margins of 74% for FY 2022 with a "slight improvement" in the second half of FY 2022.

IronNet's statement that "[w]e expect" gross margins to improve slightly in the second half of 2022 is also squarely protected under the PSLRA's safe harbor for forward-looking statements. It was expressly identified as forward-looking,[11] and investors were warned that "we cannot assure you that the forward-looking statements in this prospectus will prove to be accurate" and "you should not rely on these forward-looking statements as predictions of future events."  Ex. 14 at iii; *see also* Ex. 15 at iii (same); Ex. 16 (September 30, 2021 Prospectus) at iii (same).  Moreover, Plaintiffs make no attempt to plead contemporaneous facts showing that any Defendant did not believe that gross margins would not improve slightly in the second half of FY 2022.  *See Hillson*, 42 F.3d at 213 (affirming dismissal of Section 10(b) claim where the plaintiff "did not allege facts showing that [the defendant] did not believe the [challenged] statement was 'accurate at the time' it was made") (quoting *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)).

***Risk factors about government demand and sales cycles.***  IronNet cautioned investors that "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform." ¶ 96; Ex. 6 at 49; Ex. 14 at 19-20; Ex. 15 at 19-20; Ex. 16 at 19-20. *See also* ¶¶ 110, 116.  Invoking their "New NDAA Dependence Theory," Plaintiffs claim this risk disclosure was misleading because it was "generic and hypothetical and failed to warn investors of IronNet's already material dependence on public sector deals subject to [a new] NDAA." ¶ 97.  But, as discussed in Section I above, Plaintiffs' "New NDAA Dependence Theory" is baseless—it imputes circumstances that existed in December 2021 to August and September 2021 and ignores the $688.06 billion in funds that were already authorized for spending in August

---

[11] Ex. 14 at ii (identifying as forward-looking statements containing words such as "anticipate," "may," and "expect"); Ex. 15 at ii (same); Ex. 16 at ii (same).

and September 2021 from the then-existing NDAA, and erroneously presumes that IronNet's forecasts for revenue and ARR in August and September 2021 were limited to anticipated new transactions with the DoD.  There is thus no factual basis for Plaintiffs' contention that the risks described in the challenged disclosure had "already fatally undermined IronNet's Guidance."  ¶¶ 97, 107, 111, 117.  Nor do Plaintiffs allege any facts showing that, at the time of the risk disclosures in August and September 2021, any Defendant believed the risks had already materialized.  *See Neustar,* 83 F. Supp. 3d at 679 (dismissing Section 10(b) claim for failure to adequately plead facts showing that risk had already materialized at the time statement was made).

*  *  *

Because Plaintiffs have failed to adequately plead an actionable misrepresentation or omission, Plaintiffs' Section 10(b) claim should be dismissed.[12]

### C.    The Amended Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter On The Part Of Any Defendant

Plaintiffs' Section 10(b) claim should also be dismissed for failure to adequately plead scienter.  For forward-looking statements, a plaintiff bears the burden of pleading particularized facts giving rise to a strong inference that a defendant had "actual knowledge" of the statement's

---

[12] Plaintiffs' Section 10(b) claim is based on alleged misrepresentations and omissions in alleged violation of SEC Rule 10b-5(b), which makes it "unlawful" to "make any untrue statement of material fact or to omit to state a material fact necessary to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).  In vague, boilerplate terms, Plaintiffs appear to suggest there was a fraudulent scheme.  ¶¶ 186-87.  To the extent Plaintiffs really assert a scheme-liability claim, Plaintiffs do not identify the subsection of Rule 10b-5 under which they bring the claim (*i.e.*, Rule 10b-5(a), (c), or both) and have thus failed to provide adequate notice of their claim under even Fed. R. Civ. 8(a), much less Fed. R. Civ. P. 9(b) and the PSLRA.  Any purported scheme-liability claim also fails for the same reasons as the misrepresentations and omissions claim because it relies on the same allegations.  Moreover, a scheme-liability claim requires "something *beyond* misstatements and omissions."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original).  Here, Plaintiffs allege nothing beyond alleged misrepresentations and omissions.  Any scheme-liability claim is therefore foreclosed as a matter of law.  *Id.; see also In re Mindbody Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020).

falsity.  15 U.S.C. §§ 78u-4(b)(2)(A), 78u-5(c)(1)(B)(i).  For statements of current or historical fact, a plaintiff bears the burden of alleging particularized facts giving rise to a strong inference of "intentional misconduct" or such "severe recklessness that the danger of misleading investors was either known to the defendant or so obvious that the defendant must have been aware of it." *Cozzarelli,* 549 F.3d at 622–24 (raising a strong inference of scienter "is no small burden").  The Fourth Circuit has explained that, while it "ultimately evaluate[s] plaintiffs' allegations of scienter holistically, [it] only afford[s] their allegations the inferential weight warranted by context and common sense."  *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009).  "[W]hen the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed."  *Cozzarelli,* 549 F.3d at 624; *see also Evolent,* 2021 WL 1439680, at *33 ("[T]o survive a motion to dismiss, 'the inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations.'").

Here, the alleged falsity of the statements Plaintiffs challenge is premised on Plaintiffs' "New NDAA Dependency Theory."  As discussed above, the "New NDAA Dependency Theory" is unsupported by any contemporaneous facts and nothing more than impermissible "fraud by hindsight" pleading.  *KBC,* 19 F.4th at 613.  In advancing scienter allegations, ¶¶ 130-164, Plaintiffs put the cart before the horse: if Plaintiffs cannot plead the falsity of any challenged statement, they cannot plead any defendant's fraudulent intent either.  Plaintiffs' hodge-podge of "additional scienter allegations" in support of their flawed "New NDAA Dependency Theory," ¶¶ 130-164, is addressed below.

***General Alexander Stock Sales.***  Plaintiffs claim that IronNet and the three Individual Defendants perpetrated fraud so that General Alexander could sell "85% of his available stock" at

"artificially inflated prices just before the window closed for him to do so, executing his final trade . . . just three weeks before IronNet was forced to come clean about its Guidance" on December 15, 2021.  ¶¶ 132-41.  But, as confirmed by SEC filings, General Alexander did not sell 85% of his IronNet stock.  Nor did he have any discretion over when to execute trades.  Instead, on September 17, 2021, General Alexander entered into a Rule 10b5-1 trading plan for non-discretionary sales of up to 5% of his total shares.  *See* Ex. 18.  *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (stock sales made pursuant to non-discretionary 10b5-1 plan "weakens any inference of fraudulent purpose").  The Rule 10b5-1 plan was triggered in October and November 2021, collectively resulting in the sale of 477,625 shares, ¶¶ 132-39, or approximately 4% of General Alexander's total holdings in IronNet stock.  *See* Ex. 18; Ex. 10.

Stock sales of less than 5% of a defendant's total holdings do not come close to raising an inference of scienter.  *See Cozzarelli*, 549 F.3d at 628 (sales of "13%, 12%, and 3% of [the directors'] holdings, respectively" are "modest to *de minimis*" and do not support an inference of scienter); *KBC*, 19 F.4th at 611 (sales of 17% of holdings are insufficient to raise an inference of scienter).  Moreover, General Alexander's stock sales under the 10b5-1 trading plan were made at prices ranging from $10.12 to $12.76, Ex. 18, well below the $41.40 price per share at which IronNet stock peaked during the putative class period of September 14 to December 15, 2021.  ¶ 58; Ex. 18.  *See Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (dismissing Section 10(b) claim where defendants' stock sales "occurred at prices that were not especially high for the class period"); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (dismissing Section 10(b) claim where challenged stock sales were at prices well below the stock's high point).

**Stock Price Maintenance.**  In arguing that "IronNet repeatedly pushed unachievable projections" starting on March 15, 2021, ¶ 143, and speculating that "Defendants were loath to

correct the FY22 Guidance after heavily relying on it to execute the SPAC merger," ¶ 145, Plaintiffs ignore that IronNet reduced its revenue forecast for FY 2022 on August 10, 2021, shortly before the August 26, 2021 vote by LGL shareholders on the proposed SPAC merger.  Ex. 8. Moreover, an alleged motive to avoid a stock price drop, ¶ 145, could be attributed to any company and does not come close to creating a strong inference of fraudulent intent.  *See Yates*, 744 F.3d at 891 (declining to infer fraudulent intent based on alleged motive to "attract investors," and other "motivations common to every company"); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) ("courts have repeatedly rejected these types of generalized motives").

*General Alexander "Admission."*  Plaintiffs also claim that General Alexander effectively admitted to fraud, ¶¶ 147-49, when he stated during a December 15, 2021 earnings call that there would be a process before funds from the new NDAA passed by Congress that day would become available.  ¶ 122.  But far from "revealing" that "IronNet's large public sector deals quite predictably could not have contributed to [the] FY22 Guidance" provided three and fourth months earlier in August and September, ¶ 121, General Alexander was addressing the state of affairs as of December 15, 2021, after the appropriation of $688.06 billion in funds authorized for the DoD from the prior NDAA had already lapsed.  Plaintiffs' attempt to impute circumstances that existed in December to August and September is nothing more than an improper attempt to plead "fraud by hindsight."  *KBC,* 19 F.4th at 613.

*AICPA Guidelines.*  "As a rule, general allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b)."  *In re PEC Sols., Inc. Sec. Litig.,* 418 F.3d 379, 389 (4th Cir. 2005).  Here, Plaintiffs' allegation of non-compliance with guidelines of the American Institute of Certified Public Accountants, ¶¶ 150-57, is insufficient for an additional reason: it relies entirely on Plaintiffs' baseless "New NDAA Dependency Theory."  *See* ¶ 155

(alleged non-compliance with AICPA based on failure to disclose that the "chief assumption underlying" the September 14, 2021 forecasts for revenue and ARR was that "the NDAA would be passed and the protracted process of deploying funds under the NDAA completed in time to provide revenues for IronNet's FY 2022").

***Sean Foster Departure***.  During the putative class period, Sean Foster was IronNet's Chief Revenue Officer.  Plaintiffs assert that "Foster intimately knew about the Company's revenue and ARR guidance," ¶ 161, but make no allegations about what Mr. Foster knew and whether what he knew contradicted the September 14, 2021 forecasts.  Instead, Plaintiffs simply proclaim that "[t]he timing of Foster's leaving the Company [on December 31, 2021] . . . is highly suspicious and supports a strong inference that he knew the Guidance was fundamentally flawed." ¶ 163. That is not the law.  *See Knurr*, 272 F. Supp. 3d at 807 (timing of director departure "cannot support an inference of scienter"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (no inference of scienter based on officer resignations that were "coterminous" with alleged corrective disclosures because plaintiffs "alleged no facts linking the resignation of [the officer defendants] to the accounting improprieties at [the company]").

*   *   *

Plaintiffs do not plead contemporaneous facts showing that IronNet's internal projections for revenue and ARR contradicted the forecasts provided in its August 10 and September 14, 2021 press releases.  Instead, Plaintiffs make scattershot allegations relating to their baseless "New NDAA Dependency Theory" that do not create any inference of scienter, much less a "cogent and compelling" inference.  *See Evolent*, 2021 WL 1439680, at *33.  Accordingly, Plaintiffs' Section 10(b) claim should be dismissed.  *See KBC*, 19 F.4th at 613 (dismissing 10(b) claim where scienter allegations amounted to "little more than pleading fraud by hindsight").

## III.   PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED

A control person claim under Section 20(a), 15 U.S.C. § 78t(a), requires a primary violation of Section 10(b), 15 U.S.C. § 78j(b).  Because Plaintiffs fail to adequately plead a Section 10(b) claim, Plaintiffs' Section 20(a) claim should be dismissed as well.  *See Yates*, 744 F.3d at 894 n.8 ("Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail.").

## IV.   PLAINTIFFS' SECTION 20A CLAIM SHOULD BE DISMISSED

An insider trading claim under Section 20A, 15 U.S.C. § 78t-1, also requires an adequately pled primary violation of Section 10(b), 15 U.S.C. § 78j(b).  *See Cozzarelli*, 549 F.3d at 628 ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of their Section 10(b) and Rule 10b–5 claims, so the 20(a) and 20A claims were properly dismissed as well.").  Here, Plaintiffs' Section 20A claim is premised on their flawed "New NDAA Dependency Theory"—*i.e.*, that General Alexander's non-discretionary stock sales under his 10b5-1 trading plan were made "with absolute clarity into the fact that the NDAA would not be approved in time to contribute to IronNet's FY22 revenue or ARR."  ¶ 134.  Because Plaintiffs have no Section 10(b) claim based on the "New NDAA Dependency Theory," *see supra* Argument Sections I and II, they have no Section 20A claim based on it either.  *See Cozzarelli*, 549 F.3d at 628; *TransEnterix*, 272 F. Supp. 3d at 757 ("plaintiffs' failure to adequately allege a violation of Section 10(b) or Rule 10b–5 requires dismissal of their claims under Sections 20(a) and 20A").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

Dated: October 26, 2022

Respectfully submitted,

COOLEY LLP

By: /s/ *Robert T. Cahill*

 Robert T. Cahill (VSB 38562)

Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5656
Telephone:   (703) 456-8000
Facsimile:    (703) 456-8100
Email: rcahill@cooley.com

Aric H. Wu (*pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone:   (212) 479-6000
Facsimile:    (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Defendants IronNet, Inc., Keith B. Alexander, William E. Welch, and James C. Gerber*