# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| *In re IronNet, Inc. Securities Litigation* | **Case No. 1:22-cv-00449-RDA-JFA** |
| | <u>CLASS ACTION</u> |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**THE KAPLAN LAW FIRM**
Matthew B. Kaplan (VSB # 51027)
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22205
Tel: (703) 665-9529
mbkaplan@thekaplanlawfirm.com

*Local Counsel for Plaintiffs and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Laurence J. Hasson
Joseph R. Seidman, Jr.
Jeffrey R. McEachern
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: lhasson@bernlieb.com
        seidman@bernlieb.com
        jmceachern@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 5

    A.    IronNet Publishes Transformational FY22 Guidance to
Entice Investors ................................................................................... 5

    B.    The Class Period Begins: Defendants Confidently Reiterate
Transformational Guidance ................................................................. 6

    C.    Investors Had No Idea NDAA Funding Divorced the Guidance
From Reality ....................................................................................... 7

    D.    Alexander Profits By Selling 85% of His Available IronNet Stock at
Suspicious Times ................................................................................ 8

    E.    The Truth Is Revealed: IronNet Cuts ARR by 60% And Revamps
Guidance ............................................................................................ 9

    F.    Post Class Period: The Deals Underlying the Guidance Have Still
Not Materialized ............................................................................... 10

ARGUMENT ......................................................................................................... 10

I.     LEGAL STANDARDS ............................................................................. 10

II.    DEFENDANTS' MOTION FAILS AS IT HINGES ON FACT ISSUES AND THE
IMPERMISSIBLE JUDICIAL NOTICE OF DOCUMENTS ......................... 11

III.   DEFENDANTS' MISTATEMENTS AND OMISSIONS ARE ACTIONABLE ........... 13

IV.   THE SAFE HARBOR DOES NOT PROTECT DEFENDANTS HERE ........................ 20

V.    PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER ............................... 23

    A.    Plaintiffs Sufficiently Allege Conscious Misbehavior ........................ 23

    B.    Alexander's Admissions Further Support Scienter ............................. 24

    C.    Defendants Failed to Comply With AICPA Guidelines ....................... 24

    D.    Defendants Were Also Motivated to Commit Fraud ........................... 25

         1.    Alexander Was Motivated to Commit Fraud ........................... 25

i

2.	Defendants Were Motivated to Keep Issuing the Guidance ..................... 28

E.	Key Resignations Further Support Scienter ............................................. 29

F.	Plaintiffs' Allegations Collectively Show a Strong Inference of Scienter ........... 30

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ash v. PowerSecure Int'l, Inc.*,
  2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ........................................................................ 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................. 10

*Black v. Martek Biosciences Corp.*,
  2006 WL 8435572 (D. Md. June 14, 2006) .............................................................. 11, 14, 24

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  496 F. Supp. 2d 952 (E.D. Va. 2020) ..................................................................................... 29

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012) ............................................................................... 12, 23

*Chapman v. Fennec Pharm. Inc.*,
  2021 WL 7209981 (M.D.N.C. Dec. 16, 2021), *report and recommendation adopted*,
  2022 WL 613378 (M.D.N.C. Mar. 2, 2022) ........................................................................... 11

*City of Miami Fire Fighters' & Police Officers' Ret. Trust v. CVS Health Corp.*,
  46 F.4th 22 (1st Cir. 2021) ...................................................................................................... 21

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Ind., Inc.*,
  29 F.4th 802 (6th Cir. 2022) ................................................................................................... 26

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) .................................................................................................. 28

*Direct Benefits LLC v. TAC Financial, Inc.*,
  2014 WL 671616 (D. Md. Feb. 20, 2014) .............................................................................. 15

*Direct Benefits, LLC v. TAC Fin., Inc.*,
  2020 WL 2769982 (D. Md. May 28, 2020) ............................................................... 11, 14, 15

*Dunn v. Borta*,
  369 F.3d 421 (4th Cir. 2004) .................................................................................................. 16

*Elec. Workers Pension Trust Fund of IBEW Local Union No. 58 v. CommScope*,
  2013 WL 4014978 (W.D.N.C. Aug. 6, 2013) ........................................................................ 22

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (E.D. Va. 2016) ........................................................... 29

*Epstein v. World Acceptance Corp.*,
    2015 WL 2365701 (D.S.C. May 18, 2015) ........................................................... 21

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ........................................................... 14

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) ........................................................... 17, 18

*In re 2U, Inc. Sec. Class Action*,
    2021 WL 3418841 (D. Md. Aug. 5, 2021) ........................................................... 16, 17

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........................................................... 21

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................... 24

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ........................................................... 30

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ........................................................... 11

*In re Cable & Wireless, PLC*,
    321 F. Supp. 2d 749 (E.D. Va. 2004) ........................................................... 17

*In re Computer Sciences Corp. Securities Litigation*,
    890 F. Supp. 2d 650 (E.D. Va. 2012) ........................................................... 16

*In re Constellation Energy Grp., Inc.*,
    738 F. Supp. 2d 614 (D. Md. 2010) ........................................................... 21

*In re Federal–Mogul Corp. Sec. Litig.*,
    166 F. Supp. 2d 559 (E.D. Mich. 2001) ........................................................... 18

*In re Genworth Fin. Sec. Litig.*,
    *103 F. Supp. 3d 759* (E.D. Va. 2015) ........................................................... 21, 23

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021) ........................................................... 17

*In re Human Genome Scis. Inc. Sec. Litig.*,
    933 F. Supp. 2d 751 (D. Md. 2013) ........................................................... 11

*In re Lab Corp. of Am. Holdings Sec. Litig.*,
  2006 WL 1367428 (M.D.N.C. May 18, 2006) ....................................................... 22

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) .................................................................... 17

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D.W. Va. 2012) ............................................................... 23

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) .............................................................. 24, 25

*In re Mutual Funds*,
  437 F. Supp. 2d 444 (D. Md. 2006) ..................................................................... 23

*In re Nash Finch Co.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) .................................................................. 26

*In re Neustar Sec. Litig.*
  83 F. Supp. 3d 671 (E.D. Va. 2015) ................................................................ 17, 22

*In re Orbital Sciences Corp. Sec. Litig.*,
  58 F. Supp. 2d 682 (E.D. Va. 1999) ..................................................................... 26

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ............................................................ 21

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ......................................................... 14

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ....................................................... 29, 30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  2017 WL 3058563 (N.D. Cal. July 19, 2017) ......................................................... 23

*In re Wells Fargo & Co. Sec. Litig.*,
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .................................... 11, 13, 15, 16

*KBC Asset Management NV v. 3D Systems Corporation*,
  2016 WL 3981236 (D.S.C. July 25, 2016) ....................................................... 25, 26

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ........................................................................... 25, 27

*Khoja v. Orexigen Therap., Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................... 12

*Knurr v. Orbital ATK Inc.*,
   272 F. Supp. 3d 784 (E.D. Va. 2017) .................................................................. 30

*Knurr v. Orbital ATK Inc.*,
   294 F. Supp. 3d 498 (E.D. Va. 2018) .................................................................. 29

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
   2021 WL 4397946 (N.D. Ill. Sept. 27, 2021) ...................................................... 18

*Lefkoe v. Jos. A. Bank Clothiers*,
   2007 WL 6890353 (D. Md. Sept. 10, 2007) ........................................................ 26

*Lefkoe v. Jos. A. Bank Clothiers*,
   2008 WL 7275126 (D. Md. May 13, 2008) .......................................................... 26

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) .............................................................................. 29

*Matrixx Initiatives Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................. 30

*McIntyre v. Pedder*,
   2015 WL 5039431 (W.D.N.C. Aug. 26, 2015) .................................................... 12

*Ollila v. Babcock & Wilson Enters., Inc.*,
   2018 WL 79206 (W.D.N.C. Feb. 8, 2018) ........................................................... 21

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
   353 F.3d 338 (4th Cir. 2003) .............................................................................. 29

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
   2021 WL 1439680 (E.D. Va. Mar. 24, 2021) ......................................... 2, 12, 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
   759 F.3d 1051 (9th Cir. 2014) ............................................................................ 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   2011 WL 3501733 (N.D. Cal. Aug. 10, 2010) .................................................... 22

*Ramirez v. Exxon Mobil Corp.*,
   334 F. Supp. 3d 832 (N.D. Tex. 2018) ............................................................... 29

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .............................................................................. 28

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) .............................................................................. 10

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ........................................................................ 22

*Smith v. Circuit City Stores, Inc.*,
  286 F. Supp. 2d 707 (E.D. Va. 2003) .......................................................... 17

*Tchatchou v. India Globalization Cap. Inc.*,
  2021 WL 307415 (D. Md. Jan. 29, 2021) .................................................... 28

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ........................................................................ 28

*Tecku v. Yieldstreet, Inc.*,
  2022 WL 1322231 (S.D.N.Y. May 3, 2022) ................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................ 23, 25, 30

*Wikimedia Found. v. Nat'l Sec. Agency*,
  857 F.3d 193 (4th Cir. 2017) ........................................................................ 10

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2020) ...................................................................... 18

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .................................................................. 27, 28

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ........................................................................ 11

**Statutes**

15 U.S.C. § 78u-5(c)(1) .................................................................................... 20

**Other Authorities**

*Extending Government Funding and Delivering Emergency Assistance Ac*t,
  Pub. L. 117-43, §102(b) (2021) .......................................................... 3, 8, 13

## PRELIMINARY STATEMENT[1]

Defendants did not need a "crystal ball" here, they needed to be "transparent" with investors, as they admitted prior to this lawsuit.  From the start of the Class Period, Defendants knew but did not disclose that the Guidance was materially based on Deals reflecting a sudden and seismic shift in the Company's dependence on the public sector.  Defendants likewise knew but did not disclose that the Deals were already subject to materialized risks, including budget and authorization risks.  Instead of alerting investors, Defendants continued to paint a wildly misleading picture of IronNet's near-term growth.  In addition to confidently touting large new customer deployments that supposedly supported the Guidance, Defendants repeatedly told investors that the vast majority of IronNet's revenue came from the private sector, and that the public sector may never be a significant revenue driver for the Company.  Investors had no idea that Defendants had already substantially based the Guidance on public sector revenue, and that serious risks attendant to the Deals had already come to a head, rendering the Guidance a mere pipedream.  While Defendants misrepresented IronNet's near-term growth story, co-CEO Alexander unloaded 85% of his available IronNet stock for $5.1 million.

Investors were blindsided when Defendants revealed on December 15, 2021, just one month before FY22-end, that IronNet was slashing ARR Guidance by 60% and removing all the Deals from guidance in perpetuity.  IronNet stock fell by over 30%, analysts scathingly criticized

---

[1] Defendants' motion to dismiss is referred to as "Motion" or "Mot.".  Otherwise undefined terms are defined in the Amended Complaint (the "Complaint"). "¶_" references are to the Complaint. IronNet's "FY22" ran from February 1, 2021 through January 31, 2022. ¶1. "Guidance" refers to IronNet's FY22 guidance. "Deals" refers to large, unprecedented government deals Defendants materially based Guidance on but never identified, including private sector deals subject to government budgets and risks. For the Complaint, Plaintiffs assumed the Deals existed. However, none of the Deals have materialized, and FOIA requests to federal agencies did not identify any of them, casting further doubt on the basis for including the Deals in Guidance. Discovery will shed light on these questions of fact.  All emphasis is added unless otherwise noted.

management, and investors lost millions of dollars.  Defendants later admitted they were not "transparent" with investors, but they now claim they were just "responsibly" updating Guidance. Mot. 2.  Defendants' new-fangled claim is at odds with the facts and only raises questions of fact. For the many reasons articulated herein, Defendants' Motion should be denied in its entirety.

Defendants glom on to the fact that the misstatements here involve Guidance to argue, incorrectly, that this is a fraud-by-hindsight case warranting dismissal.  But Defendants made misstatements implicating facts they already knew, including the makeup of, and existing risks relating to, the Guidance.  Defendants do not (and cannot) contest that they knew these facts. Indeed, one key risk was NDAA funding, and Defendants concede, as they must, that the '22 NDAA could not have funded any Deals in time to support the Guidance.

Defendants chiefly base their Motion on a factual counternarrative that impermissibly conjectures that the '21 NDAA possibly could have funded Deals in FY22.  Defendants "support" this narrative by seeking judicial notice of 26 documents. It is black letter law that Defendants' narrative is impermissible and raises fact issues that cannot be decided now.  Moreover, courts, including this one, rightly decline to notice new documents like many of Defendants' exhibits here that are not integral to, or referenced in, a complaint.  *See Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *16-20 (E.D. Va. Mar. 24, 2021).  Nevertheless, Plaintiffs are now forced to respond to Defendants' unfounded narrative, and as set forth *infra*, even if this Court notices Defendants' documents (and it should not), they only further underscore the egregiousness of the fraud.

Defendants concede they knew the '21 NDAA was due to expire on September 30, 2021. Mot. 7.  Thus, Defendants made all their statements (on September 14, 20, 22, 28 and 30) knowing the imminent risk that the '21 NDAA expiration could seriously and adversely impact the

Guidance.  Defendants also knew that passage of a Continuing Resolution ("CR") – a stop-gap measure to extend the budget and avoid a government shutdown (*see infra* at 3, 7) – was not a guarantee, and that, even if a CR passed, it was highly unlikely it could fund IronNet's Deals. Rather than warn investors of these serious and immediate risks, Defendants doubled down, reiterating that the public sector was insignificant and may never be significant to IronNet. Defendants thus rendered even IronNet's generic government risk warnings irrelevant to a market focused on IronNet's transformational Guidance due imminently by FY22 end.

Ironically, Defendants argue – in hindsight – that a CR passed extending the federal budget, but the mere fact that a CR narrowly passed at the eleventh hour on September 30 affords them no protection.  Defendants did not know a CR would pass when they made all their misstatements, nor what its scope might be.  Moreover, CRs "keep the lights on" and are not intended to fund new procurements.  The CR here did not fund any of IronNet's Deals, and, based on the text of the CR – which Defendants did not include – it is very unlikely that it even could.  The CR states, in relevant part, that "[n]o appropriation or funds made available or authority granted…for the Department of Defense shall be used **to initiate multi-year procurements**…." Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43, §102(b) (2021). IronNet's average contract is three years in length and the Guidance was based on new Deals (¶32, *see also* Mot. 4).  But the key point is that in the face of urgent known risks that divorced the Guidance from reality, rather than caution investors, Defendants misled them by painting a profoundly unreasonable picture of near-term growth.  The notion that a miracle or slew of miracles could have theoretically saved the Guidance despite the risks does not make Defendants' misstatements any less misleading.

Defendants claim they provided adequate risk warnings to investors, but nothing could be further from the truth.  Defendants concealed that the Guidance reflected a massive shift in IronNet's business to the public sector, while reinforcing that the private sector accounted for over 80% of IronNet's revenue.  Defendants also repeatedly stated that public sector business was insignificant and "may never account for a significant portion of revenue."  Thus, IronNet's generic risk warnings about government "budgetary cycles", "funding authorizations", and possible "delays" were meaningless to investors looking at IronNet's revenue through the end of FY22.

Defendants further argue Plaintiffs failed to plead a strong inference of scienter, but they are wrong.  In addition to showing Defendants acted with actual knowledge, the Complaint supports scienter by alleging Alexander engaged in insider trading.  Defendants try to explain this away by wrongly arguing Alexander's sales only comprised 4% of his total holdings, but Defendants ignore that Alexander sold 85% of his *available IronNet shares* during the Class Period while in possession of material nonpublic information.  As the rest of his shares were subject to a lockup, Alexander's total holdings are meaningless in determining whether his sales were unusual.  Likewise, the fact that Alexander traded pursuant to a 10b5-1 trading plan does not immunize him since he entered into the plan on September 17, 2021 – three days into the Class Period when he knew the Guidance was a ticking time bomb.  Setting up a trading plan with such knowledge only strengthens scienter.  *See infra* at 26-28.

A strong inference of scienter is also present because Defendants were motivated to commit fraud.  Defendants wanted to stand by the Guidance because they had touted it while trying to secure IronNet's SPAC Merger.  Defendants do not dispute this and only claim this is a generic allegation, but that argument fails as IronNet desperately needed funding from the SPAC Merger. Former Co-CEO Welch admitted IronNet availed itself of a SPAC Merger, which is far less

rigorous than a traditional IPO, as it allowed IronNet to tout its future rather than focus on its cash-burning past.  Notably, the SEC has since proposed new rules exposing SPACs to greater liability for making fanciful projections as they have repeatedly been used to dupe investors.  *See* SEC Proposed Rule 2022-56, "Special Purpose Acquisition Companies, Shell Companies, and Projections" (https://www.sec.gov/news/press-release/2022-56).  Moreover, Alexander admitted on December 15, 2021 that the '22 NDAA could not have contributed revenue to FY22.  In sum, Plaintiffs plead a strong inference of scienter.

For these reasons and all those given below, the Motion should be denied in its entirety.

## STATEMENT OF FACTS

IronNet was founded as a private company in 2014 by Alexander, a retired four-star General with intimate knowledge of government contracts and a high degree of public trust. ¶28. IronNet derives over 90% of its revenue from software subscriptions, making ARR and revenue its key financial metrics. ¶33. Most of IronNet's business came from private customers; Defendants repeatedly told investors the public sector was "untapped" and did not, and "may never", account for significant revenue. ¶¶35, 107. IronNet has never been profitable, and desperately needed funding in 2021, which Defendants determined to get from the public markets. ¶36. Knowing investors would be loath to buy into a company with a history of burning cash, Defendants sought to take IronNet public through a less rigorous SPAC Merger that allowed IronNet to issue projections not likely to pass scrutiny in a traditional IPO. ¶37.

### A.  IronNet Publishes Transformational FY22 Guidance to Entice Investors

On March 15, 2021, IronNet announced its plan to go public through a SPAC Merger.  *See* ¶39.  In June 2021, Defendants issued FY22 ARR projections of $68 million, compared to prior fiscal year ARR of $25.8 million. ¶¶41, 34.  Defendants gave no detail about the composition of this guidance, but during a June 7, 2021 call with analysts, Gerber stated that over 80% of IronNet's

revenue was from private companies. ¶¶4, 42.  Gerber also claimed IronNet was "confident" in the huge "revenue increase" since "over 50% of the revenue" came from existing customers. ¶43.

Just before the SPAC Merger, on August 10, 2021, IronNet issued a press release where it increased its ARR outlook to $75 million and decreased its revenue outlook to $43-45 million for FY22. ¶¶46, 47. IronNet stated this was a result of an "increase in larger contract opportunities that it expects to close" before November 2021. ¶46. The same release touted IronNet's new partnership with Fireye/Mandiant. ¶46. The market had no reason to believe that many, or indeed any, of the large sales opportunities involved the public sector. ¶47. The Guidance was decisive in closing the Merger on August 26, 2021. ¶5.

**B. The Class Period Begins: Defendants Confidently Reiterate Transformational Guidance**

On September 14, 2021, IronNet published weak results from the first half of the year ($24 million in ARR and $12 million in revenue). ¶55. Defendants downplayed these results and emphasized that large deals were expected in the next three months and that IronNet was confidently in line to meet the Guidance. ¶56.  Welch stated that "[w]e are on target with our first half guidance" and that "[n]ew customer momentum so far in the second half of our fiscal year is strong." Gerber stated that because of "large deal formation", IronNet was "on pace to double ARR in the third quarter" and triple ARR in four months. ¶¶56-57.  Defendants also cited IronNet's August 6, 2021 proxy, which stated public sector deals "have not accounted for, and may never account for, a significant portion of our revenue." ¶96. IronNet stock jumped 38%.  ¶98.

Over the next two and a half weeks, Defendants relentlessly sold IronNet's growth story. On September 20, 2021, Gerber stated that IronNet was "pleased" that a set of "large transactions" were progressing and would finalize by FY22-end. Welch even touted IronNet's "incredible

transparency" with investors and added that "[w]e've been seeing these larger contracts coming along." ¶¶60-62. After these statements, IronNet shares rose again, this time by almost 20%. ¶101.

On September 22, 28, and 30, 2021, IronNet issued offering documents reiterating the Guidance and the insignificance of the public sector to it. ¶¶63, 96, 106, 112, 118. On September 30, 2021, Defendants also touted that IronNet was "FedRAMP Ready", a preliminary step in the process for being authorized for federal agency deals. ¶118.[2] Investors still had no reason to suspect the Guidance already materially depended on public sector Deals. ¶66.

### C. Investors Had No Idea NDAA Funding Divorced the Guidance From Reality

Unbeknownst to investors, large Deals underpinning the Guidance hinged on NDAA funding. The NDAA, which specifies the annual budget and expenditures of, *inter alia*, the DoD (¶50), is passed annually (typically December or later), and provides funding for the next year. *Id*. As the government's fiscal year ends on September 30, the NDAA expires on that date. Mot. 7.

An NDAA budget can only be extended by a CR, which must pass the House, Senate and then get signed into law by the President before the current NDAA expires. ¶¶51-52. There is never a guarantee a CR will pass. Moreover, a CR is a temporary "stopgap" measure to extend the deadline for agencies to spend limited funds for a limited time for essential services to prevent a government shutdown. *See supra* at 3. CRs typically do not fund new procurements. *Id*.

The '22 NDAA was enacted on December 15, 2021 and thus could not fund Deals in FY22. Mot. 10. The '21 NDAA was due to expire within days of the start of the Class Period on September 30. Mot. 7. Defendants did not disclose that the Guidance materially depended on

---

[2] FedRAMP provides standard requirements for companies offering cloud products to federal agencies. ¶106. There are three designations: Ready, which is the lowest designation, In-Process, and Authorized.  *See*  https://www.fedramp.gov/assets/resources/documents/FedRAMP_Marketplace_Designations_for_Cloud_Service_Providers.pdf).  "Ready" status typically only lasts a year before expiring, unless a company progresses through the program, which IronNet did not do. ¶¶106, 112, 118.

Deals, including ones that depended on NDAA funding, nor did they warn of the imminent NDAA risks, or the risk a CR might not pass or fund Deals in FY22.  ¶54.

On September 21, 2021, a draft CR with an uncertain future was introduced in the House.[3] Meanwhile, Defendants continued to tout the Guidance on September 22, 28, and 30 with impunity. ¶¶ 9, 63, 96, 106, 112, 118.   On September 30, a version of the CR narrowly passed in the Senate and was signed into law at the eleventh hour.[4]   The CR provided, in part, that "[n]o appropriation or funds made available…for the Department of Defense shall be used to *initiate multi-year procurements*…." Pub. L. 117-43, §102(b) (2021).   IronNet mainly has multi-year contracts with its customers (¶32) – and yet, Defendants still did not alert investors of any risk.

Shortly thereafter, IronNet's FedRAMP "Ready" status lapsed.[5]   Defendants did not disclose this.  As in the case with NDAA funding risk, investors had no reason to be concerned with FedRAMP authorization risk in relation to the near-term Guidance.

The CR expired on December 3, 2021 without funding any IronNet Deals. Mot. 9.

### D.  Alexander Profits By Selling 85% of His Available IronNet Stock at Suspicious Times

Pursuant to a lockup agreement he signed, Alexander could only sell up to 568,525 of his IronNet shares between September 30, 2021 and February 26, 2022. ¶138.  Alexander sold 477,625

---

[3] *See*, *e.g.*, "Federal Government Prepares for a Shutdown", Yahoo Finance, Sept. 23, 2021 ("Republicans in the Senate have vowed to kill the [CR]…"). https://finance.yahoo.com/news/federal-government-prepares-shutdown-232715623.html).

[4] *See* "Biden Signs Bill to Avert Partial Government Shutdown" AP News, Sept. 30, 2021 ("With only hours to spare, President Joe Biden on Thursday evening signed legislation to avoid a partial federal    shutdown")    https://www.usnews.com/news/business/articles/2021-09-30/congress-moves-to-avert-partial-government-shutdown).

[5]    *See*    https://www.fedramp.gov/assets/resources/documents__CSPAuthorization_Playbook_Getting_Started_with_FedRAMP.pdf.  IronNet did not regain FedRAMP Ready status until after the    Class    Period.    *See*    June    14,    2022    earnings    call    transcript, https://d1io3yog0oux5.cloudfront.net/_9ada4f8c11b9ff66704a65dc15908824/ironnet/db/881/7523/file/IronNet+1Q+FY23+Earnings+Transcript.pdf.

of his shares (85%) during the Class Period – after he knew the '21 NDAA expired, the CR wouldn't fund new multi-year procurements, and the '22 NDAA could not contribute to FY22 – with his last sales right after IronNet's FedRAMP lapse and only weeks before IronNet slashed the Guidance. ¶¶69, 72, 138.

### E.  The Truth Is Revealed: IronNet Cuts ARR by 60% And Revamps Guidance

On December 15, 2021, Defendants revealed that a "majority" of the Guidance was based on large Deals (not one of which had come through) that could not have contributed to FY22. ¶74. Defendants cut ARR by 60% to $30 million and revenue by 40% to $26 million and removed all the Deals from guidance going forward. ¶74. IronNet also acknowledged it never should have included the Deals in the Guidance to begin with. *Id*. Alexander conceded on a call that day that the Guidance was not based on "predictable" measures and, later, that IronNet had not been "transparent" with investors. ¶¶76, 82. Alexander also revealed that as the '22 NDAA passed that day, some of the Deals may start to "move forward" in coming "months". Thus, this was the start of a long process that could never finish by FY22-end. ¶¶75, 76. IronNet's stock fell by 30%. ¶79.

A December 15, 2021 analyst report criticized IronNet for the "eye-popping" reduction:

> IRNT…***reduced its year-end ARR target by an eye-popping 60% to $30MM…***  As reasons…the company highlighted that large late-stage strategic deals in the U.S. public sector were delayed…  [IronNet has] ***a lot of work ahead to rebuild creditability…given that almost every other security company [ ] met or exceeded forecasts….*** ¶80.

A December 16, 2021 analyst report further lambasted Defendants' lack of credibility:

> IronNet['s]…revised guidance is made [much] worse [since] just 90 days ago, management…stated that it was expecting to "meet [FY22] growth objectives"…[i]f investors don't trust [the] forecast, the stock will never get [the right] multiple[.] ¶81.

Alexander vaguely described some of the Deals removed from the Guidance and blamed "delays in getting funding through federal budgets". ¶120. One example was a greater than $10 million "ARR opportunity with a branch of the military." ¶126. A second was a $5-

10 million "defense industrial base" private company subject to the same federal budget delays. *Id.* These two alone accounted for at least 20% of the Guidance and the other examples were subject to similar undisclosed risks.   ¶126.

### F.  Post Class Period: The Deals Underlying the Guidance Have Still Not Materialized

IronNet has still not secured any of the Deals included in the Guidance and the '22 NDAA has now lapsed. ¶16.   In June 2022, IronNet announced it was laying off 17% of its workforce. ¶86.  On September 14, 2022, IronNet again announced abysmal financial results, including ARR of $26.5 million. *See* IronNet September 14, 2022 Press Release, https://ir.ironnet.com/news-events/press-releases/detail/68/ironnet-reports-fiscal-second-quarter-2023-financial-results. IronNet also stated it was laying off another 35% of its workforce and that Welch and Gerber were resigning. *Id.*  IronNet stock now trades at around $0.40, down nearly 99% from $47.50 just 14 months ago. *See* Wu Ex. 21.

## ARGUMENT

### I.    LEGAL STANDARDS

A complaint will defeat a 12(b)(6) motion by alleging a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Courts "accept as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).  Defendants are not entitled to present a counternarrative of facts to defeat a plaintiff's complaint.  *See id.*[6]

---

[6] Plaintiffs allege claims under Section 10(b) of the Exchange Act, which has six elements, but Defendants only challenge falsity and scienter.  *See Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).  As detailed *infra*, Plaintiffs satisfy the pleading requirements for both elements. Plaintiffs do not allege scheme liability under Section 10b-5(a) or (c).  *Compare* Mot. 25 n.12.

Defendants mischaracterize the Complaint as a hindsight pleading to no avail.  The mere fact that statements in the Complaint involve Guidance is meaningless when Defendants had actual knowledge of their falsity based on presently known facts that they hid from investors.  The Fourth Circuit has explained that "[t]he Exchange Act…ensure[s] that public companies release information that will permit 'investors to make informed investment decisions.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 605 (4th Cir. 2015).  Here, "informed" decisions were impossible because Defendants misrepresented that the Guidance was based on private sector revenue growth when, in fact, it was largely based on Deals subject to imminent risks.  Moreover, projections do not have to be "impossible" to be actionable.[7]  In the face of the serious and imminent risks known to Defendants, the Guidance was certainly divorced from reality.  Accordingly, Defendants' Motion should be denied.

## II.   DEFENDANTS' MOTION FAILS AS IT HINGES ON FACT ISSUES AND THE IMPERMISSIBLE JUDICIAL NOTICE OF DOCUMENTS

Defendants do not – because they cannot – challenge the Complaint's well-pled allegations.  Instead, Defendants brazenly offer a set of documents to create a defense based on an unfounded and highly fact-specific narrative, entirely outside the four corners of the Complaint.  *See*, *e.g.*, Mot. 14-15.  Defendants seek judicial notice of 26 exhibits, many of which are not cited in, or integral to, the Complaint.  The Court should not take notice of these exhibits, which would effectively allow Defendants to convert this Motion into summary judgment without discovery.[8]

---

[7] *See*, *e.g.*, *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *15, 16 (S.D.N.Y. Sept. 30, 2021).  Indeed, "if a company…disclose[s] a forecast…, [it] is susceptible to attack [if it lacked] a reasonable basis." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997); *cf. Direct Benefits, LLC v. TAC Fin., Inc.*, 2020 WL 2769982, at *11 (D. Md. May 28, 2020) ("projections of future performance…actionable if [] lack[ing] reasonable basis…"); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 (D. Md. June 14, 2006) (same).

[8] Defendants' citations on judicial notice are distinguishable because they do not concern the kinds of documents (*see infra* at n. 9) Plaintiffs take issue with here. Additionally, unlike here, in those

The Ninth Circuit warned that this practice leads to "harmful results" and "risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja v. Orexigen Therap., Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). *See also id.* ("risk is especially significant in…fraud [cases with] a heightened pleading standard, and… defendants [have] materials to which…plaintiffs do not yet have access." The Ninth Circuit stated:

> Submitting documents not mentioned in the complaint to create a defense is…another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the…court converts the…motion…into [one] for summary judgment, the plaintiff [has no chance] to respond to…the defendant's new version of the facts.

899 F.3d at 1003. *Cf. Carlucci v. Han*, 907 F. Supp. 2d 709, 737 (E.D. Va. 2012) (cannot decide fact issues on 12(b)(6) motion).

This Court likewise has explained that "[c]onsideration of a document attached to a motion to dismiss ordinarily is permitted ***only when the document is integral to and explicitly relied on in the complaint***". *Evolent*, 2021 WL 1439680, at \*15; *McIntyre v. Pedder*, 2015 WL 5039431, at \*6-7 (W.D.N.C. Aug. 26, 2015) (discussing "narrow" circumstances of judicial notice). In *Evolent*, this Court did not take notice of, *inter alia*, an analyst report, transcripts not referenced in the complaint, and the entirety of a transcript that *was* referenced in the complaint. 2021 WL 1439680 at \*16-20. Many of Defendants' 26 exhibits are not referenced in, or integral to, the

---

cases the documents were not submitted for the truth of the matter asserted. *See Chapman v. Fennec Pharm. Inc.*, 2021 WL 7209981, at \*7 (M.D.N.C. Dec. 16, 2021), *report and recommendation adopted*, 2022 WL 613378 (M.D.N.C. Mar. 2, 2022) (SEC filings); *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at \*5 (E.D.N.C. Sept. 15, 2015) (SEC filings); *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (press articles and analysts' reports noticed – but only to "assess what the market knew at particular points in time").

Complaint.[9]  Thus, as in *Evolent*, the Court should not judicially notice the documents.  *Id*.  But

even if the Court does notice the documents, Defendants' Motion still fails.  *See*, *e.g.*, *infra* at 13.

### III.   DEFENDANTS' MISTATEMENTS AND OMISSIONS ARE ACTIONABLE

Defendants chiefly claim their misstatements are not actionable because the '21 NDAA

had a few days left before it expired, and in hindsight was extended by a CR that theoretically

could have funded Deals supporting the Guidance.  This argument, in addition to relying on an

unfounded and impermissible fact narrative, is dead on arrival.

Regardless of NDAA timing issues, Defendants made fundamental misrepresentations and

omissions about the Guidance, *e.g.*, it was largely based on Deals with risks that already

materialized.  *See* ¶¶74, 91.  Moreover, Defendants' narrative only underscores how misleading

their statements were because Defendants knew from September 14 that the '21 NDAA was due

to expire on September 30, and that the '22 NDAA could not fund Deals in FY22. Nevertheless,

Defendants did not warn that the '21 and '22 NDAA had urgent timing risks; a CR was not a

guarantee; the scope of a CR (if enacted) was unpredictable, but highly unlikely to fund new Deals;

and IronNet's bottom-rung FedRAMP status diminished its chances of securing Deals.[10]

---

[9] *See, e.g.,* Wu Ex. 1 (Congressional Research Service), 3 (IronNet Management Presentation); 5 (Congressional Service Report), 12 and 20 (entirety of September 20, 2021 Fireside Chat and December 15, 2021 conference call referenced in Complaint), 13 (screenshot from website replay of Fireside Chat), 17 (White House Announcement), 22 (Congressional Research Service, "Defense Primer: the NDAA Process"); 23 (Congressional Budget Office website page titled "Discretionary Spending in Fiscal Year 2021: An Infographic"); 24 (Office of Management and Budget Circular); 26 (USA.gov website page titled "Budget of the U.S. Government").

[10] Wu Ex. 24 shows that even after the CR was passed Defendants were still in trouble.  *See id*. at 2 ("[b]ecause of the nature of a short-term CR, each agency should operate ***at a minimal level*** until after its regular fiscal year appropriations are enacted").  The CR also stated that "[n]o appropriation or funds made available…for the Department of Defense ***shall be used to initiate multi-year procurements…***." Pub. L. 117-43, §102(b) (2021).

It is well-settled that projections and guidance are actionable when "divorced from reality". *Wells Fargo*, 2021 WL 4482102, at *15, 16. *See also Direct Benefits*, 2020 WL 2769982, at *12 (denying summary judgment as there was an "issue of material fact as to the actionability of the revenue projection"; here, projection based on hidden assumption of significant revenue increase from Deals that historically represented a small portion of business and were already subject to serious risks); *Black*, 2006 WL 8435572, at *5 (projections that lacked "reasonable basis" actionable).[11]

Defendants began making misleading statements on September 14, 2021 when IronNet issued a press release announcing revenue guidance of $43-45 million and ARR guidance of $75 million for FY22.  ¶90.  Welch claimed "new customer momentum so far in the second half of [FY22] is strong and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group" (¶94) – the same contract Alexander would later admit suffered from government delays.  ¶126.  Gerber further justified the Guidance by pointing to "larger deployments" and "large new customer contracts" that supposedly emerged in the first half of FY22.  ¶92. IronNet also cited risk language from its August 6, 2021 proxy that its "sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of…revenue." ¶96.

These statements were materially false and misleading when made for the reasons articulated above and in the Complaint.  Defendants did not disclose that a "majority" of the Guidance was based on Deals that they alone knew had  no realistic chance of contributing to FY22.  *See* ¶¶74, 91, 93, 97; Mot. at 7.  Moreover, by downplaying the significance of the public

---

[11] *See also Galestan v. OneMain Holdings, Inc*., 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018); *In re Symbol Techs., Inc. Sec. Litig*., 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013).

sector (¶96), investors had no way of knowing that a "significant portion of revenue" **_underlying the current Guidance_** was, in fact, already dependent on government funding and/or subject to government risks. _Id_.; _see also_ ¶42 (Gerber noted 80% private business in June 2022); ¶74 (Guidance "was supported by…late-stage multi-million dollar…[deals]…the majority of which are in the U.S. public sector").[12]

Courts in this Circuit and elsewhere have found analogous statements actionable. In _Direct Benefits LLC v. TAC Financial, Inc._, 2014 WL 671616 (D. Md. Feb. 20, 2014), defendants lauded TAC's growth and projected tripling revenues while hiding that a customer accounting for a large portion of their revenue suffered a "decline[] in revenue." _Id_. at *8. The court denied the motion to dismiss, and then later the motion for summary judgment, holding that – like Defendants here – defendants failed to disclose this material change in the makeup of its business. _See id_. _See also_ 2020 WL 2769982 (D. Md. May 28, 2020) (denying summary judgment where revenue projection based on undisclosed assumption of a significant increase in revenue from a sector of company's business that historically represented only a small portion of the company's revenue is actionable).

_Wells Fargo_, 2021 WL 4482102, is directly on point. There, Wells Fargo could not expand its assets until it had complied with a consent order. CEO Sloan stated that Wells Fargo was "planning on operating under the [A]sset [C]ap through the first part of next year" but failed to disclose that Wells Fargo had "yet to submit a satisfactory Stage 1 Plan to the Federal Reserve." _Id_. at *5. While not impossible, the court found Sloan's prediction actionable:

> Sloan made a "prediction [that], though not impossible, was misleading based on…facts in [defendant's] possession…although investors were [told]… expectations could differ

---

[12] Defendants confusingly lump their August 2021 statements with the Class Period statements to make it seem like there was, in fact, a reasonable amount of time before the '21 NDAA expired, but Plaintiffs' claims do not include the August 2021 statements. _See_, _e.g._, Mot. 7, 11. At the time their statements were made, the '21 NDAA only had days left before expiring.

from reality, [they] were given no information that would assist them in understanding just how unreasonable and divorced from reality…Sloan's projection was.

Similarly, Defendants' predictions were "divorced from reality" because they had "facts in [their] possession" undermining the Guidance.  *See id*.  Defendants' bald claim that it was not "impossible" for IronNet to achieve its Guidance does not immunize them from liability.  In the face of the urgent risks, Defendants cannot hang their hat on miracles. *Compare* Mot. 14.

In *In re Computer Sciences Corp. Securities Litigation*, 890 F. Supp. 2d 650, 655 (E.D. Va. 2012), defendants touted progress on a contract with the NHS, which was "one of the corporation's most substantial contracts, while failing to disclose information… that cast serious doubt on the corporation's ability to perform." *Id.* at 655. There, Judge Ellis held that defendants' "expectations regarding the timeframe for [a program's] deployment created the misleading impression that [defendant] was capable of performing on the…[c]ontract." *Id*. at 668.  Here, Defendants knew but hid that the Guidance was materially based on Deals with significant risks "cast[ing] serious doubt on [IronNet's] ability to perform" in FY22.  *Id*. at 655.

This Court's findings in *Evolent* are also instructive. In *Evolent*, this Court noted that "[r]epresentations about business dealings may be actionable when properly supported by facts demonstrating their falsity." 2021 WL 1439680, at *23.  *See also Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) ("business dealings ***and prospects*** are not simply sales pitches but rather can be proven true or false – and, if properly supported, could be found material by a reasonable jury"). In *Evolent*, a substantial portion of the defendant's revenue was from its main customer, Passport Services, which it was overcharging.  2021 WL 1439680, at *2.  This Court found, *inter alia*, that projections about Passport's "future financial performance" were actionable as they had no reasonable foundation.  *Id*. at **30, 32.  And, like here, the mere fact that a miracle could have happened to save the day did not provide a reasonable foundation.  *See also In re 2U, Inc. Sec.*

*Class Action*, 2021 WL 3418841, at *3, 15 (D. Md. Aug. 5, 2021) (revenue guidance and claim that company was "on track" to meet it were misleading as defendants hid "declining enrollment projections").[13]

Defendants also try to explain away many of their alleged misstatements but cannot. For example, Defendants argue Gerber's statement about "larger deployments" and "large new customer contracts" was an "accura[te]… statement[] of historical fact." Mot. 22. Defendants also argue Plaintiffs "fail to plead contemporaneous facts showing…new customer momentum as of September 14 was not strong…" *Id*. Defendants miss the point. Defendants hid that the "larger deployments" and new "contracts" related to Deals subject to materialized and undisclosed risks that divorced the Guidance from reality, while repeatedly stressing that IronNet's dependence on the public sector was insignificant. *See* ¶¶96, 106, 112, 118. As none of the Deals materialized (even today), the Court should not accept Defendants' bald claim.

Defendants also claim many of their alleged misstatements were "puffery" – empirically unverifiable statements that investors do not take seriously. Defendants' case citations only highlight the weakness of their argument. *See* Mot. 18 n.7. *See*, *e.g.*, *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) (vague statements about "healthy growth" and "strong finances" puffery; Defendants' statements about "customer momentum" and large contracts specifically claimed IronNet's customer base supported the Guidance); *In re Neustar*

---

[13] Defendants' cases in support of their argument that the Guidance was not misleading are easily distinguished. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (no contemporaneous facts showing falsity where misstatements related to product quality and defendant had not yet tested products); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) (no facts indicating projections were false other than alleging defendants were senior officers); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 215 (4th Cir. 1994) (rejecting statements only where plaintiffs "utterly failed" to allege facts that projections "lacked a reasonable basis"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 311 (S.D.N.Y. 2021) (no "contemporaneous information contradicting…disclosures").

*Sec. Litig.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015) (rejecting statement expressing general confidence in securing government contract; here, Defendants made specific quantitative statements about the Guidance and contracts underlying them); *In re Federal–Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (generic representations about integrating a company); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2020) ("on track" statements hinged on "assumptions" about future events; here, Plaintiffs "describe specific…circumstances *that ha[d] already occurred*", *see id.*).

Defendants' "on target" statements were misleading because IronNet's first half financial results gave the impression the Company was rather "off track" in meeting its Guidance, but Defendants confidently told investors otherwise. ¶¶56, 94-95(i).   In doing so, Defendants addressed specific guidance figures – they did not merely claim IronNet was "on target toward achieving [its] most profitable year".   *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212–14 (4th Cir. 1994).   *Cf. La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *12 (N.D. Ill. Sept. 27, 2021) ("on target" statement actionable where, like here, the "veracity of [the] statements could have been determined [when] made").   Finally, ¶¶90 and 99 refer to empirically groundless figures.   *Compare* Mot. 18.

Defendants also wrongly claim Plaintiffs ignored other deals with "U.S. federal government departments and agencies, U.S. state agencies, and foreign governments."   Mot. 3.   Not so.   *See*, *e.g.*, ¶11 ("Defendants…revealed…a "majority" of the large deals supporting the Guidance were unprecedented large **public sector deals**…); ¶91 ("Defendants told investors that IronNet's **public sector business** was not significant and may never be significant…").   *See also* ¶¶75-76.   In fact, Plaintiffs focused on the NDAA because it was the only federal funding delay Alexander specifically disclosed on December 15 – and it was material as it related to tens of

millions of dollars that were ultimately removed from the Guidance. ¶75.[14]  Thus, analysts also correctly focused on the NDAA.  *See* ¶87 (analyst closely followed NDAA after December 15 revelation).  Plaintiffs did not limit their allegations about public sector contracts to DoD contracts, but they are significant and undeniable examples of contracts that materially affected Guidance.  Thus, Plaintiffs do not "premise" falsity solely on "the passage of a new NDAA".  Mot. at 14.[15]

Defendants continued making misstatements through September with impunity, as the '21 NDAA drew dangerously close to expiring and FY22 inched closer to its end.  On September 20, 2021, Gerber reiterated the Guidance and stressed multiple large deals (without mentioning that most were with the public sector) that would close in the second half of FY22.  ¶99.  Gerber even suggested the $75 million ARR Guidance was conservative.  *Id*.  On September 22, 2021, IronNet addressed "large contracts" but again hid that most were with the public sector. ¶103.

Defendants also stated IronNet was "now actively investing in the acquisition of customers in the U.S. federal government vertical", touted that IronNet was "FedRAMP Ready", and that "although we anticipate that they may increase in the future, sales to U.S. federal, state and local governmental agencies have not accounted for, and may never account for, a significant portion of our revenue."  ¶106. Stating that IronNet was now actively investing in acquiring government customers,  was  only  FedRAMP  Ready,  and  did  not  have  significant  government  business

---

[14] IronNet's contracts involving American Rescue Plan funds are another example of Defendants raising impermissible factual issues.  *Compare* Mot. 14, 15; ¶82.  Nevertheless, like the Deals subject to the NDAA, they also represent Deals dependent on a government budget that Defendants knew the risks of but concealed from investors.

[15] *See also* ¶91(i) (Plaintiffs' first reason for falsity does not even mention the NDAA). In addition, even IronNet's purported large private sector deals appear to have been subject to the same government-related risks as the public sector deals and hinged on federal funding and were subject to related undisclosed risks of delays. *See* ¶126 ("The second is another multi-million dollar defense industrial base customer whose contract with us [wa]s making its way more slowly through government procurement than we anticipated").  Defendants' cannot be permitted to capitalize on their opacity when discussing the Deals.

misleadingly conveyed that the Guidance, which related to the final three months of FY22, was not materially impacted by the public sector.  ¶¶ 105, 107.  It also rendered IronNet's generic government risk warnings irrelevant for FY22.  Additionally, Defendants stated that "[w]e expect that gross margins for the rest of [FY22] to improve slightly to achieve our [FY] guidance." ¶¶108, 114.  This was misleading because gross margins "were not the real impediment to IronNet achieving" its Guidance nor could an improvement in margins meet the Guidance.  ¶103.[16]

Defendants made similar statements on September 22, 28 and 30.  ¶¶106, 108, 110, 112, 114, 116, 118.  IronNet's FedRAMP Ready status lapsed shortly thereafter between October 28, 2021 and November 4, 2021.  *See supra* at 8.  Thus, Defendants knew by then, and indeed well before, that their chances of securing federal contracts was even further diminished but, again, they did not warn investors.  Defendants had a duty to update their statements, but did not do so, and should be held accountable.[17]

## IV.    THE SAFE HARBOR DOES NOT PROTECT DEFENDANTS HERE

Defendants are not protected by the safe harbor.  Their statements included present facts and their boilerplate "warnings" were themselves misleading.  *See supra* at 14, 17, 18.

The PSLRA provides a limited safe harbor for forward-looking statements accompanied by meaningful cautionary language and not made with actual knowledge (15 U.S.C. § 78u-5(c)(1)),

---

[16] Defendants claim Plaintiffs do not show Defendants did not "anticipate" government sales might increase.  Mot. 22 n.10.  That argument fails as Defendants concealed that the Guidance was already largely based on Deals.  Defendants also claim they referred to "margin guidance" in ¶¶108 and 114, not ARR and revenue guidance.  *See* Mot. 23.  But IronNet did not issue "margin guidance" in September 2021 and Defendants' argument relies on portions of documents not integral to the Complaint. *See, e.g.*, Mot. 23 (citing Wu Ex. 3).  This is also another impermissible factual issue for which Plaintiffs are entitled to the reasonable inference.  *See supra* at 10-11.

[17] Executives have a duty to update prior statements when they later become misleading.  *See, e.g.*, *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *10 (S.D.N.Y. May 3, 2022) ("[e]ven if…statements were accurate when published…intervening events…rendered the statements false, requiring Defendants to at least update investors…").

but "does not protect representations of current or historical fact." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 n.36 (S.D.N.Y. 2010); *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010). Non-forward looking parts of mixed statements are not protected. *In re Genworth Fin. Sec. Litig.*, 103 F. Supp. 3d 759, 789 (E.D. Va. 2015).[18]

Here, Defendants' statements included current and historical fact,[19] Defendants also cannot argue with a straight face that their cautionary language was meaningful. It is well-settled that "warnings or disclosures in the securities context that frame risks as merely hypothetical may be misleading when they resemble the 'Grand Canyon' metaphor, [*i.e.*], 'one cannot tell a hiker that a mere ditch lies up ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon.'" *City of Miami Fire Fighters' & Police Officers' Ret. Trust v. CVS Health Corp.*, 46 F.4th 22, 35 (1st Cir. 2021). Courts in this Circuit agree. *See, e.g.*, *Genworth*, 103 F. Supp. 3d at 790 (no safe harbor "if Defendants knew that…risks…stated [as] 'potential' [] had already been realized, and that their forward-looking statements were false or misleading"); *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *6 (D.S.C. May 18, 2015) (cannot "warn…of risks concerning…practices of which Defendants were already aware"); *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *7 (D.S.C. Mar. 29, 2019); *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 79206, at *5 (W.D.N.C. Feb. 8, 2018).

Defendants' "warnings" here are even more problematic than the "Grand Canyon" metaphor. Defendants stated that IronNet's private sector business accounted for over 80% of

---

[18] Defendants also cannot hide behind the bespeaks caution doctrine, which is largely the same as the safe harbor. *See Constellation Energy*, 738 F. Supp. 2d at 625.

[19] *See, e.g.*, ¶92 ("IronNet *was invited* into larger deployments"); ¶94 ("[n]ew customer momentum so far in the second half of our fiscal year *is strong*"); ¶96 ("sales to U.S. federal, state and local governmental agencies *have not accounted for*…"); ¶99 ("So the primary affects that *we've been seeing*…") Defendants claim ¶¶94 and 99 are forward-looking (Mot. 16) but they contain present or historical statements of fact.

revenue, and reiterated that IronNet did not, and may never, have significant business with the government – effectively telling the "hiker" there was *not* a ditch ahead, let alone that the Grand Canyon was steps away.   In these circumstances, Defendants' "warnings" were undeniably generic, hypothetical, and hid the Guidance's ***current material dependence*** on the public sector and the Deals' urgent and adverse risks.   ¶97.   *Compare* Mot. 7, 18, 19 ("warnings" about unpredictable "demand from government organizations", "public sector budgetary cycles and funding authorizations", and difficult-to-predict revenue recognition).  Defendants claim their risk language was not misleading because some federal funding was purportedly available (Mot. 24), but this fact-specific narrative is both impermissible and unfounded.  *See supra* at 13.[20]

Defendants also claim they had no actual knowledge (Mot. 20), but Defendants' statements were misleading (*see supra* at 13-20) and made with actual knowledge (*see infra* at 23-24).

---

[20]  Defendants' safe harbor case citations are all factually distinct as Defendants here misrepresented that IronNet did not have, and may never have, significant government business – *i.e.*, risks with government contracts were irrelevant.  *See Neustar*, 83 F. Supp. 3d at 682 (investors warned that government contracts represented "a substantial portion of our revenue …and we may not win a competitive procurement"); *In re Lab Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *4 (M.D.N.C. May 18, 2006) (sufficient to warn that "[a]ctual results could differ materially from those currently anticipated due to a number of factors…[including] increased competition" without warning of specific competitors); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010) (did not have to cite "particular factor" at issue because they did not discuss it, but here Defendants ***made misleading statements*** about the "[a]ctual factor" at issue – government contracts); *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014) (Ninth Circuit did not detail purported warnings, which meaningfully addressed the issues alleged to have been concealed, but the lower court did, *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2011 WL 3501733, at *9 (N.D. Cal. Aug. 10, 2010) ("ability to continue increasing sales performance worldwide' could cause variance in the results" sufficient); *Elec. Workers Pension Trust Fund of IBEW Local Union No. 58 v. CommScope*, 2013 WL 4014978, at *11 (W.D.N.C. Aug. 6, 2013) ("[defendant] sufficiently tailored the risks to its own situation"; here, Defendants ***concealed*** the real risks with IronNet's situation).

## V.   PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER

Defendants further argue Plaintiffs have not demonstrated a strong inference of scienter, but their arguments fail.  Scienter "exists if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading." *Carlucci*, 907 F. Supp. 2d at 708.  "Allegations of reckless conduct" can satisfy scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In analyzing scienter, courts accept fact allegations as true, then use "context and common sense" (*Genworth*, 103 F. Supp. 3d at 783) to determine if the facts collectively show a strong inference of scienter.  *Tellabs*, 551 U.S. at 322-23. The inference of scienter need only be "at least as compelling as any opposing inference." *Id*. Here, the inference of scienter is at least as strong "as any plausible opposing inference".

### A.  Plaintiffs Sufficiently Allege Conscious Misbehavior

Defendants knew the Guidance was materially based on the Deals when they made their statements.  In fact, each Defendant confidently spoke about the Guidance, as well as "customer momentum" and "large deployments" underlying it, throughout September 2021.  *See, e.g., In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 620 (S.D.W. Va. 2012) (strong inference of scienter where "individual directors consistently signed various SEC filings and/or made direct statements to investors during presentations or in press releases").[21]  Defendants likewise knew the urgent risks afflicting the Deals underlying the Guidance, including, *inter alia*, the NDAA timing, expiring funding, and the implications of not being FedRAMP Authorized. *See supra* at

---

[21] *See, e.g.,* ¶90 (Gerber, Welch); *see also* Wu Ex. 11 (September 14, 2021 8-K cited at ¶90 (Alexander); ¶¶92, 94 (Welch); ¶99 (Gerber); ¶¶102, 106, 108, 112, 114, 116 (documents signed by Alexander, Gerber, Welch).  Signing a document is equal to making a statement.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 3058563, at *5 (N.D. Cal. July 19, 2017) (an officer who "with scienter, signs SEC filings 'makes a statement' [under 10(b)]"); *In re Mutual Funds*, 437 F. Supp. 2d 444, 447 (D. Md. 2006).

13.  Defendants also knew IronNet's business was mainly with the private sector and stated its public sector business was insignificant, without warning the Guidance reflected a seismic shift in business.  ¶¶49, 90, 99.  Thus, Defendants knew their statements were misleading when made.[22]

### B.  Alexander's Admissions Further Support Scienter

Post-class period statements also "may be relevant…to confirm what a defendant should have known during the class period." *See Black,* 2006 WL 8435572 at *5 (CFO's end of class period admission contributed to inference that he knew projections lacked reasonable basis); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020).  Just weeks after Alexander reiterated the Guidance and sold 85% of his available IronNet stock, he admitted the Guidance depended largely on Deals subject to government funding and delays (¶148); IronNet failed to base the Guidance on "predictable" measures (¶76), and later that IronNet had not been "transparent" with investors. ¶82.  These allegations support Alexander's scienter.

Defendants claim these admissions relate to the '22 NDAA, rather than the '21 NDAA.  Defendants again raise impermissible fact-specific issues and, though the Court should not consider them, Plaintiffs are due all reasonable inferences.  *See supra* at 10.  Alexander's admissions further show he knew of NDAA funding timing, he had public sector expertise, and he knew all along that a "majority" of the Guidance was based on public sector Deals.

### C.  Defendants Failed to Comply With AICPA Guidelines

IronNet's violations of the AICPA further supports scienter. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (AICPA violations taken in context raised a

---

[22] Defendants weakly argue that "Plaintiffs do not identify any contemporaneous internal Company documents" or cite "a single witness".  Mot. 20.  But those are not required to plead scienter – they are merely some ways to do so.  Plaintiffs here have marshalled compelling and wide-ranging evidence giving rise to a strong inference that Defendants committed fraud.

strong inference that defendant acted with scienter).  The Guidance violated the AICPA because Defendants hid material assumptions underlying the Guidance, including that it was largely based on Deals subject to government funding and urgent risks. *See* ¶¶152-157. Defendants claim that '21 NDAA funds were available for a few days after the start of the Class Period, thus they did not violate the AICPA.  *See* Mot. 28.  That is incorrect.  *See supra* at 13.  Moreover, Defendants miss the point and don't dispute they failed to disclose key underlying assumptions as required.

### D.  Defendants Were Also Motivated to Commit Fraud

#### 1.    Alexander Was Motivated to Commit Fraud

Although not required, allegations of "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.  Insider trading allegations support a strong inference of scienter "if the timing and amount of a defendant's trading were unusual or suspicious." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 610 (4th Cir. 2021).  *See also In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620, 642 (E.D. Va. 2000) (insider trades support scienter where "unusual in [] timing or amount").  Alexander sold 85% of his available stock, amounting to $5.1 million, at suspicious times when IronNet's stock price was artificially inflated.  This is highly probative of his scienter.

In *KBC Asset Management NV v. 3D Systems Corporation*, 2016 WL 3981236, at *10 (D.S.C. July 25, 2016), two of three individual defendants, Reichental and Gregoire, sold approximately 9% and 50% of their shares, for $8.8 million and $8.9 million, within one month of issuing revenue guidance and within two weeks of announcing high consumer demand.  *Id*. at *10  Gregoire also sold another 50,000 shares on August 27, 2014, within a month of raising revenue guidance, as did Reichental.  *Id*.  These sales were probative of scienter.  *See id*.

Alexander's sales were even more suspicious in amount and timing than those in *3D Systems*, particularly given that most of his holdings were subject to a lockup.  Alexander sold

477,625 IronNet shares – 85% of his stock available for sale at this point – for proceeds of $5.1 million.  ¶138.  Alexander could not sell any shares until September 30, 2021 and he began selling shortly thereafter on October 18, 2021. *Id*.  IronNet had just re-affirmed the Guidance on September 30, 2021, and Alexander knew the '21 NDAA had expired and that the CR did not allow for new multi-year procurements.  ¶¶136, 167-70; *supra* at 13.  Alexander made his final sale, which alone netted him almost a quarter million dollars, just weeks before IronNet was forced to come clean about its Guidance (¶136) and two weeks after IronNet lost FedRAMP Ready status, which it never disclosed to investors.  Alexander's $5.1 million in insider sales (which also violated IronNet's Business Code) was more than ***14 times greater*** than his annual salary of $360,000.  ¶¶139, 140.  In sum, Alexander's sales are highly probative of his scienter.[23]

Defendants concede Alexander could only sell 5% of his shares during the Class Period.  *See* Mot. 7-8. Yet Defendants ignore the lock-up by repeatedly asserting that Alexander sold 4% of his ***total*** shares.  Mot. 9, 12, 27.  Defendants' argument is disingenuous at best.  Shares that Alexander could not sell during the Class Period are not relevant to the determination of whether his sales were large or unusual – and Defendants cite no case law to the contrary. The analysis must be done comparing the shares he sold to the shares that he could have sold at the time.

---

[23] *See also Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *6 (D. Md. Sept. 10, 2007) (one of three individual defendants selling 74% of his holdings adequately pled his scienter); *cf. Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *8 (D. Md. May 13, 2008) ("scienter was found to be adequately plead with respect to all three Individual Defendants, even though only Wildrick was alleged to have engaged in insider trading"); *In re Orbital Sciences Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686 (E.D. Va. 1999) (unusually-timed sales of 74% and 15% alone pled strong inference of scienter); *cf. In re Nash Finch Co.*, 502 F. Supp. 2d 861 (D. Minn. 2007) (two of three individual defendants sold 77% and 25%); *City of Taylor Gen. Emps. Ret. Sys. v. Astec Ind., Inc.*, 29 F.4th 802, 814 (6th Cir. 2022) (one of three defendants sold more than 3.5 times his compensation).

Defendants rely heavily on *KBC*, but that case only highlights the strength of Plaintiffs' allegations.  In *KBC*, one defendant sold 17% and another 77% of their shares.  *Id*. at 610.  The Fourth Circuit found 17% too small a percentage and that the 77% seller sold ***more*** before the class period than during.  *Id*. at 610-11.  That bears no relation to Alexander selling 85% of his available shares in the Class Period and none prior – and imagine if he was not subject to any lock-up.  And in *KBC*, the record was "silent as to when they entered their [trading] plans"; here, Alexander entered his plan three days into the Class Period knowing the Guidance was a ticking time bomb.  Defendants note that the *KBC* defendants reduced revenue guidance by $800 million, but that was a 2.1% reduction from $21.2 billion to $20.7 billion – not like the 40% and 60% reductions here.[24]

Defendants also argue Alexander's sales were innocent because they were part of a trading plan, but that argument is very weak.  The Fourth Circuit has held that ***when*** a defendant entered into a trading plan is critical to analyzing scienter.  *See KBC*, 19 F.4th at 611.  Alexander entered into his plan on September 17, 2021, three days into the Class Period.  Courts have repeatedly found that plans entered into during a class period can support scienter.  *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (entering plan during class period does not "immunize [defendant] from suspicion").  Defendants also claim Alexander's plan was non-discretionary and was triggered in October and November 2021 when IronNet stock "reached a certain price" (Mot. 9), but this argument must be rejected. Defendants only cite Alexander's Form 4 filings for this point, yet nowhere on the Form 4s does it say the sales were non-discretionary.

---

[24] Defendants also compare the "fraud by hindsight" allegations rejected in *KBC* to this case, but it won't work.  Plaintiffs do not allege that the mere "temporal proximity" between the Guidance and the December 15, 2021 Class Period-end announcement support a strong inference of scienter. *Compare id*. at 612.   Rather, Plaintiffs allege that Defendants knew their statements were misleading since they repeatedly spoke about the Guidance and the large new contracts (*see supra* at 23-24).  That is not fraud by hindsight.  That is actual knowledge.

Despite seeking judicial notice of 26 documents, Defendants conveniently do not seek judicial notice of Alexander's trading plan. As such, this unsupported assertion should not be afforded any weight. Regardless, the purported triggers are meaningless when Alexander knew IronNet stock would soon fall when he set up his plan. The fact that he did not capture the full extent of the artificial inflation created by Defendants' statements does not negate his scienter.[25]

### 2. Defendants Were Motivated to Keep Issuing the Guidance

Courts have found that an urgent need for funding can also be probative of motive. *Tchatchou v. India Globalization Cap. Inc.*, 2021 WL 307415, at *9 (D. Md. Jan. 29, 2021). Because IronNet burned about $12 million to $16 million per quarter, without additional capital IronNet would likely have run out of cash by November 2021. ¶142. To ensure the SPAC Merger would close in time, Defendants repeatedly issued guidance, including on August 10, 2021. ¶¶142, 46. Nine months into the year and two weeks after going public, Defendants could not reveal the Guidance was groundless without a crisis of confidence from investors. Indeed, since IronNet slashed ARR by 60% and withdrew the Guidance, IronNet's valuation has fallen by over $1 billion,

---

[25] Defendants' other insider trading citations also fail. *See, e.g., Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (sales of 13%, 12%, and 3% were "modest to *de minimis*" – nowhere near Alexander's 85%); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (sales were not timed such that defendant profited from any particular disclosure; here, Alexander's sales were well-timed and he executed the last one three weeks before IronNet stock crashed). In *Ronconi v. Larkin*, the insiders sold between at prices $52 and $56 and the stock price **subsequently increased** to $73 before eventually dropping to $49. 253 F.3d 423, 435 (9th Cir. 2001). Here, IronNet stock did not rise after Alexander's sales; thus, Alexander did not "miss the boat". *See id*. Alexander's argument that he did not sell stock at Class Period highs of $41.40 is also meritless. Mot. 27. Alexander could not sell his stock until September 30, 2021. ¶68. On that date, IronNet stock closed at only $17.05. *See* Wu Ex. 21. Further, Alexander sold at prices between $10.12 and $12.76 per share – almost three times the $4.66 price IronNet plummeted to after the December 15, 2021 disclosures. ¶13. Alexander gave himself insurance in his trading plan to ensure he could sell at artificially inflated prices before IronNet's inevitable collapse. This supports the inference of scienter. Finally, Defendants cite *Yates* but it is distinguishable because the defendant there entered the trading plan before the class period. *See id*. 744 F.3d at 891.

multiple executives have left, and IronNet's stock, which trades around $0.40, is on the verge of delisting from the NYSE. *See* supra at 10.  Alexander also wanted to prop up IronNet's stock because 95% of his shares were locked up until February 2022.  ¶138.[26]

Defendants' citations to *Ottmann v. Hanger Orthopedic Grp., Inc*., 353 F.3d 338, 352 (4th Cir. 2003) and *Yates* are easily distinguished.  In both cases, the Fourth Circuit found that general circumstances (keeping a stock price high to maintain relationships with creditors and fund acquisitions) could apply to any company.  Here, Defendants had a specific motive to prop up IronNet (at least until their share lockups expired), and they could not quickly make an about-face after finally securing funding based in large part on the Guidance without severe consequences.

### E.  Key Resignations Further Support Scienter

Suspicious resignations can also support an inference of scienter.  On December 15, 2021 – the day IronNet re-vamped how it measured revenue and ARR guidance – Defendants announced that Chief Revenue Officer ("CRO") Sean Foster was leaving the Company. As CRO, Foster intimately knew about IronNet's revenue and ARR guidance. The timing of his departure is highly suspicious and supports a strong inference that he, as well as Defendants, knew the Guidance was divorced from reality.  ¶¶160-64.[27] On September 14, 2022, IronNet announced that Welch and Gerber were resigning. These resignations are probative of their scienter because they were top officers who made many statements.  It is suspicious that IronNet let them go together.[28]

---

[26] Defendants argue a funding motive can be attributed to any company, but Plaintiffs' allegations are specific.  Courts have found scienter where a company in "dire financial need" has a strong "motive to raise funding[.]" *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832 (N.D. Tex. 2018).

[27] Under the doctrine of corporate scienter, Foster's scienter can be imputed to IronNet.  *See Knurr v. Orbital ATK Inc*., 294 F. Supp. 3d 498, 515 (E.D. Va. 2018) ("the scienter of a lower-level employee can be imputed to the corporation for the purposes of corporate liability").

[28] *See, e.g., Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc*., 576 F.3d 172, 199 (4th Cir. 2009); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc*., 496 F. Supp. 2d 952, 967 (E.D. Va. 2020); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (E.D. Va. 2016); *In re Valeant*

### F. Plaintiffs' Allegations Collectively Show a Strong Inference of Scienter

Courts must review scienter allegations holistically.  *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 48-9 (2011).  Plaintiffs' detailed allegations collectively support an inference that Defendants knowingly or recklessly made misleading statements: Defendants had actual knowledge their statements were misleading; they knew the '22 NDAA could not contribute revenue to FY22 and that the '21 NDAA would expire just days into the Class Period; Alexander sold 85% of available IronNet shares; Gerber knew the Guidance concealed a key assumption; Foster, as well as Welch and Gerber, resigned in suspicious circumstances; and Defendants were motivated to keep issuing the misleading Guidance because they had used it to consummate the Merger and did not want to now admit it was always wildly unrealistic.  These allegations together support an inference that Defendants knowingly or recklessly made misleading statements at least as strong as an innocent inference.  *Tellabs*, 551 U.S. at 308, 324.

### CONCLUSION

Accordingly, the Court should deny Defendants' Motion in its entirety.[29]

---

*Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822 (D.N.J. Apr. 28, 2017) (resignations including post-amended complaint filing).  Defendants' cases here do not bear analysis.  *See Knurr v. Orbital ATK, Inc.*, 272 F. Supp. 3d at 807 (E.D. Va. 2017) (no link to misconduct; misconduct here relates to revenue, Foster was CRO and Garber and Welch were CFO and co-CEO and made statements); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (non-fraud explanation unchallenged; none here).

[29] As Plaintiffs sufficiently allege 10(b) violations, they also allege viable 20(a) and 20A claims.  Defendants' only argument about Plaintiffs' 20(a) and 20(A) claims is that there is no underlying 10(b) violation.  Mot. 30.  That argument fails and, thus, the 20(a) and 20(A) claims should also be sustained.  Should the Court dismiss any of the Complaint's claims, Plaintiffs respectfully request leave to amend to address any perceived deficiencies.

Dated: November 30, 2022          Respectfully submitted,

**THE KAPLAN LAW FIRM**

<u>/s/ Matthew B. Kaplan</u>
Matthew B. Kaplan (VSB # 51027)
THE KAPLAN LAW FIRM
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22205
Tel: (703) 665-9529
mbkaplan@thekaplanlawfirm.com

*Local Counsel for Lead Plaintiff James Shunk,
Additional Named Plaintiff Justin Gruetzmacher
and Proposed Local Counsel for the Proposed
Class*

**BERNSTEIN LIEBHARD LLP**
Laurence J. Hasson
Joseph R. Seidman, Jr.
Jeffrey R. McEachern
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  lhasson@bernlieb.com
        seidman@bernlieb.com
        jmceachern@bernlieb.com

*Lead Counsel for Lead Plaintiff James Shunk,
Additional Named Plaintiff Justin Gruetzmacher
and the Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2022, I will electronically file the foregoing with

the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

Dated: November 30, 2022

/s/ Matthew B. Kaplan
Matthew B. Kaplan (VSB # 51027)
THE KAPLAN LAW FIRM
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22205
Tel: (703) 665-9529
mbkaplan@thekaplanlawfirm.com