**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| *In re IronNet, Inc. Securities Litigation* | **Case No. 1:22-cv-00449-RDA-JFA** |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Robert T. Cahill (VSB 38562)
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5656
Telephone:   (703) 456-8000
Facsimile:   (703) 456-8100
Email: rcahill@cooley.com

Aric H. Wu (*pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone:   (212) 479-6000
Facsimile:   (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Defendants IronNet, Inc., Keith B. Alexander, William E. Welch, and James C. Gerber*

**TABLE OF CONTENTS**

                                                                                                   **Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.     Plaintiffs Have Not Come Close To Saving Their "New NDAA Dependency
       Theory" ............................................................................................................... 3

       A.    Plaintiffs Do Not, And Cannot, Dispute That, At The Time Of IronNet's
             Forecasts, There Was Already $688.6 Billion In Funds Authorized For
             DoD Spending From A Then-Existing NDAA ...................................................... 3

       B.    Plaintiffs Do Not Identify Any Facts To Support Their Presumption That
             IronNet's Forecasts Were "Materially Based" On Prospective DoD Deals .......... 4

II.    Just Like Their Flawed "New NDAA Dependency Theory," Plaintiffs'
       "Divorced From Reality Theory" Is Unsupported By Any Facts ................................... 6

III.   IronNet Did Not Conceal Its Pursuit Of Public Sector Customers ............................... 8

IV.    Plaintiffs' Section 10(b) Claim Fails For Additional Reasons ..................................... 9

       A.    The September 14, 2021 Revenue and ARR Forecasts Are Protected
             Under The PSLRA's Safe Harbor for Forward-Looking Statements ................... 9

       B.    The Other Challenged September 2021 Statements Are Not Actionable ............ 12

       C.    The Amended Complaint Fails To Plead Particularized Facts Giving Rise
             To A Strong Inference Of Scienter On The Part Of Any Defendant ................... 14

V.     The Court May Properly Consider Defendants' Exhibits ............................................ 18

VI.    Plaintiffs' Section 20(a) and 20A Claims Should Be Dismissed ................................ 20

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ash v. PowerSecure Int'l, Inc.*,
   2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)........................................................20

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................18

*Booker v. United States*,
   2022 WL 1571309 (E.D. Va. May 18, 2022)............................................................2

*Boykin v. K12, Inc.*,
   2022 WL 17097453 (4th Cir. Nov. 22, 2022)..........................................................10

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005) .................................................................................5

*City of Miami Fire Fighters' & Police Officers' Ret. Trust v. CVS Health Corp.*,
   46 F.4th 22 (1st Cir. 2022)......................................................................................11

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
   29 F.4th 802 (6th Cir. 2022) ...................................................................................16

*In re Comput. Scis. Corp. Sec. Litig.*,
   890 F. Supp. 2d 650 (E.D. Va. 2012) .......................................................................8

*Cozzarelli v. Inspire Pharms. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ...............................................................2, 11, 14, 19

*Direct Benefits, LLC v. TAC Fin., Inc.*,
   2020 WL 2769982 (D. Md. May 28, 2020)................................................................7

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006).....................................................................19

*In re Eventbrite, Inc. Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ........................................................19

*Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020) ....................................................................20

*Giarratano v. Johnson*,
   521 F.3d 298 (4th Cir. 2008) ...................................................................................5

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) .................................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021).....................................................................7

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
42 F.3d 204 (4th Cir. 1994) ...............................................................................2, 6

*Hirtenstein v. Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*,
816 F. App'x 747 (4th Cir. 2020)..........................................................................20

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. Jul. 25, 2016) .............................................................16

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) .............................................................................3, 7

*Khoja v. Orexigen Therap., Inc.*,
899 F.3d 988 (9th Cir. 2018) ...............................................................................19

*Knurr v. Orbital ATK Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) ....................................................................18

*L'Garde, Inc. v. Raytheon Space & Airborne Sys.*,
805 F. Supp. 2d 932 (C.D. Cal. 2011) ..................................................................20

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
2006 WL 1367428 (M.D.N.C. May 18, 2006) .......................................................10

*Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ........................................................19

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ......................................................12

*Lefkoe v. Jos. A. Bank Clothiers*,
2007 WL 6890353 (D. Md. Sept. 10, 2007) ..........................................................16

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)............4

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................................16, 17

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC
Partners, Inc.*, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)................................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Nash Finch Co.*,
502 F. Supp. 2d 861 (D. Minn. 2007) ...................................................................16

*In re Neustar Sec.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ...........................................................12, 13

*Oklahoma Firefighters Pension & Ret. Sys. v. K12, Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) .................................................................15

*In re PEC Sols., Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) ...................................................................17, 19

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) .........................................................................13

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ............................................................11

*Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021) .............................................7, 8, 19

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .........................................................................16

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ...............................................................10

*Tchatchou v. India Globalization Cap. Inc.*,
2021 WL 307415 (D. Md. Jan. 29, 2021) ........................................................17

*Teachers' Ret. Sys. of LA v. Hunter*,
477 F.3d 162 (4th Cir. 2007) .........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................2, 11, 14, 18

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017) ..............................................................10

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) ..............................................................5

*In re Triangle Cap. Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021) .........................................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .......................................................................7

*Wilbush v. Ambac Fin. Grp., Inc.*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017) ..................................................................................18

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ............................................................................................5, 7

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .........................................................................................16, 20

*Yellen v. Hake*,
    437 F. Supp. 2d 941 (S.D. Iowa 2006) ..............................................................................19

**Statutes & Rules**

15 U.S.C.
    § 78u-4 ...................................................................................................................................12
    § 78u-5 ...............................................................................................................9, 10, 11, 19

Fed. R. Civ. P. 9(b) .................................................................................................................2, 6

Fed. R. Evid. 201 ........................................................................................................................20

## INTRODUCTION

Plaintiffs' opposition underscores that the Amended Complaint ("AC") should be dismissed.  Plaintiffs contend that IronNet knew, but concealed, that its August 10 and September 14, 2021 forecasts for its fiscal year ending January 31, 2022 ("FY 2022") were "impossible" to meet because they were "materially based" on U.S. Department of Defense ("DoD") deals "subject to [passage of] a [new] massive federal defense budget (the National Defense Authorization Act, or 'NDAA')" in December 2021.  ¶¶ 1, 91.[1]  As explained in Defendants' opening brief, however, Plaintiffs' "New NDAA Dependency Theory" (i) entirely ignores that, at the time of the forecasts, there were funds already authorized for spending from a then-existing NDAA; and (ii) erroneously presumes that IronNet's forecasts were limited to prospective DoD deals requiring NDAA funding.  *See* Defendants' Opening Brief ("Defs.' Br.") at 13-15 (ECF No. 50-1).

In their opposition, Plaintiffs do not dispute that, when IronNet provided its August 10 and September 14, 2021 forecasts, U.S. federal government departments and agencies were operating with $1.6 trillion in funds that Congress approved in December 2020 and that $688.06 billion of those funds was reserved for the DoD.  This eviscerates Plaintiffs' assertion in the AC that IronNet's forecasts were dependent on the passage of a new NDAA in December 2021.  *See, e.g.*, ¶¶ 1, 9, 57, 73, 91, 93, 95, 97, 100, 103, 105, 107, 109, 111, 113, 115, 117, 119.

Plaintiffs' opposition also fails to identify any facts showing that IronNet's August 10 and September 14, 2021 forecasts were "materially based" on prospective DoD deals requiring new NDAA funding.  "Through the '[e]xacting pleading requirements' of the [Private Securities Litigation Reform Act], Congress charged courts to be vigilant in preventing meritless securities

---

[1] "¶" refers to paragraphs of the Amended Complaint (ECF No. 46).  "Ex." refers to the exhibits attached to the Declaration of Aric H. Wu, dated October 26, 2022 (ECF No. 48-1).  Unless otherwise noted, all emphasis is added and all internal citations and quotations have been omitted.

fraud claims from reaching the discovery phase of litigation." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  Here, Plaintiffs do not identify any contemporaneous internal report, email, or financial model supporting their contention.  Nor do Plaintiffs make any attempt to quantify how much of the revenue or annual recurring revenue ("ARR") forecasts were dependent on new NDAA funding.  In the absence of such facts, Plaintiffs have not come close to adequately pleading the falsity of the challenged forecasts under the heightened pleading requirements of the PSLRA.

Because their "New NDAA Dependency Theory" is fatally flawed, Plaintiffs improperly advance an entirely new theory.  *See Booker v. United State*s, 2022 WL 1571309, at *2 n.2 (E.D. Va. May 18, 2022) ("Plaintiff cannot amend his complaint through a brief filed in opposition to a dispositive motion.").  Plaintiffs now claim that the August 10 and September 14, 2021 forecasts were "divorced from reality" because funding from the then-existing NDAA was set to expire on September 30, 2021.  *See* Pls.' Opposition ("Opp.") at 7-8, 13-14 (ECF No. 51).  But "an inference from timing alone is not sufficient, without additional supporting facts and circumstances, to withstand the strict requirements of Rule 9(b)," much less the heightened pleading requirements of the PSLRA.  *Hillson Partners Ltd. P'ship v. Adage, Inc.,* 42 F.3d 204, 215 (4th Cir. 1994).

Just like their flawed "New NDAA Dependency Theory," Plaintiffs' "divorced from reality" theory is conclusory and unsupported by any facts.  Indeed, the AC is devoid of facts showing that IronNet's challenged forecasts were "materially based" on prospective DoD deals that relied on NDAA funding, much less that, at the time of the forecasts, IronNet did not reasonably believe that prospective DoD deals would close with available NDAA funding.  Instead, Plaintiffs skip forward to December 15, 2021, when IronNet revised its forecasts, and proclaim that IronNet's August 10 and September 14, 2021 forecasts must have been based on

deals that "had no realistic chance of contributing to FY 22." Opp. 14. This type of fraud-by-hindsight pleading has been repeatedly rejected. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612-13 (4th Cir. 2021) (affirming dismissal of securities fraud action where company reduced revenue forecast by $800 million less than three months after it reaffirmed the forecast).

Plaintiffs also attempt to contrive a claim by arguing that investors were misled into believing that IronNet's forecasts were primarily based on prospective deals with private sector customers. *See* Opp. 3, 17-19. But Plaintiffs do not identify any statement about the forecasts even remotely suggesting they were primarily based on anticipated private sector deals. Moreover, Defendants made a point of noting that "the government market is largely untapped and we're ramping up rapidly there," and of cautioning investors that "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform."

For all the reasons discussed herein, Plaintiffs' AC should be dismissed with prejudice.

## ARGUMENT

### I.   Plaintiffs Have Not Come Close To Saving Their "New NDAA Dependency Theory"

In the AC, the alleged falsity of IronNet's September 14, 2021 forecasts and various other statements in the month is premised on Plaintiffs' contention that the forecasts were "impossible" to meet because they were "materially based" on DoD deals subject to passage of a new NDAA in December 2021. ¶¶ 1, 9, 57, 73, 91, 93, 95, 97, 100, 103, 105, 107, 109, 111, 113, 115, 117, 119. Plaintiffs have not come close to salvaging their "New NDAA Dependency Theory."

#### A.   Plaintiffs Do Not, And Cannot, Dispute That, At The Time Of IronNet's Forecasts, There Was Already $688.6 Billion In Funds Authorized For DoD Spending From A Then-Existing NDAA

Plaintiffs do not, and cannot, dispute that, when IronNet provided its forecasts, U.S. federal government departments and agencies were operating with $1.6 trillion in funds that Congress

approved in December 2020 and that $688.06 billion of those funds was reserved for the DoD. *See* Exs. 5, 23, 26.  Indeed, Plaintiffs concede that NDAA funding extends through September 30 of each year.  *See* Opp. 7.  This dooms Plaintiffs' contention that, at the time of IronNet's August 10 and September 14, 2021 forecasts, prospective DoD deals "required the approval of both the House of Representatives and Senate – neither of which had occurred[.]"  ¶¶ 91, 93, 95.

Plaintiffs purport to rely on General Alexander's statement during a December 15, 2021 earnings call that there would be a process before funds from the new NDAA passed by Congress that day would become available.  ¶ 122.  Far from "reveal[ing]" that "IronNet's large public sector deals quite predictably could not have contributed to [the] FY22 Guidance" provided three and fourth months earlier in August and September, ¶ 121, General Alexander was addressing the state of affairs as of December 15, 2021, after the prior NDAA had already lapsed. *See* Ex. 5. Plaintiffs cannot contrive a claim by imputing circumstances that existed in December to September. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("without contemporaneous falsity, there can be no fraud").

## B.   Plaintiffs Do Not Identify Any Facts To Support Their Presumption That IronNet's Forecasts Were "Materially Based" On Prospective DoD Deals

Although IronNet disclosed it (i) had private sector customers;[2] (ii) had public sector customers that spanned U.S. federal government departments and agencies, U.S. state agencies, and foreign governments;[3] and (iii) with respect to U.S. federal government departments and agencies was "pursuing opportunities in the civilian, defense, and intelligence sectors" (*i.e.*, not just the DoD),[4] Plaintiffs fail to identify any facts in the AC showing that IronNet's forecasts were

---

[2] *See* Ex. 6 at 184-85, 189-90; Ex. 8; Ex. 14 at 94.

[3] *See* Ex. 2 at 154; Ex. 4 at 20; Ex. 7 at 186, 189, 191; Ex. 14 at 76.

[4] *See* Ex. 2 at 173; Ex. 6 at 186.

"materially based" on prospective DoD deals requiring new NDAA funding. *See Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (explaining that, on a motion to dismiss, courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments").

Plaintiffs do not identify any contemporaneous internal report, email, or financial model showing that IronNet's forecasts for FY 2022 revenue and ARR were "materially based" on prospective deals with the DoD subject to passage of a new NDAA. Nor do Plaintiffs make any attempt to quantify how much of either the revenue or ARR forecasts were supposedly dependent on new NDAA funding. This dooms Plaintiffs' claims. *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) is instructive. There, the complaint alleged "defendants knew Trex could not meet its 2005 guidance because, by January 2005, . . . most of its distributors were stocked to capacity," and relied on a confidential witness statement that "in December 2004, the Company made two large deals with two Northern Californian distributors . . . to ship product before year-end." *Id.* at 574-75, 578. The *Trex* court found the confidential witness statements insufficient because there was "no quantification of these 'large' deals." *Id.* at 578. Similarly, in affirming the dismissal of a Section 10(b) claim in *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079 (8th Cir. 2005), the Eighth Circuit determined that the plaintiffs' allegations "cannot survive the Reform Act's falsity standard" because they failed to identify specific deals that were lost and the impact of any such lost deals on the company's ability to meet its earnings projections. *Id.* at 1084; *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017) (affirming dismissal of Section 10(b) claim based on missed revenue projections because "Plaintiffs fail to plead specific facts regarding the amount of [lost] sales revenue from Vortex projected by Globus").

Plaintiffs purport to rely on supposed "admissions" by General Alexander during an earnings call on December 15, 2021, the day IronNet reduced its revenue and ARR forecasts. Opp.

9.  But far from admitting that "[m]ost, if not all" deals underlying IronNet's forecasts were DoD deals "subject to the passage of the NDAA," ¶¶ 91, 93, 95, 100, 103, 109, 115, General Alexander provided examples of strategic opportunities with customers other than DoD that were removed from guidance, including "several deals with states that are gaining momentum as the American Rescue Plan funds are arriving and being approved by state legislatures" and "an international government that was working through political turmoil and the impacts of the pandemic." ¶ 126. The only DoD deal the AC purports to identify is "a $10 million contract worth at least 15% of the FY22 ARR."[5]  *Id.*  That is a far cry from Plaintiffs' repeated conclusory assertion that "[m]ost, if not all" deals underlying the forecasts were DoD deals.  ¶¶ 91, 93, 95, 100, 103, 109, 115.

## II.   Just Like Their Flawed "New NDAA Dependency Theory," Plaintiffs' "Divorced From Reality Theory" Is Unsupported By Any Facts

Because their "New NDAA Dependency Theory" is fatally flawed, Plaintiffs advance an entirely new theory in their opposition.  Plaintiffs now claim that the September 14, 2021 forecasts were "divorced from reality" because funding from the then-existing NDAA was set to expire on September 30, 2021.  *See* Opp. 7-8, 13-14.  But "an inference from timing alone is not sufficient, without additional supporting facts and circumstances, to withstand the strict requirements of Rule 9(b)," much less the heightened pleading requirements of the PSLRA.  *Hillson*, 42 F.3d at 215.

Just like their flawed "New NDAA Dependency Theory," Plaintiffs' "divorced from reality" theory is conclusory and presumes, without any supporting facts, that IronNet's challenged forecasts were "materially based" on DoD deals that relied on NDAA funding.  *See supra* Section I.B.  Moreover, Plaintiffs do not identify any communications IronNet had with DoD representatives, or any contemporaneous internal report, email, or financial model showing that,

---

[5] Plaintiffs do not plead any particulars about the deal, and the AC is devoid of any facts showing that, at the time of the forecasts, the deal was contingent on the passage of a new NDAA or that IronNet did not reasonably believe there would be funding to close the deal by January 31, 2022.

at the time of the forecasts, IronNet did not reasonably believe that prospective DoD deals would close with funding available from the then-existing NDAA passed in December 2020.[6]

Rather than plead contemporaneous facts contradicting IronNet's September 14, 2021 forecasts, Plaintiffs skip forward to December 15, 2021, when IronNet revised the forecasts, and proclaim that the September 14, 2021 forecasts must have been based on deals that "had no realistic chance of contributing to FY 22."  Opp. 14.  That is not the law.  *See KBC*, 19 F.4th at 612-13 (affirming dismissal where revenue forecast was reduced by $800 million less than three months after reaffirming forecast); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 311 (S.D.N.Y. 2021) (dismissing where company reduced June 2019 revenue forecast by 40% in October 2019).

*Williams* is instructive.  There, the plaintiffs claimed the projections had no reasonable basis because they included revenues from a lost customer.  869 F.3d at 241.  The Third Circuit affirmed dismissal because the plaintiffs relied on inferences from post-class period events (like Plaintiffs here, *see* Opp. 10, 24), rather than contemporaneous facts: "Plaintiffs were required to plead 'true facts' sufficient to show the February and April revenue projections were false or misleading when made.  But instead of citing contemporaneous sources . . ., plaintiffs rely on conjecture based on subsequent events.  This is insufficient."  869 F.3d at 244.[7]

---

[6] Nor does the AC plead any facts showing that it was "impossible" to close any DoD deals between September 30, 2021 and January 31, 2022.  Plaintiffs contend that a continuing resolution ("CR") signed on September 30 for continued funding through December 2021 could not be applied to "multi-year procurements," Opp. 3, but the AC does not allege any facts showing that IronNet's forecasts were "materially based" on DoD deals involving "multi-year procurements."

[7] Unlike the AC here, the complaints in the cases cited by Plaintiffs, *see* Opp. 15-16, contained detailed contemporaneous facts contradicting the defendants' public statements.  *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *4 (S.D.N.Y. Sept. 30, 2021) (Federal Reserve letter "stat[ed] that [Wells Fargo's] proposed plans were insufficient and so materially incomplete that they could not 'be evaluated . . . for their adequacy'"); *Direct Benefits, LLC v. TAC Fin., Inc.*, 2020 WL 2769982, at *4, *17 (D. Md. May 28, 2020) (company projected 2011 revenues would triple, but internal records showed that "revenue from its largest client" had "dropped by seventeen percent by the end of April, 2011"); *Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL

Plaintiffs put the cart before the horse when they argue that "Defendants did not warn that the '21 and '22 NDAA had urgent timing risks" or that a "CR was not a guarantee." Opp. 13. The AC does not allege, and Plaintiffs do not identify, facts showing that IronNet's forecasts were "materially based" on DoD deals requiring NDAA funding or relied on the passage of a CR.

## III.   <u>IronNet Did Not Conceal Its Pursuit Of Public Sector Customers</u>

The AC alleges that IronNet "failed to warn investors of IronNet's already material dependence on public sector deals *subject to the NDAA*." ¶ 97; *see also* ¶ 54 (same). In their opposition, Plaintiffs contend they "d[o] not limit their allegations about public sector contracts to DoD contracts." Opp. 19. But the AC does not plead any particularized facts about IronNet's non-NDAA public sector deals, much less facts showing that any such deals hinged on securing new funding, or that, at the time of its forecasts, IronNet did not reasonably believe that such deals would close in its FY 2022. *See also* Opp. 18 (conceding that "Plaintiffs focused on the NDAA").

Because the AC is devoid of particularized facts regarding non-NDAA public sector deals, Plaintiffs attempt to contrive a claim by arguing that investors were misled into believing that IronNet's forecasts were primarily based on private sector deals. *See* Opp. 3, 17-19. Plaintiffs point to Mr. Gerber's statements at a June 7, 2021 Virtual Analyst Day, Opp. 5-6, 15 (citing ¶ 42), but Mr. Gerber did not describe or characterize the composition of the deals underlying IronNet's FY 2022 forecasts. Instead, after stating that 80% of revenue had been from the private sector, he made of special point of noting that "the government market is largely untapped and we're ramping up rapidly there." Ex. 4 at 28; *see also* Ex. 3 at 11 (identifying factors IronNet believed provided "significant momentum" for the public sector's adoption of IronNet's "Collective Defense").

---

1439680, at **3-10 (E.D. Va. Mar. 24, 2021) (contradicting statements that company was effective in lowering client costs, confidential witnesses described increased client costs); *In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 665-67 (E.D. Va. 2012) (confidential witnesses described internal controls deficiencies and reports and letters sent to management detailing same).

Far from "downplaying the significance of the public sector" or the risks associated with public sector customers, Opp. 14-15, IronNet's September 14, 2021 press release directed investors to "carefully consider" the "risks and uncertainties described under the heading 'Risk Factors'" in the August 6 Prospectus, Ex. 11 at 3-4, including that "IronNet's revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for its platform, particularly with respect to large organizations and government entities," Ex. 6 at 47; "[d]emand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles," *id.* at 49; and "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform." *Id.*[8]

\* \* \*

Because Plaintiffs' ever-changing theories on why IronNet's September 14, 2021 forecasts were "impossible" to meet are unsupported by facts, all of Plaintiffs' claims should be dismissed.

## IV.    Plaintiffs' Section 10(b) Claim Fails For Additional Reasons

### A.    The September 14, 2021 Revenue and ARR Forecasts Are Protected Under The PSLRA's Safe Harbor for Forward-Looking Statements

Plaintiffs do not dispute that the PSLRA's safe harbor for forward-looking statements encompasses not only IronNet's September 14, 2021 forecasts, 15 U.S.C. § 78u-5(i)(1)(A) and (C), but also "assumptions underlying or relating to" the forecasts.  15 U.S.C. § 78u-5(i)(1)(D). Contrary to Plaintiffs' contention that "[t]he PSLRA provides a limited safe harbor for forward-looking statements accompanied by meaningful cautionary language *and* not made with actual

---

[8]  The August 6 Prospectus also cautioned investors that IronNet's "FedRAMP-ready" status was "only available for a certain period of time" and that, "[i]f not utilized, IronNet would likely have to go through certain parts of the FedRAMP process again," which "could cause governments and governmental agencies to delay or refrain from purchasing IronNet's solutions."  Ex. 6 at 50; *compare* Opp. 8 ("investors had no reason to be concerned with FedRAMP authorization risk").

knowledge," Opp. 20, the PSLRA safe harbor "is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017). The September 14 forecasts, ¶¶ 90, 94, 99, and related assumptions, such as that IronNet was "on pace" to meet its forecasts, ¶¶ 6, 56, 90; *see also* ¶¶ 8, 47, 56, 78, 99 and that "momentum in the marketplace" with larger "evolving contracts" was behind the ARR forecast, ¶ 99, are forward-looking statements, *see Boykin v. K12, Inc.*, 2022 WL 17097453, at *4 (4th Cir. Nov. 22, 2022), protected under two independent prongs of the safe harbor.

***The September 14, 2021 Forecasts And Related Assumptions Were Accompanied By Meaningful Cautionary Language***. Plaintiffs do not identify any statement describing or accompanying the September 14, 2021 forecasts that "hid" any "material dependence" of the forecasts "on the public sector." Opp. 22. Moreover, IronNet's September 14 press release directed investors to the "Risk Factors" in the August 6 Prospectus, Ex. 11 at 3-4, which identified "important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), including that IronNet had a limited operating history making it difficult to model future growth; demand from government organizations was unpredictable, subject to budgetary uncertainty, and typically involved long sales cycles; and funding reductions or delays could adversely affect public sector demand. *See* Ex. 6 at 37, 47, 49; Defs.' Br. at 18-19. These cautionary statements were "meaningful" because they "explicitly identif[y] the salient risk[s]." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015); *In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *5 (M.D.N.C. May 18, 2006).

Plaintiffs' own case underscores that dismissal is appropriate here.  In invoking the "Grand Canyon" metaphor discussed in *City of Miami Fire Fighters' & Police Officers' Ret. Trust v. CVS Health Corp.*, 46 F.4th 22 (1st Cir. 2022), Plaintiffs ignore that the First Circuit affirmed dismissal because the plaintiffs failed to plead sufficient facts showing that the risks at issue had already materialized and because the law "does not require a company to be omniscient, even if the company looks foolish in hindsight for not properly predicting whatever harm befell it."  *Id.* at 35-36.  Here, the AC is devoid of contemporaneous facts showing that, at the time of the September 14, 2021 forecasts, IronNet's disclosed risks regarding public sector deals had already materialized and that IronNet did not reasonably believe that the deals underlying its forecasts would close in FY 2022.  Plaintiffs' claims relating to the forecasts and related assumptions are thus foreclosed by the PSLRA safe harbor.  *Id.*; *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 549-52 (M.D.N.C. 2013) (earnings projections protected under PSLRA safe harbor).

***No Strong Inference Of Any Defendant's Actual Knowledge Of Falsity***.  The September 14, 2021 forecasts and related assumptions are also protected because Plaintiffs do not adequately plead facts giving rise to a "strong inference" that they were made with "actual knowledge" of their falsity.  U.S.C. § 78u-5(c)(iii); *Tellabs*, 551 U.S. at 313-14.  Plaintiffs do not identify any contemporaneous internal documents or communications with government representatives contradicting the September 14, 2021 forecasts or related assumptions.  Instead, Plaintiffs claim that particularized contemporaneous facts "are not required to plead scienter – they are merely some ways to do so."  Opp. 24, n.22.  That is not the law.  *See Cozzarelli*, 549 F.3d at 626 (no strong inference of scienter where plaintiffs "ha[d] not alleged the existence of any internal documents . . . or other direct statements contradicting the inference that defendants acted with a

11

lawful intent"); 15 U.S.C. § 78u–4(b)(2)(A) (PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

**B.    The Other Challenged September 2021 Statements Are Not Actionable**

*Statements regarding customer development*.  Plaintiffs do not dispute that Defendants' statements regarding the status of IronNet's customer acquisitions and negotiations were accurate statements of historical fact.  *See* Defs. Br. at 21-23.  Instead, contend that "Defendants hid that the 'larger deployments' and new 'contracts' related to Deals" were "subject to materialized and undisclosed risks that divorced the guidance from reality."  Opp. 17.  As discussed in Section II above, the AC fails to plead facts showing that the September 14 forecasts were "divorced from reality," much less facts giving rise to a strong inference that any defendant believed the forecasts were "divorced from reality" when they were made.  *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 685 (E.D. Va. 2015) (dismissing Section 10(b) claim because a company is "allowed to remain optimistic about its business prospects" and plaintiffs failed to adequately plead facts showing that any defendant subjectively believed that the challenged statements were false when made).[9]

*Expected gross margins*.  Plaintiffs do not dispute that IronNet's May and August 2021 Management Presentations projected FY 2022 gross margins of 74%.  Ex. 3 at 22; Ex. 9 at 11. Nor do Plaintiffs dispute that IronNet's September 22 and 28, 2021 registration statements and September 30, 2021 prospectus reported 2Q 2022 gross margins of 71.1%, ¶ 102, and that "[w]e expect that gross margins for the rest of fiscal 2022 to improve slightly to achieve our full year guidance."  ¶¶ 102, 108, 114; *see also* Ex. 14 at 58; Ex. 15 at 58; Ex. 16 at 58.  Instead, Plaintiffs pretend as if the reference to "full year guidance" in the section about gross margins was somehow

---

[9] The "customer momentum" statements, ¶¶ 94, 99, are also inactionable statements of corporate optimism.  *See* Defs. Br. at 22.  *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) (cited in Opp. 18) underscores what is missing from the AC here—contemporaneous facts contradicting the challenged statements.  *Id.* at *2.

to IronNet's revenue and ARR forecasts, rather than its gross margins forecast, and makes the straw man argument that "gross margins were not the real impediment to IronNet achieving its [revenue and ARR] Guidance[.]"  Opp. 20.  The Court need not blindly accept Plaintiffs' blatant mischaracterization of IronNet's disclosures.  *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) (dismissing Section 10(b) claim where the "complaint rest[ed] on mischaracterizations of the public record, exaggeration of a single statement, and isolation of that statement from its context and from the wealth of other information publicly available when it was made").

Moreover, Plaintiffs do not, and cannot, dispute that IronNet's "[w]e expect" statement is protected under two separate prongs the PSLRA's safe harbor because (i) it was identified as forward-looking and accompanied by meaningful cautionary statements; and (ii) Plaintiffs make no attempt to plead contemporaneous facts showing that any Defendant did not believe that gross margins would not improve slightly in the second half of 2022.  *See* Defs.' Br. at 24.

***Risk factors about government demand and sales cycles.***  As explained in Defendants' opening brief, the AC fails to plead facts showing that, at the time of the September 14, 2021 forecasts, the risks described in IronNet's challenged disclosure about government demand and sales cycles had "already fatally undermined IronNet's Guidance," ¶¶ 97, 107, 111, 117, or that any Defendant believed the risks had already materialized.  *See* Defs.' Br. 24-25; *Neustar*, 83 F. Supp. 3d at 679 (dismissing Section 10(b) claim for failure to adequately plead facts showing that risk had already materialized).  Plaintiffs contend that IronNet's risk disclosures are "irrelevant" because investors believed that IronNet's forecasts were primarily based on private sector deals. Opp. 17-19.  As discussed in Section III above, however, Plaintiffs do not identify any statement about the forecasts even remotely suggesting they were primarily based on private sector deals.

* * *

Because Plaintiffs have failed to adequately plead an actionable misrepresentation or omission, Plaintiffs' Section 10(b) claim should be dismissed.

### C.   The Amended Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter On The Part Of Any Defendant

"[R]aising a 'strong inference' of scienter is no small burden." *Cozzarelli,* 549 F.3d at 624. Indeed, the Supreme Court "gave [the] standard teeth, using adjectives like 'cogent,' 'compelling,' 'persuasive,' 'effective,' and 'powerful.'" *Id.* at 622–24 (quoting *Tellabs*, 551 U.S. at 323). "Thus, when the facts as a whole more plausibly suggest that the defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed." *Id*. at 624. As discussed above, the AC does not plead facts supporting Plaintiffs' ever-changing theories on why IronNet's forecasts were "impossible" to meet. If Plaintiffs cannot adequately plead falsity, they cannot plead any defendant's fraudulent intent either.

***Purported "Admissions*."** Plaintiffs claim that General Alexander effectively admitted to fraud because he "knew that the Guidance materially depended on securing large contracts with public sector agencies" and "conceded" on the December 15, 2021 earnings call that these contracts "were subject to protracted processes by which agencies receive and deploy funding after the passage of the NDAA" in December 2021. ¶ 148. This is but another variation of Plaintiffs' flawed and factually unsupported "New NDAA Dependency Theory." *See supra* Section I.

Plaintiffs also claim that, in April 2022, General Alexander "admitted" that "IronNet had not been 'transparent' with investors" in connection with its September 14, 2021 forecasts. Opp. 24. What General Alexander actually said was: "As we stated last quarter, anticipated strategic deals were delayed, so we took them out of our forecast and will continue to do so . . . . They are still in our line of sight. It's just a question of when they come in. So we thought it was appropriate to be completely transparent with you and others to say, we're going to gauge everything on the

14

transactional side.  And then every time a strategic deal comes in, we'll announce it and we'll adjust our guidance as appropriate."[10]  General Alexander did not refer to the September 14, 2021 forecasts, much less admit that IronNet had not been "transparent" at that time.  Instead, General Alexander merely reiterated what he and Mr. Gerber explained on the December 15, 2021 earnings call: IronNet had decided to "reset" its guidance approach by removing all prospective large strategic transactions from forecasts and, going forward, would only include such transactions when they are closed.  Ex. 20 at 3, 9.  The Company's guidance with respect to strategic deals would thus be "completely transparent" in that it would be based on closed deals and not include any anticipated deals.  That does not mean that IronNet's September 14, 2021 forecasts, which included anticipated strategic deals, perpetrated fraud.[11]  This is nothing more than an improper attempt to plead fraud by hindsight.  *See Oklahoma Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 717 (E.D. Va. 2014) ("[H]is post-period comments suggest that, in hindsight, K12 realized that its marketing activities were not done in the most effective manner. They do not allow the inference that . . . Murray had the required degree of scienter").

    ***General Alexander Stock Sales***.  Plaintiffs do not dispute that General Alexander entered into a Rule 10b5-1 trading plan for non-discretionary sales of up to 5% of his total shares, pursuant to which he sold only approximately 4% of his total holdings.  Nonetheless, Plaintiffs contend that

---

[10] Transcript of IronNet Q4 and Fiscal Year 2022 Earnings Call (Apr. 6, 2022), at 2, 11, *available at*: https://www.sec.gov/Archives/edgar/data/1777946/000119312522099164/d342240dex992.htm.

[11] Plaintiffs' contention that General Alexander "admitted" on the December 15, 2021 earnings call that IronNet deliberately "failed to base the Guidance on 'predictable' measures," Opp. 24, is equally spurious.  What General Alexander actually said was: "We recognize that you want us to have a predictable business, and we can accomplish that with our transactional side, and we're going to do that, and these strategic deals will add momentum into our revenue as we move forward."  ¶ 76.  That General Alexander stated on December 15, 2021, when IronNet revised its FY 2022 forecasts, that he recognized that investors want to have a predictable business, does not mean that he admitted that, at the time of the September 14, 2021 forecasts, he believed that the forecasts were "impossible" to meet or not based on "predictable" measures.

General Alexander's stock sales are "probative" of fraud because he "sold 85% of his available stock" under the trading plan.  Opp. 25.  Plaintiffs do not cite any authority for their contention that "[s]hares that Alexander could not sell during the Class Period are not relevant."[12]  *Id.* at 26. Nor would it make any sense to focus only on available sales.  If an individual knows that bad news is coming, the impact of that news would negatively impact all shares.  Here, when IronNet's stock price dropped, 96% of General Alexander's stock decreased in value.

Moreover, stock sales made pursuant to a non-discretionary Rule 10b5-1 plan "weakens any inference of fraudulent purpose."  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014).  Plaintiffs claim the Rule 10b5-1 plan here is "irrelevant" because it was entered into on September 17, 2021, Opp. 27, but, as discussed above, the AC fails to allege facts showing that, by September 17, 2021, the September 14, 2021 forecasts were "impossible" to meet.

Plaintiffs also ignore that General Alexander's limited stock sales plan were made at prices ranging from $10.12 to $12.76, Ex. 18, well below the $41.40 price per share at which IronNet stock peaked during the putative class period.  *Id.*; ¶ 58.  This also affirmatively undermines any inference of fraud.[13]  *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (dismissing Section 10(b) claim where defendants' stock sales "occurred at prices that were not especially high for the class period"); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (dismissing Section 10(b) claim where stock sales were at prices well below high point).

---

[12] In each of Plaintiffs' cases, total stock holdings were considered.  *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *10 (D.S.C. Jul. 25, 2016); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 646 (E.D. Va. 2000); *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 814 (6th Cir. 2022); *Lefkoe v. Jos. A. Bank Clothiers,* 2007 WL 6890353, at *6 (D. Md. Sept. 10, 2007); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 870, 882 (D. Minn. 2007).

[13] Plaintiffs half-heartedly argue that lockup periods precluded General Alexander from trading at higher prices, Opp. 28, n.25, but do not, and cannot, explain how or why General Alexander would have been motivated to inflate the stock price for periods when he was precluded from trading.

**AICPA Guidelines.**  Plaintiffs do not dispute that their allegation of non-compliance with AICPA guidelines is based on their "New NDAA Dependency Theory," ¶ 155, which, as discussed above, is fatally flawed and factually unsupported.  *Compare* Defs.' Br. at 28-29, *with* Opp. 24-25.  Nor do Plaintiffs dispute that "general allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b)."  *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005).  Instead, Plaintiffs merely posit that there were "violations of the AICPA," Opp. 24, and cite an inapposite case in which the court found that alleged AICPA violations were "red flags" for the outside auditor, **not** the company.  *See MicroStrategy*, 115 F. Supp. 2d at 653–54.

**Alleged Motive to Raise Capital.**  Plaintiffs argue that IronNet was motivated to commit fraud because it had an "urgent need of funding" **before** the class period, which prompted it to issue guidance "ensure the SPAC Merger would close in time."  Opp. 28.  But Plaintiffs' only case, *Tchatchou v. India Globalization Cap. Inc.,* 2021 WL 307415 (D. Md. Jan. 29, 2021), undermines this argument.  There, the court found that a motivation to raise capital raised an inference of scienter where the company was in "dire need for funds" **during the class period**.  *Id.* at *9.  Here, there is no dispute that the SPAC Merger closed in August 2021, before the beginning of the putative class period, and provided IronNet with substantial capital.  Moreover, as the AC admits, IronNet **decreased** its revenue guidance on August 10, 2021.  ¶ 46.  If Defendants' supposed motive was to "ensure the SPAC Merger would close," then why would IronNet decrease its revenue guidance?  Plaintiffs' theory is simply implausible and inconsistent with the facts.

Plaintiffs also speculate that "Defendants could not reveal the Guidance was groundless without a crisis of confidence from investors."  Opp. 28.  But an alleged motive to keep investors happy is no different than an alleged motive to maintain a stock price, a point on which Plaintiffs failed to meaningfully respond.  *Compare* Defs.' Br. at 27-28, *with* Opp. 29.

*Officer Departures*.  Plaintiffs do not dispute that the AC contains no allegations about what non-party Foster knew or whether what he knew contradicted the September 14, 2021 forecasts and that they purport to rely entirely on the timing of his departure.  *Compare* Defs.' Br. at 29, *with* Opp. 29.  That is patently insufficient.  *See Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 807 (E.D. Va. 2017); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005).  Plaintiffs contend the resignations of Messrs. Welch and Gerber announced in September 2022 are "probative," Opp. 29, but an officer's departure nine months after an alleged corrective disclosure does not support any inference of fraud.  *See Wilbush v. Ambac Fin. Grp., Inc.,* 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.,* 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016).

## V.     **The Court May Properly Consider Defendants' Exhibits**

In an attempt to distract from the AC's failure to plead the particularized facts required under the PSLRA, Plaintiffs complain Defendants seek "impermissible judicial notice of documents." Opp. 11.  Although Plaintiffs do not dispute the authenticity of any of Defendants' exhibits, all of which are publicly available, Plaintiffs take issue with 11 exhibits.[14]  Opp. 13 n.9.  As the Supreme Court has made clear, however, when ruling on a motion to dismiss, "courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.  Each of the exhibits Plaintiffs take issue with is properly considered under the incorporation by reference and/or judicial notice doctrines.

*Exhibits 12-13, 20.*  Although the AC extensively cites the September 20, 2021 Fireside Chat webcast (Ex. 12) and the December 15, 2021 earnings call (Ex. 20), *see* ¶¶ 8, 12, 37, 53, 59,

---

[14] Plaintiffs do not object to Exs. 2-4, 6-8, 10-12, 14-16, 18-20, all of which may be considered under the incorporation by reference and judicial notice doctrines.  *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 746 (4th Cir. 2021) (considering exhibits not objected to by plaintiff).

75, 76, 99, 121-26, Plaintiffs ask the Court not to consider the "entirety of" the transcripts.  Opp.

13, n.9.  That is not the law: "[T]he complaint quotes selectively from various reports . . . and

plaintiffs argue that we should not consider the reports in full.  That argument is erroneous. . . .

[W]e must examine the facts as a whole."  *Cozzarelli*, 549 F.3d at 625; *PEC*, 418 F.3d at 388 n.7

("Because the CAC relied on Mead's public testimony it is proper to consider the full text[.]").[15]

The AC quotes from and characterizes both the September 20, 2021 webcast, ¶¶ 8, 37, 99, and

December 15, 2021 earnings call, ¶¶ 53, 76, 121-26, including that the latter supposedly revealed

that "IronNet's large public sector deals quite predictably could not have contributed to FY22

Guidance" because most "were dependent on the NDAA."  ¶ 121.  They are thus integral to the

AC.  Indeed, in *Evolent*, this Court considered the entirety of the source that allegedly revealed the

"truth" as "integral to" the complaint.  2021 WL 1439680, at **10, 18.  The PSLRA requires that

Exhibit 13, a screenshot of the cautionary statement for the September 20, 2021 webcast,[16] be

considered in tandem with Exhibit 12: "on any motion to dismiss . . . the court *shall consider* any

statement cited in the complaint *and any cautionary statement accompanying the forward-looking

statement*[.]" 15 U.S.C. § 78u-5(e); *Yellen v. Hake,* 437 F. Supp. 2d 941, 963 (S.D. Iowa 2006)

("Congress has directed courts to consider all information and documents relevant to a

determination of whether a defendant has given adequate warnings for Safe Harbor protection.").

---

[15] *Khoja v. Orexigen Therap., Inc.*, 899 F.3d 988 (9th Cir. 2018) "did not eradicate the rule that alleged false statements must be analyzed in context" and "does not prevent a defendant from using the doctrines of judicial notice or incorporation by reference to create factual disputes with a plaintiff's *conclusory* allegations." *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020) (considering "transcript of Eventbrite's Q3 2018 Earnings Call"); *Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *3-5 (N.D. Cal. Jan. 27, 2020) (reviewing *Khoja* and considering earnings call transcripts containing alleged false statements or corrective disclosures or otherwise served as a "basis of plaintiffs' scienter or falsity allegations").

[16] Plaintiffs do not dispute Exhibit 13's authenticity.  *See Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (judicially noticing information on public website).

*Exhibit 3.*   The AC not only cites and characterizes IronNet's May 2021 Management Presentation (Ex. 3), but also provides a hyperlink to it.   ¶ 41.   It is thus incorporated by reference. It is also subject to judicial notice as a public record filed with the SEC.   *See Yates,* 744 F.3d at 881; *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *5 (E.D.N.C. Sept. 15, 2015).

*Exhibits. 1, 5, 17, 22-24, 26*.   Plaintiffs do not dispute, and instead embrace, what the U.S. government document exhibits (Exs. 1, 5, 17, 22-24, 26) show—*i.e.*, NDAA funding extends through September 30 of each year.   Opp. 7; *see also* Opp. 13 n.10 (relying on Exhibit 24). "[D]ocuments found on government websites" are "the proper subject of judicial notice." *Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.,* 501 F. Supp. 3d 735, 752 (N.D. Cal. 2020); *accord Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of statistics on Virginia Division of Legislative Services website).   "Pursuant to Federal Rule of Evidence 201, a court may judicially notice a fact that is not subject to reasonable dispute," *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 549–50 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*, 816 F. App'x 747 (4th Cir. 2020), and "government documents available from reliable sources on the Internet" are "generally considered 'not to be subject to reasonable dispute[.]'"[17] *L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 937-38 (C.D. Cal. 2011).

## VI.   Plaintiff's Section 20(a) and 20A Claims Should Be Dismissed

Plaintiffs do not dispute that there can be no Section 20(a) or 20A claim if there is no underlying Section 10(b) violation.   *Compare* Defs. Br. at 30, *with* Opp. 30 n.29.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

---

[17] Plaintiffs cannot seriously dispute this point; their opposition cites a number of U.S. government documents and news articles not referenced in the AC.   *See, e.g.*, Opp. 7-8 nn.2-5.

Dated: December 21, 2022

Respectfully submitted,

COOLEY LLP

By: /s/ *Robert T. Cahill*
    Robert T. Cahill (VSB 38562)

Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5656
Telephone:   (703) 456-8000
Facsimile:    (703) 456-8100
Email: rcahill@cooley.com

Aric H. Wu (*pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone:   (212) 479-6000
Facsimile:    (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Defendants IronNet, Inc., Keith
B. Alexander, William E. Welch, and James C.
Gerber*