IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| IN RE IRONNET, INC. SECURITIES LITIGATION | ) ) ) ) ) | Civil Action No. 1:22-cv-449 (RDA/JFA)<br><br>CLASS ACTION |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants IronNet, Inc., Keith B. Alexander, James C. Gerber, William E. Welch's ("Defendants") Motion to Dismiss ("Motion") (Dkt. 47) the Amended Class Action Complaint ("Amended Complaint") (Dkt. 46) brought by Lead Plaintiff James Shunk and Named Plaintiff Justin Gruetzmacher ("Plaintiffs") on behalf of themselves and all other similarly situated persons. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering Plaintiffs' Amended Complaint (Dkt. 46) and Defendants' Motion (Dkt. 47), together with Defendants' Memorandum in Support (Dkt. 48), Plaintiffs' Opposition (Dkt. 51), and Defendants' Reply (Dkt. 52), the Court DENIES Defendants' Motion.

## I. BACKGROUND

### A. Factual Background[1]

#### 1. IronNet and the Individual Defendants

IronNet is a cybersecurity software company headquartered in McLean, Virginia. Dkt. 46 ¶ 24. IronNet products are marketed as being able to detect cybersecurity threats in real-time. *Id.*

[1] For purposes of considering the instant Motion, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

¶¶ 29-31. The products share information through "Collective Defense," an interactive network through which customers can collaborate to address those threats. *Id.*

Defendant Keith Alexander, a retired four-star General of the United States Army, founded IronNet in 2014. *Id.* ¶ 25. Previously, he was the Director of the National Security Agency, Chief of the Central Security Service, and Commander of Cyber Command. *Id.* He serves as IronNet's CEO, President, and Chairman of the Board of Directors. *Id.* During the putative class period, Defendant William Welch served as Co-CEO of IronNet and Defendant James Gerber served as CFO of the company. *Id.* ¶¶ 26-27.

2. IronNet's Business Model

IronNet primarily generates revenue through multi-year subscriptions to its cybersecurity software. *Id.* ¶ 33. IronNet's private sector customers include energy, financial services, oil and gas, and global technology companies. *See* DX 6 (8/6/2021 Prospectus/Proxy) at 184-85, 189-90; DX 8 (8/10/2021 Press Release); DX 14 (9/22/2021 Form S-1) at 94.[2] IronNet's public sector customers include U.S. federal government departments and agencies, U.S. state agencies, and foreign governments. *See* DX 2 (5/14/2021 S-1) at 154; DX 4 (Transcript of 6/7/21 Virtual Analyst Day) at 20; DX 7 (8/6/2021 S-4) at 186, 189, 191; DX 14 at 76.

3. IronNet Announces its Plan to Become a Publicly Traded Company

On March 15, 2021, IronNet announced its plan to become a publicly traded company by October 2021 through a merger with LGL. Dkt. 46 ¶ 39. LGL is a special purpose acquisition

[2] The Court may consider documents subject to judicial notice, such as public SEC filings, articles, and press releases, without converting the instant Motion to one for summary judgment. *See Burt v. Maasberg*, No. CIV.A. ELH-12-0464, 2013 WL 1314160, at *10 (D. Md. Mar. 31, 2013) ("[F]acts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d).").

company, meaning a company formed to raise capital through an initial public offering for the purpose of acquiring or merging with an existing company. *Id.*

4. IronNet and LGL Disclose IronNet's Active Pursuit of Public Sector Customers

On May 14, 2021, LGL filed with the SEC a Registration Statement and Prospectus, which, in its description of IronNet's business, cautioned investors that

> IronNet's revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for its platform, particularly with respect to large organizations and government entities. Customers often view the subscription to its platform as a significant strategic decision and, as a result, frequently require considerable time to evaluate, test, and qualify its platform and solutions prior to entering into or expanding a relationship with it. Large enterprises and government entities in particular often undertake a significant evaluation process that further lengthens its sales cycle.

DX 2 at 44-45; *see also* DX 6 at 47 (same).

The May 14, 2021 Registration Statement also disclosed that while "IronNet [had] spent the first five years of its life building foundational customer relationships in the commercial sector," it was "now actively investing in the acquisition of customers in the U.S. federal government vertical," had "registered with the Department of Homeland Security Continuous Diagnostics & Monitoring program approved products list to provide federal agencies with innovative securities tools," had its platform "deployed in the AWS GovCloud," and was "pursuing opportunities in the civilian, defense, and intelligence sectors." DX 2 at 173; *see also* DX 6 at 186 (same).

In a June 1, 2021 filing with the SEC, LGL attached a May 2021 IronNet Management Presentation, which included a financial plan projecting $54.2 million in revenue and $68 million

in annual recurring revenue ("ARR")[3] for the fiscal year ending January 31, 2022 ("FY22"). DX 3 (6/1/2021 Management Presentation) at 23-24.[4] While noting that 81% of IronNet's revenue was currently from the private sector, *id.* at 7, the presentation identified factors providing "significant momentum" for the adoption of Collective Defense by the public sector, *id.* at 11. In a June 7, 2021 Virtual Analyst Day, Dkt. 46 ¶ 42, Gerber similarly noted that "[o]ver 80% of our product revenue is from the private sector," but that "the government market is largely untapped and we're ramping up rapidly there." DX 4 at 28.

5. IronNet Reduces its Revenue Forecast

In an August 10, 2021 press release, IronNet reduced its revenue forecast for FY22 from $54.2 million to $43-45 million due to shifts in the anticipated closing of several large new customer contracts and their impact on the timing of revenue recognition. DX 8. IronNet also increased its ARR forecast for FY22 from $68 million to $75 million due to large contracts it expected to close in the third quarter of its FY22. *Id.* IronNet "cautioned" investors "not to rely on the forecast . . . as the forecast may be materially different than actual results." *Id.*

LGL's August 6, 2021 Prospectus provided notice of an August 26, 2021 special meeting of LGL stockholders to vote on the proposed merger with IronNet. DX 6. On August 26, 2021, LGL stockholders voted to approve the proposed merger, and on August 27, IronNet became a publicly traded company on the New York Stock Exchange. Dkt. 46 ¶ 48. "Certain IronNet

[3] ARR is the annual value of all existing customer contracts, assuming the contracts are renewed on existing terms. DX 6 at 223.

[4] Plaintiffs ask the Court not to consider Defendants' Exhibit 3. Dkt. 51 at 13 n.9. However, the Amended Complaint not only cites and characterizes IronNet's May 2021 Management Presentation, but also provides a hyperlink to it. Dkt. 46 ¶ 41. It is thus incorporated by reference, and the Court may properly consider it on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

stockholders" were made "subject to a 180-day lockup period for all shares . . . held by such persons, subject to customary carve-outs." DX 7 at 112. General Alexander, who was issued 11,370,495 shares in connection with the merger, was one of the individuals subject to the 180-day lockup with a 5% carveout that allowed him to sell up to 568,525 of his 11,370,495 shares during the lockup period. DX 10 (9/7/21 Schedule 13D).

6. IronNet Maintains its Revenue and ARR Forecasts

On September 14, 2021, the first day of the putative class period, IronNet issued a press release announcing its second quarter and first half FY22 financial results. Dkt. 46 ¶ 55. While revenue for the quarter was "$6.1 million compared to $7.9 million in the same quarter last year," "[s]ubscription revenue grew to $5.8 million from $5.3 million in the same quarter last year" and ARR was "$24.1 million compared to $19.5 million at the end of the same quarter last year." DX 11. The press release also provided revenue and ARR forecasts for FY22 that were the same as the financial guidance provided in its August 10, 2021 press release: $43-45 million in revenue and $75 million in ARR. *Id.*

In the press release, Welch noted that "[n]ew customer momentum so far in the second half of our fiscal year is strong and already includes an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group," and Gerber asserted that the Company had been "invited into larger deployments that shifted the anticipated closing of several large new customer contracts into the third quarter." *Id.*

The press release warned that "[y]ou should carefully consider the . . . risks and uncertainties described under the heading 'Risk Factors' in LGL's [August 6, 2021 Prospectus]." Dkt. 46 ¶ 96. The August 6, 2021 Prospectus that the press release referenced warned that there were numerous risks associated with IronNet's pursuit of additional business from public sector

customers, including that "[d]emand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles," and that "government demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform." *Id.*; *see also* DX 6 (8/6/21 Prospectus/Proxy) at 49.

Several days later, on September 20, 2021, Defendants participated in a fireside chat with Wells Fargo, at which they again reiterated that IronNet was on track to achieve its guidance. Dkt. 46 ¶ 8. Defendant Gerber stated that IronNet was "pleased" that a set of "large transactions" were progressing and would finalize by the end of the fiscal year. *Id.* A slide presented at the beginning of the fireside chat contained the same cautionary language found in the press release. DX 13.[5]

7. General Alexander's Sale of IronNet Stock

On September 17, 2021, General Alexander entered into a Rule 10b5-1 trading plan for the shares subject to the 5% carveout from the 180-day lockup period. *Id.* ¶ 137. Under the trading plan, if IronNet stock reached a certain price, a pre-determined number of General Alexander's shares would automatically be sold. *See* DX 18 (Form 4s). The Rule 10b5-1 plan was triggered in October and November 2021, collectively resulting in the sale of 477,625 shares, Dkt. 46 ¶¶ 132-39, or approximately 4% of General Alexander's total holdings in IronNet stock, DX 18 at 1.

8. IronNet Reduces its Revenue and ARR Forecasts

On December 15, 2021, the last day of the putative class period, IronNet issued a press release announcing its third quarter FY22 financial results. Dkt. 46 ¶ 120. IronNet reduced its

[5] Plaintiffs urge the Court not to consider Defendants' Exhibit 13, which is a screenshot of a cautionary statement presented at the fireside chat. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires just the oppositive, however: "on any motion to dismiss . . . the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement[.]" 15 U.S.C. § 78u-5(e).

FY22 guidance to $26 million in revenue and $30 million in ARR. *Id.* The press release stated that the company had expected to finalize in the second half of FY22 "what [it] assessed as late-stage multi-million dollar strategic customer opportunities, the majority of which are in the U.S. public sector," but that these opportunities had yet to be finalized and were now unlikely to be finalized in FY22 "primarily due to government delays in getting funding through to federal budgets." *Id.*

During an earnings call that day, an analyst asked about "these budgeting issues that you're seeing." DX 20 at 5.[6] General Alexander explained that "[w]e've seen a slowdown in public sector, especially in the ones we're dealing with, based on the congressional lack of movement on the [National Defense Authorization Act ("NDAA")]." *Id.*

The NDAA is the National Defense Authorization Act. DX 1.[7] The National Defense Authorization Act authorizes funding for U.S. federal government departments and agencies through September 30 of each year, DX 1, 22, 26, and the President and Congress may pass a

[6] Plaintiffs ask the Court not to consider "the entirety" of the December 15, 2021 earnings call transcript, Dkt. 51 at 13 n.9, even though it was referenced in the Amended Complaint, Dkt. 46 ¶¶ 53, 76, 121-26. The law is clear, however, that because the Amended Complaint quotes excerpts from the earnings call, it is appropriate for the Court to consider the entire transcript on a motion to dismiss. *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) ("[T]he complaint quotes selectively from various reports . . . and plaintiffs argue that we should not consider the reports in full. That argument is erroneous . . . . [W]e must examine the facts as a whole."); *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 388 n.7 (4th Cir. 2005) ("Because the CAC relied on Mead's public testimony it is proper to consider the full text[.]"). Accordingly, the Court denies Plaintiffs' request.

[7] Plaintiffs also argue that the Court should not take judicial notice of Defendants' Exhibits 1, 5, 17, 22, 22, 23, 24, and 26. However, these exhibits are all U.S. government documents, and "documents found on government websites" are "the proper subject of judicial notice." *Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 752 (N.D. Cal. 2020); *see also Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of statistics on Virginia Division of Legislative Services website). As such, this Court takes judicial notice of these documents.

continuing resolution ("CR") to provide temporary funding to federal government departments and agencies past September 30. *See* DX 24 at 2; DX 26. On December 27, 2020, Congress had approved $1.6 trillion in government spending through September 30, 2021, with $688.06 billion reserved for the DoD. *See* DX 5, 23. And on September 30, 2021, President Biden signed CRs extending funding for U.S. federal government departments and agencies up until December 3, 2021. DX 17. Subsequently, on December 15, 2021, Congress passed an NDAA to provide DoD funding through September 30, 2022. Dkt. 46 ¶ 52.

On the December 15, 2021 earnings call, General Alexander noted that the "passage of the NDAA . . . today means that we can start to see some of these [customer opportunities] move forward" in coming "months." DX 20 at 5-6. General Alexander explained, however, that there would be a process before funds from the NDAA passed by Congress on December 15, 2021 would become available: "[I]t'll go to the President, he will sign it. It then goes to OMB, the Office of Management and Budget. They take that, and they push that out to the Defense Department which then breaks it down and pushes it out to all the services and department agencies" that can apply the money to contracts once "they know now what their full authorization levels are." *Id.* at 5.

Gerber explained on the earnings call that, given the difficulty predicting when larger strategic transactions would close, IronNet had decided to "reset" its guidance approach by removing all large strategic transactions, whether with DoD, other U.S. federal government departments or agencies, state governments, foreign governments, or private sector clients, from its revenue forecasts and, going forward, would only include such transactions after they close:

> I think you were just asking about our guidance for this year of the $26 million for revenue. As we've noted, what we've significantly done here is to completely remove all of these larger strategic transactions that are still out there but difficult to predict. So, we've reset the guidance at this point to not include them. Our

> guidance from August had included them. As so, we're setting ourselves up here so that we can be sure that as they come in and add materially to our number, that we get that information out. We will update our guidance accordingly.

DX 20 at 5; *see also id.* at 3 (General Alexander's statement that, "[g]iven the delayed timing, we have removed these strategic opportunities from our fiscal year ARR outlook").

General Alexander then went on to provide examples of four different types of strategic customer opportunities IronNet had expected to finalize in the second half of FY22, but that remained pending and were removed from the Company's updated guidance on December 15, 2021 for FY22: (1) an "ARR opportunity with a branch of the military that [wa]s held up as part of the federal funding delays playing out in Washington"; (2) a "defense industrial base customer whose contract with us [wa]s making its way more slowly through government procurement than we anticipated"; (3) "several deals with states that are gaining momentum as the American Rescue Plan funds are arriving and being approved by state legislatures;" and (4) "an international government that was working through political turmoil and the impacts of the pandemic." Dkt. 46 ¶ 126. Later that same day, IronNet announced that Chief Revenue Officer ("CRO") Sean Foster was leaving the Company. *Id.* ¶ 160.

B. Procedural Background

On April 22, 2022, Initial Named Plaintiff Adam Grad filed a Complaint against Defendants. Dkt. 1. The Court appointed James Shunk as Lead Plaintiff on July 15, 2022. Dkt. 41. On August 29, 2022, Lead Plaintiff James Shunk and Named Plaintiff Justin Gruetzmacher ("Plaintiffs") filed the Amended Complaint. Dkt. 46. Subsequently, on October 26, 2022, Defendants filed a Motion to Dismiss the Amended Complaint, Dkt. 47, along with a Memorandum in Support thereof, Dkt. 48. Plaintiffs filed an Opposition on

November 30, 2022, Dkt. 51, and Defendants filed a Reply on December 21, 2022, Dkt. 52.

II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of [his] claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017)

(citing *Goldfarb*, 791 F.3d at 508). However the Court may also consider, without converting the motion into one for summary judgment, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record . . . items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." 5B Wright & Miller, *Federal Practice & Proc.* § 1357, at 375-76; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (citing *id.* in the context of a securities fraud case brought under § 10(b)).

When a plaintiff alleges a claim under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), that claim faces a heightened pleading standard imposed by Congress and Federal Rule of Civil Procedure 9. "To survive a motion to dismiss, private securities fraud plaintiffs must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009). In making a private securities fraud claim, a plaintiff must allege that "(1) the defendant[s] made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff[s] justifiably relied (4) that proximately caused the plaintiff's damages." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994).

As to the first element, in addition to requiring that the alleged facts meet the plausibility standard to survive a motion to dismiss, the PSLRA demands that private securities fraud plaintiffs allege: "(1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, 'with particularity *all facts* on which that belief is formed.'" *Teachers' Retirement Sys. of LA v. Hunter*, 477 F.3d 162, 173 (4th Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)). Ultimately, the Court "need

only determine . . . whether [the] complaint alleges *sufficient facts* upon which a *reasonable belief* can be formed that [the defendants'] representations or omissions were misleading." *Id.* As to the second element, the PSLRA requires the plaintiff to plead sufficient facts to raise a "strong inference of scienter." *Id.* (citing § 78u-4(b)).

Courts also analyze the elements of a securities fraud claim under the traditional pleading rules cabined in Federal Rules of Civil Procedure 8 and 9. These "fraud-based claims must satisfy Rule 9(b)'s heightened pleading standard." *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (citing *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455-56 (4th Cir. 2013)). "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake.'" *Id*. (quoting Fed. R. Civ. P. 9(b)). This standard contemplates that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)). Further, when a plaintiff fails to plead fraud with particularity under Rule 9(b)'s pleading requirements, the omission "is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savanna River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999).

## III. ANALYSIS

The gravamen of Plaintiffs' Amended Complaint is that Defendants knew, but concealed, that the FY22 revenue and ARR forecasts they provided in September 2021 were "materially based" on "large and unprecedented multi-million dollar public sector deals" that had "no realistic chance of closing in FY22" because they "were subject to a massive federal defense budget (the . . . []NDAA[]) that typically only passes in December" of each year. Dkt. 46 ¶ 1. Plaintiffs also

claim that General Alexander's stock sales in October and November 2021 were made "with absolute clarity into the fact that the NDAA would not be approved in time to contribute to IronNet's FY22 revenue or ARR." *Id.* ¶ 134. Plaintiffs characterize General Alexander's stock sales as a fraud that resulted in him "pocketing over $5 million when selling 85% of his available IronNet shares." *Id.* ¶ 86.

Based on these allegations, Lead Plaintiff Shunk and Named Plaintiff Gruetzmacher bring claims on behalf of a putative class of those who purchased IronNet securities between September 14, 2021 and December 15, 2021. Plaintiffs assert a claim under Section 10(b) of the Exchange Act and Rule 10b-5 against IronNet and the Individual Defendants. *Id.* ¶¶ 185-94. Plaintiffs also bring a Section 20(a) control person claim against the Individual Defendants, *id.* ¶¶ 195-98, and a Section 20A insider trading claim against General Alexander on behalf of all investors who purchased IronNet stock contemporaneously with his stock sales in October and November 2021, *id.* ¶¶ 199-208. Defendants seek dismissal of all three counts of the Complaint. The Court addresses Plaintiffs' Section 10(b) and Rule 10b-5 claim before evaluating their Section 20(a) and Section 20A claims.

A. The Section 10(b) and Rule 10b-5 Claim

Defendants move the Court to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claim because the statements Plaintiffs challenge either are protected under the PSLRA's safe harbor provision for forward-looking statements or are otherwise not false or misleading. Dkt. 48 at 16-25. In the alternative, Defendants ask the Court to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claim because Plaintiffs fail to plead particularized facts giving rise to a strong inference of scienter on the part of Defendants. *Id.* at 25-29. The Court considers whether any of the statements Plaintiffs challenge are actionable before turning to the scienter requirement.

1. Whether Plaintiffs Pleaded any Actionable Misrepresentation or Omission

a. The September 2021 Revenue and ARR Forecasts

Plaintiffs claim that Defendants began making misleading statements and omissions on September 14, 2021, when they reiterated revenue guidance of $43-45 million and ARR guidance of $75 million for FY22 in a September 14, 2021 press release, and again, at the September 20, 2021 fireside chat. Dkt. 46 ¶¶ 6, 8. Plaintiffs assert that Defendants made these statements despite having knowledge that the deals the guidance was based on were subject to serious budget and authorization risks. Dkt. 51 at 1. Specifically, Plaintiffs aver that Defendants knew that the '21 NDAA was due to expire on September 30, 2021, that the passage of a CR was not a guarantee and the scope of any potential CR was unpredictable, and that the '22 NDAA could not fund deals in FY22. *Id.* at 13. In response, Defendants contend that their September revenue and ARR forecasts are insulated by two separate prongs of the PSLRA's safe harbor for forward-looking statements. Dkt. 48 at 16.

The PSLRA's safe harbor provision provides that a defendant "shall not be liable" for any forward-looking statement that is either (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (2) "immaterial;" or (3) not "made with actual knowledge by [the speaker] that the statement was false or misleading." 15 U.S.C. § 78u-5(c). "The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *TransEnterix Inv'r Grp. v. TransEnterix*, Inc., 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017) (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766

(2d Cir. 2010)). Here, Defendants argue that the September 2021 forecasts fall under the first and third prongs of the PSLRA's safe harbor and are thus not actionable. Dkt. 48 at 16.

As an initial matter, the September 2021 revenue and ARR forecasts fit squarely within the PSLRA's definition of forward-looking statements, as they addressed a "projection of revenues" and "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A) and (C). With respect to the first prong of the safe harbor, the Court finds that the September 2021 forecasts were also expressly identified as forward-looking. *See* DX 11 ("This [September 14, 2021] press release includes 'forward-looking statements' within the meaning of the 'safe harbor' provisions [of the PSLRA, including] statements regarding IronNet's future outlook and revenue guidance for fiscal 2022 and ARR growth in the third and fourth fiscal quarters . . . ."); DX 13 ("This [September 20, 2021 fireside chat] presentation contains forward-looking statements within the meaning of the [PSLRA, including] expectations regarding future revenue [and] annual recurring revenue.").

Having established that the challenged September 2021 forecasts were identified as forward-looking statements, the Court next considers whether those statements were accompanied by meaningful cautionary language. Defendants maintain that the following language in the August 6, 2021 Prospectus (which the September 14, 2021 press release and a slide of the September 20, 2021 fireside chat presentation incorporated by reference) effectively warned investors of the relevant risks:

> Demand from government organizations is often unpredictable, subject to budgetary uncertainty and typically involves long sales cycles.
>
> [G]overnment demand and payment for IronNet's platform may be impacted by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for its platform.

Dkt. 48 (citing DX 6 at 49).[8]

Plaintiffs, however, counter that these generic warnings about government "budgetary cycles," "funding authorizations," and possible "delays" were not *meaningful* in that they omitted the reality that the '21 NDAA was set to expire just days later on September 30, 2021; that a new CR, even if approved by Congress and the President, may not be able to fund any new projects;[9] and that the '22 NDAA was unlikely to be enacted in time to fund any deals in FY22. Dkt. 51 at 13. In support of their position, Plaintiffs invoke the principle that "warnings or disclosures in the securities context that frame risks as merely hypothetical may be misleading when they resemble the Grand Canyon metaphor, [*i.e.*], one cannot tell a hiker that a mere ditch lies up ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon." *Id.* at 21 (quoting *City of Miami Fire Fighters' & Police Officers' Ret. Trust v. CVS Health Corp.*, 46 F.4th 22, 35 (1st Cir. 2021)).

The Court finds the "Grand Canyon metaphor" to be particularly salient here. While Defendants warned investors about risks inherent to the government contracting process, they did so while contemporaneously concealing that those serious risks were dangerously close to materializing. As such, Defendants' warnings about potential risks do not rise to the level of *meaningful* cautionary language. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) (noting that the PSLRA's safe harbor provision does not insulate omissions of material information).

---

[8] Plaintiffs also challenge this cautionary language itself as a misleading statement. The Court agrees that the cautionary language is actionable as a misleading statement because, as explained *infra*, the language omits pertinent information about risks that were dangerously close to materializing.

[9] Indeed, Defendants do not claim that the CR enacted on September 30, 2021 funded any of IronNet's deals.

Turning to the third prong of the safe harbor, the Court considers whether Defendants' September 2021 forecasts were made with "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(iii). The PSLRA requires Plaintiffs to plead particularized facts creating a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong[,]' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

In the instant case, Defendants argue that they did not know that their September 2021 forecasts were false or misleading because significant funds were already authorized for DOD spending from the previous year's NDAA and the deals underlying the September 2021 forecasts were not limited to prospective deals with the DoD that required NDAA funding. Dkt. 48 at 3, 15. In response, Plaintiffs direct the Court's attention to Defendants' revamped December 15, 2021 guidance. Dkt. 51 at 24. According to Plaintiffs, the December 15, 2021 press release indicates that Defendants' FY22 outlook was primarily based on public sector deals that had stagnated due to "government delays in getting funding through to federal budgets." Dkt. 46 ¶ 74.

At this early stage of the proceedings, and even with the heightened pleading standards of Rule 9(b) and the PSLRA in mind, the Court finds that Defendants' December 15, 2021 press release sufficiently establishes an inference of actual knowledge on their part. Specifically, the press release can be understood to indicate that Defendants knew that a significant portion of the deals undergirding the September 2021 guidance hinged on the DoD obtaining additional funding through a forthcoming NDAA, which they knew would only pass in December of that year. Though perhaps not *impossible*, Plaintiffs adequately allege that it was highly unlikely for the '22 NDAA to fund any new deals in FY22, given that "the passage of the NDAA was only the beginning of a very protracted process to deploy approved funds." *Id.* ¶ 1. Accordingly, the Court

concludes that Defendants' September 2021 forecasts are not shielded by the third prong of the PSLRA's safe harbor and are thus actionable.

b. September 2021 Statements Regarding Customer Development

Next, Plaintiffs challenge statements from IronNet's September 14, 2021 press release and September 20, 2021 Fireside Chat (and the August 6, 2021 Prospectus incorporated by reference by each therein), September 20 and 28, 2021 registration statements, and September 30, 2021 Prospectus about the current status and future prospects of customer acquisitions and negotiations. *Id.* ¶¶ 92, 94, 96, 99, 106, 112, 118. In particular, Plaintiffs argue that Defendants hid that their larger deployments and new contracts related to deals subject to materialized and undisclosed risks that divorced the Guidance from reality, while repeatedly stressing that IronNet's dependence on the public sector was insignificant. Dkt. 51 (citing Dkt. 46 ¶¶ 96, 106, 112, 118). Defendants, however, contend that Plaintiffs do not plead any facts contradicting the accuracy of statements of historical fact such as "[i]n the first half of fiscal 2022, IronNet was invited into larger deployments"; "[n]ew customer momentum" already included "an authorization to proceed with the first installment of a deployment in a significant defense industrial base customer group"; and "state and local governmental agencies have not accounted for . . . a significant portion of [IronNet's] revenue." Dkt. 48 at 22 (quoting Dkt. 46 ¶¶ 92, 94, 96). Defendants further assert that the challenged statements that "[n]ew customer momentum so far in the second half of our fiscal year is strong"; and that there was "momentum in the marketplace" constitute statements of corporate optimism and are generally unactionable. *Id.* at 22.

The Court agrees with Defendants' analytical framework. First, Plaintiffs do not allege any facts indicating that the first category of statements were false when made. Second, Defendants' statements referencing growing customer momentum are quintessential examples of

puffery upon which a reasonable investor would not rely. *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) (holding that statements touting company's "healthy growth" and "exceptionally strong finances" were non-actionable as false statements). The Court therefore finds that these statements cannot form the basis of Plaintiffs' Section 10(b) and Rule 10b-5 claim.

c. September 2021 Statements Regarding Expected Gross Margins

Finally, Plaintiffs challenge Defendants' September 22 and 28, 2021 registration statements that "w[e] expect that gross margins for the rest of [FY22] to improve slightly to achieve our full year guidance." Dkt. 46 ¶¶ 108, 114. Plaintiffs argue that these statements were misleading because gross margins "were not the real impediment to [Defendants] achieving" their guidance nor could an improvement in margins meet the guidance. *Id.* ¶ 103. Defendants counter that Plaintiffs conflate and confuse IronNet's revenue and ARR forecasts with its May and August 2021 gross margins projections of 74% for FY22. Dkt. 48 at 23. Defendants assert that the "full year guidance" they were referring to was IronNet's projected gross margins of 74% for FY22 and that Plaintiffs do not plead facts showing that IronNet could not achieve that number. *Id.* The Court, however, finds that whether the statement at issue related to the September 2021 revenue and ARR forecasts or the 2021 gross margins projections is a question of fact not suitable for resolution on a motion to dismiss. *See Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts.").

Defendants alternatively argue that their statements regarding projected gross margins are protected under the first and third prongs of the PSLRA's safe harbor. With respect to the first prong, Defendants assert that the statements were expressly identified as forward-looking and contained the cautionary language that "we cannot assure you that the forward-looking statements

in this prospectus will prove to be accurate" and "you should not rely on these forward-looking statements as predictions of future events." Dkt. 48 (quoting DX 14 at iii; DX 15 at iii (same); DX 16 (September 30, 2021 Prospectus) at iii (same)). But if Defendants were referring to an increase in gross margins helping them achieve their revenue and ARR forecasts (which the Court assumes at this stage of the proceedings), the cautionary language is not meaningful in that it fails to specifically mention that serious risks that could undermine the guidance were just days away from materializing. And regarding the third prong of the safe harbor, Plaintiffs sufficiently allege that Defendants knew that the gross margins "were not the real impediment to IronNet achieving" its guidance, Dkt. 46 ¶ 103, given their understanding of the government's budgetary cycles, *id.* ¶ 147. The Court thus finds Defendants' statements regarding projected gross margins to be actionable at this dispositional stage.

2. Whether Plaintiffs Pleaded Particularized Facts Giving Rise to a Strong Inference of Scienter

Having found that at least some of the statements Plaintiffs challenge are actionable, the Court next considers whether Plaintiffs sufficiently allege a strong inference of scienter. The PSLRA acts "[a]s a check against abusive litigation by private parties" and requires that a plaintiff in a private securities fraud action, for each act alleged, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" or "scienter." *Maguire*, 876 F.3d at 546 (quoting 15 U.S.C. § 78u-4(b)(2)). "[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Courts in this circuit draw a "strong inference" from allegations "that a defendant benefited in a concrete and personal way from the fraud . . . [or] knew facts or had access to information suggesting his public statements were not accurate . . . ." *Carlucci*, 907 F. Supp. 2d at 729 (quoting *In re IBM Corp. Sec. Litig.*, 163 F. 3d 102, 107 (2d Cir. 1998)). In

determining whether Plaintiffs have adequately pleaded scienter, this Court assesses "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "Proof of scienter need not be direct, but may be inferred from circumstantial evidence." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).

And importantly, "an inference of scienter can only be strong . . . when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). "To survive a motion to dismiss in a § 10(b) complaint, 'the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.'" *Maguire*, 876 F.3d at 547 (quoting *Tellabs*, 551 U.S. at 324); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014) ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as an opposing innocent inference." (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009))). Still, an inference of scienter need only be "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 322-23.

In the instant case, Plaintiffs ask this Court to take a holistic view of their allegations in finding that they have adequately pleaded scienter. Dkt. 51 at 30. Plaintiffs reiterate their theory that, at the time that the September 14, 2021 press release was issued, Defendants knew of the urgent risks afflicting many of the deals underlying the guidance—they knew that the '22 NDAA could not contribute revenue to FY22, that the '21 NDAA would expire just days into the class period, and that the passage of a CR was not a guarantee and that the scope of any potential CR

was unpredictable. *Id.* at 30. Additionally, Plaintiffs again construe the statement in IronNet's December 15, 2021 press release that "[w]e had previously expected to finalize these opportunities in the second half of the fiscal year, however they remain pending primarily due to government delays in getting funding through to federal budgets" as an admission that the September 2021 guidance was based on deals Defendants knew could only be funded by the '22 NDAA and thus could not be finalized by the end of FY22. *Id.* at 24. Plaintiffs also highlight the fact that General Alexander sold 85% of his available stock shortly after IronNet announced its September 2021 guidance. *Id.* at 25.[10]

In response, Defendants once again contend that Plaintiffs' theory of fraud entirely ignores that, at the time the September 2021 forecasts were issued, funds were already authorized for spending from a then-existing NDAA. Dkt. 48 at 26. Defendants also stress that General Alexander did not sell 85% of his *total* IronNet stock holdings. *Id.* at 26-27. Rather, he merely sold under 5% of his total shares pursuant to a non-discretionary Rule 10b5-1 trading plan, and according to Defendants, such a low percentage does not come close to raising an inference of scienter. *Id.* at 27. Lastly, Defendants maintain that General Alexander's stock sales were innocent because they were made pursuant to a non-discretionary trading plan, meaning that he did not have discretion over when to execute trades. *Id.*

---

[10] Plaintiffs further argue that the suspicious timing of Foster's resignation on the same day that IronNet revamped its guidance supports an inference that he, as well as Defendants, knew that the guidance was divorced from reality. Dkt. 51 at 29. But beyond the timing of Foster's departure and the fact that, as CRO, he was aware of IronNet's ARR and revenue forecasts, Plaintiffs provide no other allegations showing that his departure had anything to do with the company's decision "to come clean about its [g]uidance." Dkt. 46 ¶ 70, 135. Thus, the Court finds that the timing of Foster's resignation does not support an inference of scienter. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (no inference of scienter based on officer resignations that were "coterminous" with alleged corrective disclosures because plaintiffs "alleged no facts linking the resignation of [the officer defendants] to the accounting improprieties at [the company]").

The Court finds that Plaintiffs' allegations, taken collectively, raise a strong inference that Defendants had actual knowledge that their September 2021 revenue and ARR forecasts lacked a reasonable basis. Defendants' argument that they believed the September 2021 guidance was realistic due to the plethora of funds available from the '21 NDAA is undermined by their own concession in the December 15, 2021 press release that many of the deals that the guidance was based on hinged on future government funding. Furthermore, Plaintiffs sufficiently allege that, given General Alexander's "knowledge of the inner workings of the government" and his "access to key decisionmakers within . . . government agencies," he and his company understood that any deals funded by the December 2022 NDAA were unlikely to close by January 31, 2022. Dkt. 46 ¶¶ 147-48 (inner quotation marks omitted); *see also* DX 20 (General Alexander's statement that, after the '22 NDAA passed on December 15, 2021, some deals may start to "move forward" in coming "*months*" (emphasis added)).

This inference of actual knowledge on the part of Defendants is further bolstered by Plaintiffs' allegations regarding General Alexander's stock sales. Insider trading allegations can support a strong inference of motivation to mislead investors "if the timing and amount of a defendant's trading were unusual or suspicious." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 610 (4th Cir. 2021); *see also In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620, 642 (E.D. Va. 2000) (insider trades support scienter where "unusual in [] timing or amount"). Here, Plaintiffs sufficiently allege that General Alexander sold a significant percentage of his available stock, amounting to $5.1 million, at suspicious times when IronNet's stock price was artificially inflated. Dkt. 46 ¶ 136. Specifically, General Alexander began selling his IronNet stock on October 18, 2021, shortly after IronNet reaffirmed its guidance on September 30, 2021, and made his final sale, which alone netted him almost a quarter million dollars, just weeks before

IronNet was forced to reduce its guidance. *Id.* ¶ 136. Defendants emphasize that General Alexander sold less than 5% of his total stock in IronNet—a percentage that they argue is much too low to support an inference of scienter. Dkt. 48 at 27 (citing *Cozzarelli*, 549 F.3d at 628 (sales of "13%, 12%, and 3% of [the directors'] holdings, respectively" are "modest to *de minimis*" and do not support an inference of scienter); *KBC*, 19 F.4th at 611 (sales of 17% of holdings are insufficient to raise an inference of scienter)). However, Defendants do not cite any authority in support of their contention that shares that General Alexander could not sell, even if he tried, should be relevant to the inquiry. Moreover, while Defendants highlight that General Alexander's stock sales were non-discretionary, the fact that stock sales are made pursuant to a non-discretionary trading plan does not "immunize [a defendant] from suspicion." *Yates*, 744 F.3d at 891. That is especially true where, like here, a defendant entered into such a trading plan just days into the class period. *Id.* ("[The defendant's] Rule 10b5-1 plan does less to shield him from suspicion because he instituted the plan . . . after the start of the class period.").

In sum, Plaintiffs' allegations, taken together, support an inference of scienter that is at least as strong as an innocent inference. Accordingly, this Court will allow Plaintiffs' Section 10(b) and Rule 10b-5 Claim to proceed beyond the motion to dismiss stage.

B. The Section 20(a) and Section 20A Claims

The Court next turns to Plaintiffs' Section 20(a) and Section 20A claims. A control person claim under Section 20(a) and an insider trading claim under Section 20A both require a primary violation of Section 10(b). *See Cozzarelli*, 549 F.3d at 628 ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of their Section 10(b) and Rule 10b-5 claims . . . ."); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 677 (D.S.C. 2016) ("Section 20(a) imposes secondary liability, jointly and severally, on any person who "controls" the primary

violator of the Exchange Act."). Here, Defendants assert that because Plaintiffs have not sufficiently stated a Section 10(b) claim, their Section 20(a) and Section 20A claims must also fail. However, because this Court holds that Plaintiffs have adequately pleaded a primary violation of Section 10(b), dismissal of the Section 20(a) and Section 20A claims is not appropriate here.

IV. CONCLUSION

For the foregoing reasons, Defendants' Motion (Dkt. 47) is DENIED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

/s/

Rossie D. Alston, Jr.
United States District Judge

Alexandria, Virginia
August 9, 2023